UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

RICHARD SAPIENZA, ET AL.              CIVIL ACTION NO. 16-CV-01701

VERSUS                                UNASSIGNED DISTRICT JUDGE

DAVID O. TRAHAN, ET AL.               MAGISTRATE JUDGE HANNA

## PROPOSED FINDINGS OF FACT AND RECOMMENDATIONS

Currently pending before the Court is the plaintiffs' Motion for Preliminary Injunction (Rec. Doc. 61). The motion was referred to the undersigned to conduct an evidentiary hearing, and to submit proposed findings of fact and recommendations (Rec. Doc. 53). For the following reasons, it is recommended that the Motion for Preliminary Injunction be denied.

Rule 52(a)(2) mandates that the district court issue findings of fact and conclusions of law when it grants, or refuses to grant, an injunction. Further, Rule 65(d)(1) requires the district court to set forth in specific terms its reasons for issuing an injunction, describing in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required. *Landmark Land Co. c. Office of Thrift Supervision*, 990 F.2d 807, 811 (5th Cir. 1993).

After due consideration of the stipulations of the parties, the evidence presented at the evidentiary hearing, and having had the opportunity to assess the demeanor of the witnesses, this Court hereby makes the following proposed findings

of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

## PROPOSED FINDINGS OF FACT

In October 2015, Richard Sapienza ("Sapienza") was a consultant for EnerSciences Holdings, LLC, ("EnerSciences") a Texas limited liability company that was partially owned by Ben Davis ("Davis") and David Trahan ("Trahan"). At the time, Sapienza was assisting EnterSciences's research lab in developing a low temperature gel breaker for Chem Rock, a limited liability company owned by Wayne Cutrer ("Cutrer") who is also a named defendant. EnerSciences was a research and development company that relied on a separate entity to sell their products. When EnerSciences announced that it was shutting down, Trahan, Davis, and Sapienza wanted to keep EnerSciences's research team together and replicate their business model. This consisted of creating a new entity called, Advanced Applied Research, LLC ("AAR"), for the research and development of chemical technologies and processes that would be owned by Trahan, Davis, and Sapienza. However, like EnerSciences's previous business model they did not intend for their new entity to sell or manufacture products. Instead, they intended to rely on a separate entity to sell

and manufacture AAR's chemical technologies and processes. Rapid Specialty Products ("Rapid Specialty") was intended to fufill this duty.

Rapid Specialty was a Texas limited liability company, whose sole member and manager was Novastar Holdings, LLC, a Louisiana limited liability company whose members were Trahan and Davis. In October of 2015, EnerSciences shut down and their research team started to work for Rapid Specialty, with the intent to work for AAR once the company was formed. Two members of this research team, Dr. Madrid and Ms. Hazra, testified that they were aware that they would work for AAR when it was formed, but they were under the impression that AAR would not be formed until January 2016. Therefore, Dr. Madrid and Ms. Hazra continued their research and development of certain technologies and processes while being paid by Rapid Specialty.

Even though Rapid Specialty continued to pay AAR's intended research team until January 2016, AAR, a Louisiana limited liability company, was officially formed on October 29, 2015. AAR does not have an operating agreement. Trahan and Sapienza testified that the intended members of AAR were Tarrytown Ventures, LP, with Davis as it sole member, Cypress Technlogies, LLC, with Trahan as its sole member and Visibly Green, LLC, with Sapienza as its sole member. However, the Articles of Organization that were filed with the Secretary of State do not identify

-3-

AAR's members. When Trahan received notice that the members were not listed in the Articles of Organization, he filed a Notice of Change, which identifies AAR's members as Trahan, Davis, and Sapienza. The three members are again listed as members in their individual capacity in several documents including the Associate Guide to Policy Handbook, an excel spreadsheet of contributions, and AAR's balance sheet. The Annual Report that was filed with the Secretary of State for the time period ending October 30, 2016 also identified Trahan, Davis, and Sapienza as AAR's members.

Each member of AAR made capital contributions in the form of cash and services in exchange for a one-third membership interest in AAR. As members, Trahan, Davis, and Sapienza were each intended to oversee different areas of AAR's business. Trahan was intended to oversee the business end regarding marketing and sales. Davis was intended to help Trahan oversee marketing and sales and secure additional sources of funding. Sapienza was intended to oversee the science and technology area regarding the researching, inventing, developing, and testing of the chemical technologies and processes.

Following EnerSciences's business model, it was intended that AAR was to research and develop chemical technologies and processes for use and application in agricultural, industrial, oil & gas, and other markets. It was expected that the chemical

-4-

technologies and processes would create two forms of revenue: (1) AAR would enter contracts for research, development, testing, and service functions for its chemical technologies and processes; (2) AAR would license and sell its chemical technologies and processes as intellectual property. However, AAR never intended to manufacture, sell or distribute their products.

On November 17, 2015, Trahan illustrated this intent in a memo to all AAR employees, which stated that Rapid Specialty would "serve as a conduit to the market in order to supply products and solutions into the field. AAR will share in the gross profit on these sales, generating additional revenue to our AAR team." Sapienza agreed that a separate entity would sell AAR's products and he knew that Rapid Specialty, which was owned by Trahan and Davis, was intended to fill that position. Sapienza knew he did not have an ownership interest in Rapid Specialty. However, it turned out that Rapid Specialty was never used to sell AAR's products.

Trahan testified that Rapid Specialty experienced issues because of name similarities with Rapid Drilling, LLC, which was a subsidiary of EnerSciences. As a result, Trahan and Davis intended to form a new entity to replace Rapid Specialty and clear up the confusion surrounding its name. On December 9, 2015, Chem Advances, LLC, ("Chem Advances") a Louisiana limited liability company was formed. Chem Advances's members are TarryTown Ventures, LP, and Cypress

Technologies, LLC, two of AAR's intended members. Neither Sapienza nor his entity, Visibly Green, LLC are members of Chem Advances.

Sapienza was aware of Chem Advances' existence and its purpose. Trahan explained to AAR's staff that Chem Advances would replace Rapid Specialty as the primary marketing arm for products and services. The evidence indicates the staff was unequivocally informed of the existence of two separate entities. Dr. Madrid testified that she knew from the beginning that AAR and Chem Advances were two separate companies. She attended a meeting, with Sapienza present, where it was explained that AAR would be a research and development company and Chem Advances would sell and manufacture AAR's products. Sapienza testified that he was unaware that AAR and Chem Advances were two separate entities, but the Court finds that Sapienza's testimony was not credible. Sapienza received multiple emails and other documents evidencing the existence of AAR and Chem Advances as two separate and distinct entities.

After AAR was formed, there was a potential business opportunity with Univar. Univar is an international distributor of chemical related products and services that previously had a distribution agreement with Rapid Specialty. In an attempt to secure an agreement with Univar, AAR prepared a product list that contained their product names and a general description of each product. Once Chem

-6-

Advances was formed, Trahan began to discuss the AAR deal with Univar through Chem Advances. On December 15, 2015, Trahan sent a memo to Univar discussing a proposed distribution agreement between AAR/Chem Advances and Univar. However, a distribution agreement was never reached. Trahan testified that Chem Advances entered into a separate agreement with Univar to replace a prior agreement that Univar had with Rapid Specialty, but this agreement did not include any AAR developed chemical technology or process. Trahan further testified that Univar never purchased any AAR developed chemical technology or process from AAR or Chem Advances.

Chem Advances also pursued a business opportunity with Downhole Chemical Solutions, LLC. ("DCS"). In December of 2015, Trahan reached out to DCS, a company that is partially owned by Cutrer. Trahan knew Cutrer from previous business interactions and knew that he previously requested research regarding a low temperature breaker from EnerSciences. On January 4, 2016, in an e-mail exchange between Trahan and Cutrer, it was agreed that Dr. Madrid, Ms. Hazra, and Sapienza would continue their previous research from EnerSciences to develop a low temperature breaker for DCS. Trahan and Cutrer established a pay for hire agreement between DCS, AAR, and Chem Advances. Pursuant to this agreement, AAR developed a low temperature breaker that is currently used in certain DCS products.

-7-

On January 27, 2016, Ms. Hazra's Choline Chloride Enhancer Evaluation was completed for AAR. Two days later, Chem Advances made modifications to the report and renamed it Clay Control 532 to market and sell as a product. Sapienza knew that Chem Advances was marketing Clay Control 532 and a concentrated version called Clay Control 532C. On March 15, 2016, in an e-mail from Raymond Bienvenu, a Chem Advances employee, to Trahan and Sapienza, the "Chem Advances 532C" is discussed and its safety data sheet and customer label is attached. These two attachments do not contain proprietary information regarding Clay Control 532C. In the project data sheet, under the section titled "Composition Information on Ingredients," the actual composition/specific chemical identity is not disclosed and the information is only identified as proprietary.

Trahan also e-mailed the Chem Advances's Clay Control 532 report to Cutrer as an advertisement to DCS to purchase Clay Control 532. As a result, DCS purchased and continues to purchase Clay Control 532 from Chem Advances and uses it as an additive in their ClayBlok 35. Cutrer testified that the chemical formula for Clay Control 532 has never been disclosed to him and he does not know the chemical formula to create Clay Control 532. Furthermore, no proprietary information regarding Clay Control 532 is disclosed in DCS's safety data sheet for Clay Blok 35. On June 1, 2016, AAR started to invoice DCS for the work it performed related to the

development of the low temperature breaker, the development of clay control and other services. Cutrer testified that all invoices that DCS received from AAR were paid.

Chem Advances also pursued a business opportunity with Balchem regarding AAR's Choline Chloride Enhancer. Chem Advances wanted to reach an agreement with Balchem because it is one of the largest manufacturers and suppliers of choline chloride and AAR's Choline Chloride Enhancer would allow them to supplement choline chloride and sell their product at a lower cost. On April 1, 2016, Balchem signed a non-disclosure and non-solicitation agreement with AAR. On August 17, 2016, Chem Advances and AAR held a presentation for Balchem in Lafayette regarding the Choline Chloride Enhancer. The presentation was put together by Trahan and Sapienza and contained references to both Chem Advances and AAR. During the presentation, Balchem requested the identity of the key raw material supplier for the Clay Control 532 concentrate. On August 22, 2016, Trahan disclosed the supplier to Balchem under the terms of the previously executed non-disclosure agreement. However, Balchem never reached an agreement with Chem Advances or AAR regarding the Choline Chloride Enhancer.

While attempting to sell AAR's products, Chem Advances prepared Product Data Sheets for Breaker LT 105 Concentrate, Clay Control 532C and Advanced

ClayControl to advertise to potential customers. The product data sheets contained a general product description that is commonly used to advertise products to potential customers. These product data sheets did not disclose any product formulations or specific details about the technical aspects of the products.

AAR protected their proprietary information through different methods. AAR authorized only its members, managers, and employees to access their research and relied on two different web-based programs called Projectturf and Engyte. All access to Projecturf and Engyte required the use of a password and was limited to only AAR's members, managers, and employees.  AAR also made all employees acknowledge that they received an Associate Guide to Policy Handbook. The Associate Guide to Policy Handbook, in the Confidential Information section on page 21, provides in pertinent part:

> "[AAR] policy requires that all Associates protect the integrity of the company's proprietary and confidential information as well as the proprietary and confidential information of others.  It is the responsibility of all [AAR] Associates to safeguard sensitive company information.  The nature of our business and the economic well-being of our company is dependent upon protecting and maintaining proprietary company information.  Continued employment with the company is contingent upon compliance with this policy.  Each company supervisor/manager bears the Responsibility for the orientation and training of his or her Associates to ensure enforcement of company confidentiality.  Any and all company information, including trade secrets or confidential information relating to products, processes, know-how, customers, designs, drawings, formulas, test data, marketing data, accounting, pricing or salary information, business plans and

strategies, negotiations and contracts must remain company private and confidential...

Company trade secrets or confidential information should never be transmitted or forwarded to outside individuals or companies not authorized to receive that information, and should not even be sent or forwarded to Associates inside the company who do not have a need to know the information...

Associates who improperly use or disclose trade secrets or confidential business information may be subject to disciplinary action, up to and including termination and legal action."

AAR also implemented a policy to protect their confidential information from former employees. Dr. Madrid and Ms. Hazra testified that their hard drives were removed from their computers and their access to Projecturf and Engyte was terminated when their employment with AAR ended.

## PROPOSED CONCLUSIONS OF LAW

The plaintiff in this action is Richard Sapienza, both individually and/or derivatively as member/manager on behalf of AAR. In opposition to the plaintiffs' motion for preliminary injunction, the defendants contend that Sapienza is not a member of AAR and as a result does not have standing to assert a derivative action on behalf of AAR. However, the Court will not address this issue because the parties stipulated that Visibly Green, LLC would be added as a plaintiff for the purposes of the motion for preliminary injunction and that named defendants David Trahan and Ben Davis would be bound by any injunction issued against their respective companies, Cypress Technologies, LLC and Tarrytown Ventures, LP.

-11-

In their motion, the plaintiffs are seeking a preliminary injunction against Trahan, Davis, and Chem Advances, as well as "other persons who are in active concert or participation with them," pursuant to Fed. R. Civ. P. 65(d)(2), including DCS and Cutrer. Specifically, the plaintiffs are seeking an injunction to enjoin Trahan, Davis, and Chem Advances from further misappropriation and misuse of AAR's trade secrets.

## I. STANDARD FOR GRANTING A PRELIMINARY INJUNCTION

The grant or denial of a preliminary injunction rests in the discretion of the district court, subject only to the satisfaction of four prerequisites enumerated by the Fifth Circuit for the grant of such relief. *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). In order to obtain a preliminary injunction, the plaintiff must demonstrate each of the following pre-requisites: 1) a substantial likelihood of success on the merits; 2) a substantial threat that failure to grant the injunction will result in irreparable injury; 3) the threatened injury outweighs any damage that the injunction will cause to the adverse party; and 4) the injunction will not have an adverse effect on the public interest. *Id.; Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998). " A preliminary injunction is an extraordinary remedy. It should only be granted if the movant has clearly carried the burden of persuasion on all four *Callaway* prerequisites. The decision to grant a preliminary injunction is to be treated

as the exception rather than the rule." *Mississippi Power & Light v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5ᵗʰ Cir. 1985).

To assess the likelihood of success on the merits, the Court looks to the "standards provided by the substantive law." *Janvey v. Alguire,* 647 F.3d 585, 596 (5ᵗʰ Cir. 2011); *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5ᵗʰ Cir. 1990) (citation omitted).   The movant  must "present a *prima facie* case but need not show that he is certain to win." *Id. (quoting* Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11A Federal Practice & Procedure § 2948.3 (2d ed. 1995)).

A preliminary injunction should not issue except upon a clear showing of irreparable injury. *Enterprise Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5ᵗʰ Cir. 1985)*; Johnson Controls, Inc., v. Guidry,* 724 F.Supp.2d 612, 619 (W.D. La. 2010). Irreparable injury is harm that "cannot be undone through monetary damages," that is, harm for which money damages are inadequate or for which money damages are "especially difficult" to compute. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5ᵗʰ Cir. 1981); *Allied Marketing Group, Inc. v. CDL Marketing, Inc*., 878 F.2d 806, 810 fn. 1 (5ᵗʰ Cir. 1989)[1].

---

[1] The Fifth Circuit has recognized that a finding of irreparable harm is appropriate when the nature of economic rights makes "establishment of the dollar value of the loss . . . especially difficult or speculative."  *Allied Marketing Group, Inc.*, 878 F.2d at 810 fn. 1 (*quoting Mississippi Power & Light*, 760 F.2d at 630 n. 12).

-13-

In the balancing of hardships inquiry, the Court must identify the harm which a preliminary injunction might cause the defendant and weigh it against the plaintiff's threatened injury. *Allied Marketing Group, Inc.*, 878 F.2d at 810 at fn. 1; *Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 390 (5th Cir.1984). When the harm to the defendant that may be caused by the grant of an injunction is equal or greater than the harm threatened to the plaintiff, it is improper to grant the injunction. *Apple Barrel Productions, Inc.*, 730 F.2d at 389-390. The plaintiff must show that its potential harm could possibly exceed the threatened harm to the defendants. *Id*.

The final inquiry is to balance the harm to the public that would be suffered if the injunction is granted.

## II. APPLICATION OF THE LAW TO THE FACTS OF THIS CASE

The plaintiffs allege that they are entitled to a preliminary injunction based on the following theories: (1) the Defend Trade Secrets Act ("DTSA"); (2) the Louisiana Uniform Trade Secrets Act ("LUTSA"); (3) breach of fiduciary duties; and (4) the Computer Fraud and Abuse Act. After a review of the pleadings, the plaintiffs only allege future conduct regarding their claims under DTSA and LUTSA. Therefore, the only issue before the Court is whether the plaintiffs are entitled to injunctive relief based on their claims under DTSA and LUTSA.

**A. Whether the plaintiff has established a likelihood of success on the merits**

The DTSA was formally enacted on May 11, 2016 to provide a civil remedy for misappropriation, occurring on or after that date, of trade secrets related to a product or service used in, or intended for use in interstate or foreign commerce. *See* Defend Trade Secret Act of 2016, Pub.L No. 114-153, § 2(e), 130 Stat. 376, 381-82.

Under DTSA, the owner of a misappropriated trade secret may bring a civil action when the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce. 18 U.S.C. § 1836. The DTSA also provides injunctive relief to prevent actual or threatened misappropriation. 18 U.S.C. § 1836(3)(A). In the amended complaint it is alleged that Sapienza is the actual owner of three of the alleged trade secrets. Sapienza claims that the trade secrets were part of his contribution to AAR, but his contributions were tainted with a vice of consent. However, for the purpose of the motion for preliminary injunction, the plaintiffs stipulated that AAR is the owner of the alleged trade secrets . Therefore, the plaintiffs must establish: (1) the existence of a trade secret; (2) misappropriation of the trade secret by another; and (3) the trade secret's relation to a good or service used or intended for use in interstate or foreign commerce. 18 U.S.C. § 1836(b)(1); *see also Source Production & Equipment Co., Inc. v. Schehr*, 2017 WL 3721542, (E.D. La. 08/29/2017).

Like DTSA, LUTSA also provides for injunctive relief against "actual or threatened misappropriation" of trade secrets. La. R.S. 15:1432(A). Under LUTSA, the plaintiff must prove (1) the existence of a trade secret; (2) misappropriation of the trade secret by another; and (3) actual loss caused by the misappropriation. *Computer Management Assistance Co.v. Robert F, DeCastro*, 220 F.3d 396 (5th Cir. 2000). The definitions provided under LUTSA are almost identical to the definitions under DTSA.

## 1. The Existence of a Trade Secret

Under DTSA, a trade secret is defined as:

> All forms and types of financial, business, scientific, technical, economic, or engineering information, including patters, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if–
>
> A. The owner thereof has taken reasonable measures to keep such information secret; and
>
> B. The information derives independent economic value, actual or potential, from not being known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. 18 U.S.C. § 1839(3).

The definition of a trade secret under LUTSA is very similar the definition under DTSA. *Compare* 18 U.S.C. § 1839(3) and La. R.S. 51:1431(4).

-16-

In the motion for preliminary injunction, the plaintiffs' contend that there are five trade secrets: (1) Choline Choloride Trade Secrets, which include the Clay Control Enhancer, Clay Control Concentrate, and Advanced Clay Control; (2) Hydrogen Peroxide Trade Secrets, which include the Breaker LT105 Concentrate and Low Temperature Breaker Activator; (3) Carbon Disulfide Solvent Trade Secret; (4) Flow Aid Blend Trade Secret; and (5) Hydrogen Sulfide Trade Secret. No evidence was presented regarding the alleged Carbon Disulfide Solvent Trade Secret, the Flow Aid Blend Trade Secret or the Hydrogen Sulfide Trade Secret. Therefore, the Court finds that the plaintiff failed to satisfy the requirement of a likelihood of success on the merits regarding the Carbon Disulfide Solvent Trade Secret, the Flow Aid Bend Trade Secret or the Hydrogen Sulfide Trade Secret.

However, the evidence indicates that the chemical technologies and processes developed by AAR related to Choline Chloride and Hydrogen Peroxide are classified as trade secrets. These technologies contain scientific formulas that AAR used reasonable measures to protect. AAR secured the proprietary information regarding the research and development of these technologies on computer programs that had limited access, AAR had their employees execute confidentiality agreements, and AAR required non-disclosure agreements to disclose certain aspects of the technologies to potential customers. Furthermore, the Choline Chloride and Hydrogen

17

Peroxide technologies remain valuable to potential companies because they are not generally known and not readily ascertainable. The evidence indicates that several companies, such as DCS, Balchem, and Univar, were interested in these technologies because of their attributes and their inability to obtain them from other sources. Therefore, the Court finds that the Choline Chloride and Hydrogen Peroxide technologies are classified as a trade secret under DTSA and LUTSA.

## 2. The Misappropriation of a Trade Secret

Under DTSA, a "misappropriation" is defined as:

A. Acquisition of a trade secret of another by a person who known or has reason to know that the trade secret was acquired by improper means; or

B. Disclosure or use of a trade secret of another without express or implied consent by a person who–

I. Used improper means to acquire knowledge of the trade secret;

II. At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was –
    i. Derived from or through a person who had used improper means to acquire the trade secret;

    ii. acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

    iii. Derived from or through a person who owed a duty to the person seeking relief to maintain the secret of the trade secret or limit the use of the trade secret; or

III. Before a material change of the position of the person, knew or had reason to know that–

    i. The trade secret was a trade secret; and

    ii. Knowledge of the trade secret had been acquired by accident or mistake.  18 U.S.C. § 1839(5)

The term "improper means" is defined as including theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and does not include reverse engineering, independent derivation, or any other lawful means of acquisition. 18 U.S.C. § 1839(6). Under LUTSA, the definition of a "misappropriation" and "improper means" are almost identical to their definitions under the DTSA. *Compare* La. R.S. 51:1431(2) and 18 U.S.C. § 1839(5); *Compare* La. R.S. 51:1431(1) and 18 U.S.C. § 1839(6).

The plaintiffs contend that the Choline Chloride and Hydrogen Peroxide trade secrets were misappropriated by Trahan and Davis through improper means because they breached their fiduciary duties to AAR by forming Chem Advances. Then, the plaintiffs contend that Chem Advances misappropriated AAR's trade secrets by manufacturing and selling them to third parties. Based on the evidence presented, the Court finds that the plaintiffs failed to establish a likelihood of success on the merits that Trahan, Davis, or Chem Advances misappropriated AAR's trade secrets.

AAR's three members have access to AAR's trade secrets and acquire their trade secrets through lawful means. There is no evidence that Trahan or Davis used theft, bribery, misrepresentation or an inducement of a breach of duty to maintain secrecy to acquire AAR's trade secrets. There is also no evidence that Trahan or Davis disclosed AAR's trade secrets without consent. AAR is a member-managed LLC, where each member is a mandatary of the LLC for all matters in the ordinary course of its business. La. R.S. 12:1317. Trahan, whether in his personal capacity or through his entity as a member, had the authority to reach out to third parties to sell AAR's chemical technologies and processes. This action alone does not constitute a misappropriation of a trade secret.

The Court also finds that the statute does not contemplate a breach of a fiduciary duty as suggested in the context of this case, i.e. the formation of a separate company in which Sapienza did not have an interest, to be "improper means." The members of AAR always intended that a separate entity would manufacture and sell products that incorporated AAR's technologies and processes. While Trahan made the decision that Chem Advances would be that entity, his actions were consistent with the members' intent. It is undisputed that AAR's members and employees knew that Chem Advances was being used to manufacture and sell products that contained AAR's trade secrets. Sapienza did not object to Chem Advances manufacturing and

selling the products until he realized he did not timely receive profits from the sales of Chem Advances. While this is unfortunate for Sapienza, the Court does not find that the plaintiffs established a likelihood of success on the merits that Trahan's actions are a misappropriation of AAR's trade secrets. Furthermore, no evidence was presented that Davis took any action at all related to AAR's trade secrets. Therefore, the Court finds that the plaintiffs failed to establish a likelihood of success on the merits that Davis misappropriated AAR's trade secrets.

The Court also finds that the plaintiffs failed to establish a likelihood of success on the merits that Chem Advances's actions are considered a misappropriation of AAR's trade secrets. Chem Advances did not obtain AAR's trade secrets through theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy. To the contrary, Chem Advances lawfully obtained AAR's trade secrets and received consent from AAR to manufacture and sell products containing their trade secrets to third parties as part of their agreement. Based on the agreement, there is no evidence that Chem Advances disclosed AAR's trade secrets without AAR's consent. Therefore, there is no likelihood of success on the merits that Chem Advances misappropriated AAR's trade secrets.

**B. Whether the plaintiff has established that there is a substantial threat that the failure to grant the preliminary injunction is likely to cause irreparable harm.**

The plaintiffs also failed to establish that the failure to grant a preliminary injunction is likely to cause irreparable harm that cannot be compensated through monetary damages. The plaintiffs contend that the failure to grant an injunction is likely to cause irreparable harm because the value of AAR's trade secrets would diminish and AAR would lose potential customers. However, Sapienza's testimony is not consistent with the plaintiffs' allegations. Sapienza testified that he filed the present lawsuit after he learned he did not have a membership interest in Chem Advances and would not personally benefit from Chem Advances manufacturing and selling AAR's chemical processes and technologies. Sapienza further testified that his claims against the defendants could be rectified by a large monetary settlement or judgment. No evidence was presented that AAR would suffer any damage that could not be compensated by monetary damages. Therefore, the plaintiffs failed to establish that the failure to grant a preliminary injunction is likely to cause irreparable harm and the plaintiffs failed to meet the second prerequisite for a preliminary injunction to be issued.

**C. Whether the threatened injury outweighs any damage that the injunction will cause to the adverse party.**

The plaintiffs contend that AAR's threatened injury outweighs any potential damage that an injunction would cause the defendants.  However, no evidence was presented to establish the severity of the plaintiffs' threatened injury. The evidence established that DCS has two products that utilize AAR developed chemical technologies and processes. Cutrer testified that DCS's product that utilizes the low temperature breaker has generated approximately $4,200,000 in revenue this year and DCS's Clay Blok 35 containing Clay Control 532 has generated approximately $500,000 in revenue this year. While it is not clear exactly what financial impact would be felt by DCS and/or Cutrer if the ingredients for its products are no longer available from Chemical Advances, it is the finding of this Court that DCS would sustain some adverse impact and there is no evidence AAR would suffer an adverse impact at all.  On the contrary, the evidence indicates that if AAR is "sharing in the gross profits" from the sale of the products, it too would suffer an adverse impact if the injunction is granted. Therefore, the plaintiffs failed to establish that their threatened injury outweighs any damage that an injunction will cause to the adverse parties and the plaintiffs failed to meet the third prerequisite for a preliminary injunction to be issued.

**4. Whether the injunction will have an adverse effect on the public interest.**

The plaintiffs contend that an injunction would not have an adverse effect on the public interest. However, the evidence presented does not support the plaintiffs' argument. AAR is a research and development company that performed work for hire research on behalf of DCS. As a result, DCS has two products that use AAR developed chemical technologies and processes as additives that are subsequently sold to third parties at a more competitive price than they otherwise could be sold for if a substitute additive was utilized. The public interest would be adversely effected if DCS is enjoined from using AAR developed chemical technologies and processes because the flow of commerce would be disrupted and the public would be unable to obtain the economic benefits that are derived from DCS's products. Therefore, the plaintiffs failed to establish that an injunction would not have an adverse effect on the public interest and the plaintiffs failed to meet the fourth prerequisite for a preliminary injunction to be issued.

## <u>CONCLUSION</u>

Based on the foregoing reasons, it is recommended that the plaintiffs' motion for preliminary injunction (Rec. Doc. 61) should be **denied.**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this

report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed at Lafayette, Louisiana, this 23rd day of October 2017.

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE