# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

RICHARD SAPIENZA           CASE NO. 6:16-CV-01701

VERSUS           MAGISTRATE JUDGE HANNA

TRAHAN ET AL           BY CONSENT OF THE PARTIES

## <u>MEMORANDUM RULING</u>

Currently pending is a Motion for Summary Judgment and to Sever Final Judgment [Rec. Doc. 133], filed by Defendants Wayne Cutrer and Downhole Chemical Solutions, LLC (collectively "Defendants"). Plaintiffs Richard Sapienza, individually and/or derivatively as member and manager on behalf of Advanced Applied Research, LLC (collectively "Plaintiffs"), filed an opposition [Rec. Doc. 139], to which Defendants filed a reply. [Rec. Doc. 143]. Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, the motion is GRANTED in part and DENIED in part.

## <u>PROCEDURAL BACKGROUND</u>

This lawsuit was brought by Plaintiffs Richard Sapienza ("Sapienza"), individually and/or derivatively as member and manager on behalf of Advanced Applied Research, LLC ("AAR"), and involves allegations of, *inter alia*, misappropriation and misuse of trade secrets against the following Defendants:

David O. Trahan ("Trahan"); Ben D. Davis ("Davis"); Chem Advances, LLC ("CA"); AAR; Wayne Cutrer ("Cutrer"); Downhole Chemical Solutions, LLC ("DCS"); Cypress Technologies, LLC ("Cypress Technologies"); and Tarrytown Ventures, LP ("Tarrytown Ventures").[1] The instant motion for summary judgment is brought by Cutrer and DCS only; therefore, the facts recited herein focus on those relevant to Plaintiffs' allegations against Cutrer and DCS. Likewise, of the seventeen total counts alleged in the amended complaint, only the following are brought against "all defendants," to include Cutrer and DCS: Count One, violations of the Defend Trade Secrets Act ("DTSA") and the Louisiana Uniform Trade Secrets Act ("LUTSA"); Count Seven, intentional and negligent misrepresentation; Count Nine, conversion; Count Twelve, alter ego and single business enterprise liability; Count Thirteen, conspiracy; and Count Fourteen, unjust enrichment.[2] This ruling will therefore focus on the allegations against Cutrer and DCS arising out of those five counts.

The undersigned previously held a four-day hearing on Plaintiffs' requests for injunctive relief, after which proposed findings of fact and recommendations

---

[1] Rec. Docs. 1 (complaint); 32 (first amended and restated complaint).

[2] Rec. Doc. 32, pp. 36–50. Count Sixteen, pursuant to which Plaintiffs reserve the right to seek declaratory judgment "on all issues so decidable," does not appear to implicate these Defendants and the parties have made no arguments in support of or in opposition to Count Sixteen. Count Seventeen, pursuant to which Plaintiffs sought injunctive relief under the DTSA, LUTSA, and/or Fed. R. Civ. P. 65, was likewise brought against "All Defendants[;]" however, that request for relief has been addressed and is not relevant herein. *See* Rec. Docs. 123 and 131.

were issued and subsequently adopted by the then-presiding district judge.[3] Thereafter, the parties consented to proceed before the undersigned magistrate judge, at which time the case and all pending motions, including the instant motion for summary judgment, were referred to the undersigned.[4]

In opposition to the instant motion, Plaintiffs represented that certain facts had been unavailable to them and therefore, pursuant to Federal Rule of Civil Procedure 56(d), requested that the Court defer consideration of the motion and allow time to take additional discovery.[5] On the basis of Plaintiffs' request, the Court upset the original hearing on the instant motion and granted Plaintiffs an additional thirty days to supplement their opposition.[6] That same day, Plaintiffs requested, and were granted, relief from the scheduling order, so that the case-specific deadlines would

---

[3] Rec. Docs. 125, 125-1, 125-2, 125-3 (transcript, volumes I – IV); 123 (the undersigned's proposed findings); 131 (the then-presiding district court's order adopting proposed findings).

[4] *See* Rec. Docs. 153, 155, 156, and 158.

[5] Rec. Doc. 139, pp. 2, 7-12. Defendants correctly point out that Sapienza's affidavit [Rec. Doc. 139-1] is, in large part, improper and/or not probative of any facts at issue, to the extent it is based on Sapienza's belief rather than personal knowledge. *See Richardson v. Oldham,* 12 F.3d 1373, 1378 (5th Cir. 1994). However, the Court has exercised its discretion in granting the Plaintiffs' requests for extensions of time to conduct further discovery and supplement their response and, as such, the statements set forth in the affidavit are no longer ripe for consideration. Thus, Defendants' request to strike the affidavit [Rec. Doc. 143, p. 4 n. 4] is denied as moot.

[6] Rec. Doc. 162. The parties were also put on notice that the Court would "consider facts determined in the preliminary injunction hearing." *See* Rec. Doc. 162; *see also* Fed. R. Civ. P. 65(a)(2) ("[E]vidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial."); *but cf. H & W Indus., Inc. v. Formosa Plastics Corp., USA*, 860 F.2d 172, 178 (5th Cir. 1988) (absent notice to the parties that a decision on the merits would occur, summary judgment following preliminary injunction hearing was found to be improper).

conform with those deadlines contemplated by the parties' joint Rule 26(f) report.[7]

Plaintiffs then filed an untimely motion to again extend the deadline by which to supplement their opposition to the instant motion, and the Court granted Plaintiffs' request.[8] Despite these extensions, and having been put on notice that the Court would consider evidence presented during the preliminary injunction hearing, Plaintiffs failed to supplement their opposition and likewise failed to controvert Defendants' statement of uncontested facts. As such, all material facts set forth by Cutrer and DCS will be deemed admitted, for purposes of the instant motion.[9]

## FACTUAL BACKGROUND[10]

A brief history of the parties' interrelationships is helpful in understanding the factual backdrop of this case. In October 2015, Sapienza was a consultant for EnerSciences Holdings, LLC ("EnerSciences"), which was a company partially owned by named defendants Davis and Trahan. At the time, Sapienza was assisting

---

[7] *See* Rec. Docs. 163, 164 (motion and order, respectively); 159 (scheduling order); and 152 (Rule 26(f) report, filed by all parties).

[8] Rec. Doc. 167 (motion); Rec. Doc. 168 (order).

[9] Rec. Docs. 133-10 (Defendants' statement of uncontested facts); 139-2 (Plaintiffs' response). Pursuant to Local Rule 56.2, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." Because Plaintiffs failed to file "a separate, short and concise statement of the material facts as to which there exists a genuine issue to be tried," all material facts set forth by Cutrer and DCS will be deemed admitted, in accordance with Local Rule 56.2.

[10] Unless otherwise indicated, the facts are drawn from Defendants' statement of uncontested facts and the transcripts from the four-day preliminary injunction hearing. *See* Rec. Docs. 133-10; 125, 125-1, 125-2, 125-3. To the extent the Court cites findings made as a result of that hearing, it has determined same to have been established by the evidence presented therein and uncontroverted by Plaintiffs in response to the instant motion. *See* Rec. Doc. 123.

EnerSciences' research lab in developing a low temperature gel breaker for Chem Rock, a limited liability company owned by Cutrer, defendant herein. EnerSciences, as a research and development company, was intended to rely on a separate entity, Rapid Specialty Products, to sell its products. When EnerSciences shut down, Trahan, Davis, and Sapienza decided to create AAR, to keep EnerSciences' research team together and replicate its business model.[11]

AAR, which was officially formed on October 29, 2015, was created to conduct research and development of chemical technologies for both internal and third party use, as applicable in agricultural, industrial, oil and gas, and other markets. AAR does not have an operating agreement; however, its members are Trahan, Davis, and Sapienza, each of whom was intended to oversee different aspects of AAR's business.[12] Trahan was intended to oversee the business aspects, including marketing and sales; Davis was intended to help with marketing and sales and also secure additional sources of funding; and Sapienza was intended to oversee

---

[11] In October 2015, EnerSciences shut down and its research team continued to research and develop certain technologies and processes while being paid by Rapid Specialty Products. Two members of that research team testified during the preliminary injunction ("PI") hearing that they were aware that they would work for AAR once it was formed; however they were under the impression AAR would not be formed until January 2016 and that they would continue to work for Rapid Specialty Products until then. Their beliefs notwithstanding, AAR was officially formed on October 29, 2015. *See* Rec. Doc. 123, pp. 2-3.

[12] During the PI hearing, testimony established that AAR's intended members were Tarrytown Ventures, with Davis as its sole member; Cypress Technlogies, with Trahan as its sole member; and Visibly Green, LLC, with Sapienza as its sole member. Rec. Doc. 123, p. 3. However, upon noticing that the Articles of Organization failed to identify AAR's members, Trahan filed a notice of change, identifying AAR's members as Trahan, Davis and Sapienza. *Id.* at pp. 3-4.

the science and technology aspects, including the researching, inventing, developing, and testing of chemical technologies and processes. Like EnerSciences, AAR was never intended to manufacture or market chemicals itself. The initial plan was for AAR to use Rapid Specialty Products to market internally-developed products to third parties; however, named defendant CA was ultimately created, in December 2015, to serve that purpose.[13]

DCS is an oil and gas fluids company, formed in 2015, that works with companies, such as AAR and CA, to develop applications of oil and gas chemistry into products for use by oil and gas companies in the field. DCS is partially owned by Cutrer and is also a wholly-owned subsidiary of Dynamic Chemical Solutions, Inc., which has multiple shareholders and a seven-person board of directors. DCS is not an owner of AAR or CA, nor does it control the operations of AAR or CA. Neither Trahan, Davis, nor any of their other entities possess either an ownership interest in DCS or any rights entitling them to profit from DCS's sales.

In December 2015, Trahan reached out to DCS, in light of Cutrer's previous interactions with EnerSciences, including his October 2015 research request regarding a low temperature gel breaker on behalf of Chem Rock. Cutrer responded

---

[13] During the PI hearing, testimony established that Rapid Specialty Products was a Texas limited liability company, whose sole member and manager was Novastar Holdings, LLC, a Louisiana limited liability company whose members were Trahan and Davis. Rec. Doc. 123, p. 3. Additionally, CA was formed as a Louisiana limited liability company, whose members are Tarrytown Ventures and Cypress Technologies. Neither Sapienza nor his entity, Visibly Green, LLC are members of CA. *Id*. at pp. 5-6.

by indicating his immediate interest, on behalf of DCS, in the development of a low temperature breaker. As a result, Trahan and Cutrer entered into a work-for-hire agreement between DCS, AAR, and CA, pursuant to which AAR successfully developed a low temperature breaker that is currently used in certain DCS products.

DCS routinely does business on a handshake, with no written contract. Consistent with that practice, Trahan and Cutrer did not execute a written contract; rather, they orally agreed, on behalf of their respective companies, that AAR would perform the breaker testing and development work for DCS at a set hourly rate, to be periodically invoiced to DCS. In order for AAR to determine which products would work for DCS's intended purposes, DCS provided AAR with certain parameters for the breaker development. AAR ultimately developed a formulation with three additives that works with a diluted peroxide to break down polymers at a slow enough speed to allow the chemicals to function before being broken down. AAR figured out the additives, each of which is publicly available and commonly known as a peroxide additive, and conducted testing with various dilutions of peroxide to determine the optimal formulation for DCS's needs. After obtaining the formulation, DCS ordered the additives from CA and sent the additives to an entity named PeroxyChem to be mixed with peroxide.

On January 27, 2016, an AAR employee and member of its research team, Suchandra Hazra, completed a Choline Chloride Enhancer Evaluation for AAR.

Two days later, on January 29, 2016, CA made modifications to the report and renamed the product Clay Control 532 ("CC 532"), in order to market and sell it as a product. DCS buys CC 532 from CA and blends it with choline chloride, a widely known and commonly used clay control product. DCS hired and paid AAR by the hour to test various blends to find a commercially viable blend of CC 532 and choline chloride. DCS provided AAR with its desired specifications, and AAR billed DCS for hours spent working on the project. As requested by DCS, AAR provided DCS with a formulation blend of CC 532 and choline chloride. DCS's end product, using the cationic starch-choline chloride formulation, is sold under the trade name Clayblok 35.[14] DCS manufactures Clayblok 35 by shipping the chemicals to a facility, where they are blended based on the specific formulation DCS paid AAR to develop for DCS, and then markets and sells that blend to its oil and gas customers.

DCS also hired AAR for testing and development of a specific flow aid blend and a friction reducer sourced by AAR and/or CA. DCS paid AAR for all time expended in testing the successes of the flow aid blend and friction reducer products and in determining what specific quantities or dilutions were needed to meet DCS's specifications.

---

[14] Defendants represent that, until this lawsuit, DCS was not aware of the source of the cationic starch, and DCS is still unaware of the specific chemical composition of the starch. *See* Rec. Doc. 133-10, p. 5, ¶ 25, n. 34; *see also* Rec. Doc. 133-10, p. 7, ¶ 41 ("DCS did not know what comprised the CC 532 sold by CA until Sapienza presented the alleged trade secrets in open court.").

Under the direction of Trahan, CA provided AAR with administrative services, including payroll, accounting, invoicing, human resources, and general bookkeeping. Trahan appointed his son, Richard "Butch" Trahan, a CA employee, to oversee AAR's payroll and other administrative aspects such as accounting and bookkeeping. Sapienza was aware that Trahan entered into a business arrangement with DCS and that DCS was paying AAR for its services.

AAR began sending invoices to DCS in June 2016. After reviewing time entries in Projecturf, a web-based program used to track AAR's work and protect its proprietary information, AAR would generate invoices using Quickbooks. AAR would then provide the invoices to DCS through a web-based program called Smartsheet. Once an invoice was posted to Smartsheet, Butch Trahan would notify DCS's accounting manager that the invoice was available, and DCS would then wire the money directly to CA's account.[15] In total, AAR has invoiced DCS $771,562.69, and DCS has paid, in full, each invoice it has received from AAR.

---

[15] DCS's accounting manager, Bryan Leonards, testified by affidavit that AAR, CA, and DCS all had access to Smartsheet. When new AAR and CA invoices were posted to Smartsheet, Butch Trahan notified Mr. Leonards, at which time Mr. Leonards would wire the amount due from DCS "directly to CA's account." However, "[i]n at least one instance, the money was sent by check or wire directly to AAR." Rec. Doc. 133-8, pp. 1-2, ¶¶ 3-4.

<u>**ANALYSIS**</u>

**A.** <u>**THE SUMMARY JUDGMENT STANDARD**</u>

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable governing law.[16] A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[17]

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.[18] The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of genuine issues of material fact.[19] If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact.[20]

---

[16] *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex*., 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc*., 232 F.3d 473, 477 (5th Cir. 2000).

[17] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citing *Anderson*, 477 U.S. at 252); *Hamilton,* 232 F.3d at 477.

[18] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

[19] *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007) (citing *Celotex Corp.*, 477 U.S. at 323).

[20] *Washburn*, 504 F.3d at 508.

All facts and inferences are construed in the light most favorable to the nonmoving party.[21]

The court cannot make credibility determinations or weigh the evidence, and the nonmovant cannot meet his burden with unsubstantiated assertions, conclusory allegations, or a scintilla of evidence.[22] Under Rule 56(c)(3), "[t]he court need consider only the cited materials, but it may consider other materials in the record."[23] After putting the parties on notice of its intent to do so, for purposes of the instant motion, the Court considered the evidence presented during the preliminary injunction hearing held on October 2–5, 2017.[24] "When all of the summary judgment evidence presented by both parties could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is proper."[25]

---

[21] *Brumfield*, 551 F.3d at 326 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

[22] *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).

[23] Fed. R. Civ. P. 56(c)(3).

[24] *See* Fed. R. Civ. P. 65(a)(2) (Even when the Court does not consolidate the injunction hearing with trial on the merits, "evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial."); *see also Brown v. Livingston*, 524 F. App'x 111, 115 (5th Cir. 2013) (consideration of, *inter alia*, evidence presented at preliminary injunction hearing resulted in conversion of motion to dismiss into a summary judgment motion); *JSLG, Inc. v. City of Waco*, No. 11-131, 2011 WL 13180227, at *1 (W.D. Tex. Sept. 26, 2011), *aff'd*, 504 F. App'x 312 (5th Cir. 2012) (considering evidence presented at a preliminary injunction hearing in granting a motion for summary judgment).

[25] *Greene v. Syngenta Crop Protection, Inc.*, 207 F.Supp.2d 537, 542 (M.D. La. 2002) (citing *Matsushita*, 475 U.S. at 587).

Where, as here, a party seeks "a continuance of a motion for summary judgment in order to obtain further discovery, [that] party must indicate to the court by some statement, preferably in writing (but not necessarily in the form of an affidavit), why he needs additional discovery and how the additional discovery will create a genuine issue of material fact."[26] "The nonmoving party 'may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts.'"[27] Instead, that party must "set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion."[28] "If it appears that further discovery will not produce evidence creating a genuine issue of material fact, the district court may, in the exercise of its discretion, grant summary judgment."[29]

## B.    DEFENDANTS CUTRER AND DCS ARE ENTITLED TO SUMMARY JUDGMENT

As mentioned, only the following five counts are brought against "all defendants," to include Cutrer and DCS. Each count will be analyzed in turn.

---

[26] *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993) (citations omitted).

[27] *Id*. (quoting *SEC v. Spence & Green Chemical Co.*, 612 F.2d 896, 901 (5th Cir. 1980)).

[28] *American Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013) (quoting *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010) and *C.B. Trucking, Inc. v. Waste Mgmt. Inc.*, 137 F.3d 41, 44 (1st Cir. 1998)).

[29] *Krim,* 989 F.2d at 1442 (citing *Netto v. Amtrak*, 863 F.2d 1210, 1216 (5th Cir. 1989); *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991)).

*Count One: Violations of the DTSA and the LUTSA*

Plaintiffs allege that Sapienza and AAR own the following five trade secrets, collectively referred to as the "AAR/Sapienza Trade Secrets:" (1) Choline Chloride Trade Secrets; (2) Hydrogen Peroxide Trade Secrets; (3) Carbon Disulfide Trade Secrets; (4) Flow Aid Blend Trade Secret; and (5) Hydrogen Sulfide Trade Secrets.[30] In Count One, Plaintiffs allege that "Defendants willfully, maliciously, and in bad faith, misappropriated [and continue to misappropriate] the AAR/Sapienza Trade Secrets by (a) acquiring them by improper means; [and] (b) disclosing and using them without express or implied consent."[31]

In the background section of the amended complaint, Plaintiffs allege that, as early as March 2016, "Sapienza learned that Trahan and Davis disclosed certain of the AAR/Sapienza Trade Secrets to Cutrer on behalf of himself and/or [DCS], still without the protection of a non-disclosure agreement (or any reasonable protections, in place) and without a contract or compensation for services."[32] Plaintiffs further allege several fact-specific scenarios, between February and August 2016, in which Trahan and Davis allegedly failed to take reasonable measures to protect the AAR/Sapienza Trade Secrets in their business dealings with Cutrer and DCS.[33] They

---

[30] Rec. Doc. 32, pp. 36-37, ¶ 85.
[31] Rec. Doc. 32, p. 37, ¶ 86.
[32] *Id*. at p. 32, ¶ 75.
[33] *Id*. at pp. 33-35, ¶¶ 76-81.

then attempt to attribute these actions or inactions of Trahan and Davis to the instant Defendants by alleging that "Cutrer and [DCS] misappropriated the AAR/Sapienza Trade Secrets by acquiring them via the improper means of misrepresentation, inducement of the breach of duty to maintain secrecy and limit use, electronic means, and other unlawful means."[34] And, more specifically, they allege that "these acts by Cutrer and [DCS] misappropriated the AAR/Sapienza Trade Secrets by disclosing and using them without express or implied consent because they used improper means to acquire the knowledge; and/or they knew or should have known that the knowledge came from persons who used improper means and/or derived from/through persons who owed a duty to the Plaintiffs to maintain secrecy and limit use."[35] Because there is no evidentiary basis underlying these assertions vis-à-vis Cutrer and DCS, the Court pretermits any further discussion of the alleged facts and moves directly to the Plaintiffs' failure to establish the required legal elements of their claims.

To succeed under the DTSA, a plaintiff must establish (1) the existence of a trade secret; (2) misappropriation of the trade secret by another; and (3) the trade

---

[34] *Id*. at pp. 35-36, ¶ 82.
[35] *Id*. at p. 36, ¶ 82.

secret's relation to a good or service used or intended for use in interstate or foreign commerce.[36] The DTSA defines the term "misappropriation" to mean:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
>> (i) used improper means to acquire knowledge of the trade secret;
>>
>> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>>
>>> (I) derived from or through a person who had used improper means to acquire the trade secret;
>>>
>>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>>
>>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>
>> (iii) before a material change of the position of the person, knew or had reason to know that—
>>
>>> (I) the trade secret was a trade secret; and
>>>
>>> (II) knowledge of the trade secret had been acquired by accident or mistake[.][37]

---

[36] 18 U.S.C. § 1836(b)(1); *see also Source Prod. & Equip. Co. v. Schehr*, No. 16-17528, 2017 WL 3721543, at *2 (E.D. La. Aug. 29, 2017).

[37] 18 U.S.C. § 1839(5); *see also Source Prod.*, 2017 WL 3721543, at *3.

The DTSA also defines the term "improper means[,]" which explicitly "does not include . . . any other lawful means of acquisition[.]"[38]

Similarly, to succeed under the LUTSA, "a complainant must prove (a) the existence of a trade secret, (b) a misappropriation of the trade secret by another, and (c) the actual loss caused by the misappropriation."[39] "In order to show that the trade secrets have been misappropriated, [Plaintiffs] would have to prove that (1) a trade secret existed, and (2) that they were misappropriated by the [Defendants]."[40] The LUTSA's definition of "misappropriation" is almost identical to that under the DTSA, and "improper means" is defined to "include[] theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."[41]

For purposes of this ruling, the Court assumes that the chemical technologies and processes developed by AAR related to Choline Chloride and Hydrogen Peroxide are classified as trade secrets.[42] The Court previously made this finding, on

---

[38] 18 U.S.C. § 1839(6)(B).

[39] *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 403 (5th Cir. 2000) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 648 (5th Cir. 1997) (citations omitted)).

[40] *Johnson Controls, Inc. v. Guidry*, 724 F. Supp. 2d 612, 628–29 (W.D. La. 2010).

[41] La. Rev. Stat. § 51:1431(2) (defining misappropriation) and (1) (defining improper means).

[42] Rec. Doc. 123, p. 17 (After the injunction hearing, the Court found that no evidence had been presented regarding the Carbon Disulfide, Flow Aid Blend, or Hydrogen Sulfide Trade Secrets; however, the Court further found that the evidence indicated that the chemical technologies and processes developed by AAR related to Choline Chloride and Hydrogen Peroxide are classified as trade secrets.); *see also* Rec. Doc. 32, pp. 12-13, ¶ 24(a) (description of Choline Chloride Trade Secrets); and p. 13, ¶ 24(b) (description of Hydrogen Peroxide Trade Secrets).

the basis of the evidence presented during the preliminary injunction hearing, and Plaintiffs have failed to submit any further evidence of the existence of any other trade secrets in support of this motion.[43] Both of these trade secrets are relevant to the business dealings with Cutrer and DCS. Nonetheless, as explained below, Plaintiffs' attempts to attribute the alleged misappropriation thereof by Trahan and Davis to Defendants Cutrer and DCS are undermined by these Defendants' undisputed evidence of a legitimate work-for-hire agreement, pursuant to which AAR and CA were paid for the work performed on behalf of Cutrer and DCS.

As explained herein, DCS entered into lawful business transactions, pursuant to an oral work-for-hire agreement, as evidenced by the testimony presented during the preliminary injunction hearing and the exhibits attached to the instant motion for summary judgment.[44] Contrary to Plaintiffs' assertions, such oral agreements are not prohibited by Louisiana law.[45] Pursuant to that agreement, AAR provided DCS with technical services and lab work. As work was performed, on a fee-per-hour basis,

---

[43] *See Johnson Controls, Inc. v. Guidry*, 724 F. Supp. 2d 612, 629 (W.D. La. 2010) ("Determining whether information qualifies as trade secrets is a question of fact.").

[44] *See, e.g.,* Rec. Doc. 133-2, pp. 10-12; Rec. Doc. 133-3, pp. 10-11; Rec. Doc. 133-5, pp. 13-18; and Rec. Doc. 122-1, incorporated by reference at Rec. Doc. 133-1, p. 7 n. 17.

[45] *See* La. Civ. Code arts. 1927 ("A contract is formed by the consent of the parties established through offer and acceptance. Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally . . ."); 1906 ("A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished."); 2045 ("Interpretation of a contract is the determination of the common intent of the parties.").

AAR invoiced DCS, as indicated in the billing records, and DCS paid each invoice in full.[46]

Despite the assumed existence of trade secrets, Plaintiffs' claims under Count One fail, because there is no evidence that Cutrer or DCS misappropriated any trade secret or used any improper means. Aside from conclusory allegations that *Trahan and Davis* formed CA for the purpose of misappropriating trade secrets,[47] Plaintiffs have failed to come forward with any evidence to support that allegation, much less any evidence upon which the Court might find any improper means attributable to Cutrer and/or DCS. And, as noted, at the summary judgment stage, the nonmovant cannot meet his burden with unsubstantiated assertions or conclusory allegations.[48] Defendants have established that DCS and AAR, as well as CA, entered into an arms-length business transaction, pursuant to which AAR conducted the requested testing and development at a set hourly rate and CA provided goods for a market price. Although DCS provided AAR with its required specifications for each project, neither Cutrer nor DCS has any ownership interest in or control over the management or operations of AAR or CA. The evidence further establishes that both AAR and CA billed DCS for the work and goods, respectively, and DCS paid every invoice it received. Based on the uncontroverted evidence submitted by these

---

[46] *See* Rec. Docs. 133-4, 133-8, and 133-9.
[47] *See* Rec. Doc. 32, pp. 17-25, ¶¶ 30-49.
[48] *Boudreaux*, 402 F.3d at 540.

Defendants, as well as the testimony presented during the preliminary injunction hearing, Cutrer and DCS are entitled to summary judgment as to Count One.

### Count Seven: Intentional and Negligent Misrepresentation

In the amended complaint, Plaintiffs allege "that Defendants expressly, repeatedly, and extensively made intentional and negligent misrepresentations to Sapienza and AAR."[49] Although Count Seven is drafted generally against "All Defendants," only Trahan and Davis are specifically named as having made "express, repeated, and extensive intentional and negligent misrepresentations[,] . . . [which] caused injury and loss to Sapienza and AAR."[50] Thus, DCS and Cutrer correctly point out that Plaintiffs have failed to identify any misrepresentation, whether negligent or intentional, which was allegedly made by these Defendants. Because Plaintiffs have not met their burden of establishing any misrepresentation, DCS and Cutrer are entitled to summary judgment as to Count Seven.[51]

---

[49] Rec. Doc. 32, p. 43, ¶ 113.

[50] *Id*. at p. 44, ¶ 114.

[51] Without alleging a particular misrepresentation or breach, Plaintiffs cannot establish intentional or negligent misrepresentation against DCS or Cutrer. "The elements of a claim for *intentional* misrepresentation in Louisiana are: (1) a misrepresentation of a material fact; (2) made with intent to deceive; and (3) causing justifiable reliance with resultant injury." *Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs*., 527 F.3d 412, 418 (5th Cir. 2008). "To make out a *negligent* misrepresentation claim in Louisiana: (1) there must be a legal duty on the part of the defendant to supply correct information; (2) there must be a breach of that duty, which can occur by omission as well as by affirmative misrepresentation; and (3) the breach must have caused damages to the plaintiff based on the plaintiff's reasonable reliance on the misrepresentation." *Id*.

### *Count Nine: Conversion*

Similar to Count Seven, although Count Nine is drafted generally against "All Defendants," only Trahan, Davis and CA are specifically named as having "converted the Sapienza/AAR Trade Secrets, which caused injury and damage to Sapienza and AAR."[52] Plaintiffs allege that they "never gave consent to CA to possess the Sapienza/AAR Trade Secrets" and they "terminated any consent given to Trahan and Davis to possess the Sapienza/AAR Trade Secrets, and demanded return of them[,] [which] Trahan and Davis refused."[53] "Under Louisiana law, conversion is an intentional tort, committed when one wrongfully does any act of dominion over the property of another in denial of or inconsistent with the owner's possessory rights, such as when one wrongfully exercises or assumes authority over another's goods, depriving him of possession, permanently or for an indefinite time."[54] Given that Plaintiffs have failed to allege, much less establish, that DCS and Cutrer committed the intentional tort of conversion, they are entitled to summary judgment as to Count Nine.

---

[52] Rec. Doc. 32, p. 45, ¶ 120.

[53] *Id*. at p. 45, ¶ 119.

[54] *Zaveri v. Condor Petroleum Corp.*, 27 F. Supp. 3d 695, 708 (W.D. La. 2014) (citing *F.G. Bruschweiler Antiques, Ltd. v. GBA Great British Antiques, LLC*, 03-792 (La. App. 5th Cir. 11/25/03); 860 So.2d 644, 649–650 (citations omitted)).

***Count Twelve: Alter Ego and Single Business Enterprise Liability***

As relevant to these Defendants, Count Twelve of the amended complaint alleges that, "upon information and belief, [DCS] is the alter ego of Cutrer[,"] such that "the entity structure may be disregarded . . . and Cutrer may be held liable for any liability imposed upon [DCS]."[55] Attached to the motion for summary judgment are excerpts of Sapienza's deposition wherein he was asked to support his allegation that "Cutrer effectively and completely controls both [DCS] and Dynamic Chemical[.]"[56] Sapienza responded that Cutrer was "listed as the owner . . . of both . . . entities[;]" that "Dynamic Chemical is a publically traded company[;]" and that Cutrer is listed, along with others, as an owner of both DCS and its parent company, Dynamic Chemical, such that Cutrer controls both of those entities.[57] Plainitffs have offered no evidence, beyond Sapienza's conclusory assertions, to support this theory of liability.[58]

By Plaintiffs' own admission, Louisiana courts have traditionally focused on the following five elements in applying the alter ego doctrine, "(1) commingling of corporate and shareholder funds; (2) failure to follow statutory formalities for incorporation and the transaction of corporate affairs; (3) undercapitalization of the

---

[55] Rec. Doc. 32, p. 47, ¶ 129.
[56] Rec. Doc. 133-7, p. 10.
[57] *Id*. at pp. 11-12.
[58] As noted, *supra*, DCS is partially owned by Cutrer and is also a wholly-owned subsidiary of Dynamic Chemical Solutions, Inc., which has multiple shareholders and a seven-person board of directors. [Rec. Doc. 133-2, p. 9; Rec. Doc. 140, p. 3, ¶ 11].

corporation; (4) failure to provide separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder or director meetings."[59] Yet, Plaintiffs fail to allege, much less establish, any of these factors. There is no evidence that DCS commingles funds with Cutrer; fails to follow statutory formalities for incorporation or the transaction of corporate affairs; is undercapitalized; fails to provide separate bank accounts or bookkeeping records; or fails to hold regular meetings. Accordingly, Cutrer and DCS are entitled to summary judgment as to Count Twelve.

### Count Thirteen: Conspiracy

Count Thirteen of the amended complaint alleges that the "Defendants conspired with one another to commit the underlying intentional torts alleged [in the complaint, as amended], and acted in furtherance of that conspiracy[,]" and are therefore liable *in solido*, pursuant to Louisiana Civil Code article 2324.[60] For the reasons outlined herein, Plaintiffs have failed to establish that any underlying intentional tort may be attributed to Cutrer or DCS and have further failed to establish that the lawful business transactions in which Cutrer and DCS engaged with Plaintiffs could support their allegations of conspiracy. Accordingly, Cutrer and DCS are entitled to summary judgment as to Count Thirteen.

---

[59] *United States v. Clinical Leasing Serv., Inc.*, 982 F.2d 900, 902 (5th Cir. 1992) (collecting Louisiana cases); *see also* Rec. Doc. 32, p. 47, ¶ 128 (Plaintiffs' citation to Louisiana case law on alter ego liability).

[60] Rec. Doc. 32, p. 48, ¶¶ 131-132. Louisiana Civil Code article 2324(A) provides: "He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act."

***Count Fourteen: Unjust Enrichment***

Count Fourteen of the amended complaint alleges that "Defendants were enriched without cause at Plaintiffs' expense," such that "Defendants are bound to compensate Plaintiffs," pursuant to the DTSA and Louisiana Civil Code article 2298.[61] To recover under a theory of unjust enrichment, the Louisiana Supreme Court has explained that a plaintiff must show the following: "enrichment on the part of the defendant; impoverishment on the part of plaintiff; [causal] relationship between the enrichment received by the defendant and the plaintiff's impoverishment; and a lack of other remedy at law."[62] Again, for the reasons outlined herein, Plaintiffs have failed to establish unjust enrichment, as they entered into a valid agreement with these Defendants, pursuant to which DCS was billed via invoices, which it paid in full, for all work performed by AAR. Accordingly, Cutrer and DCS are entitled to summary judgment as to Count Fourteen.

---

[61] Rec. Doc. 32, pp. 48-49, ¶¶ 134-135. Louisiana Civil Code article 2298 provides, in pertinent part: "A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term 'without cause' is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law." Further, in a civil action brought under the DTSA with respect to the misappropriation of a trade secret, a court may award "damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss[.]" 18 U.S.C. § 1836(b)(3)(B)(II).

[62] *Carriere v. Bank of Louisiana*, 95-3058 (La. 12/13/96); 702 So. 2d 648, 658, *on reh'g* (Nov. 3, 1997).

## C.   DEFENDANTS CUTRER AND DCS ARE NOT ENTITLED TO A FINAL JUDGMENT PURSUANT TO RULE 54(B)

In addition to summary judgment, Defendants Cutrer and DCS seek to sever final judgment in their favor, pursuant to Federal Rule of Civil Procedure 54(b), arguing that there is no just reason to delay same. Pursuant to Rule 54(b), "[w]hen an action presents more than one claim for relief . . . or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."[63] Plaintiffs oppose the request and argue that granting these Defendants a final judgment under Rule 54(b) would result in piecemeal appeals, which would be inefficient, uneconomical, and contrary to historical federal policy against same. The Court agrees, particularly in light of the Defendants' lack of articulated basis for requesting same.[64] As the Fifth Circuit has explained, "[s]ince the inception of the federal judiciary," the role of a court of appeals "has been to review final decisions of the trial courts, not to tinker with ongoing cases through piecemeal appeals, which waste 'judicial energy,' create unnecessary delays, and

---

[63] Fed. R. Civ. P. 54(b).
[64] The Court further notes that Defendants have asserted counterclaims, including a request for attorney's fees, pursuant to DTSA and LUTSA. *See* Rec. Doc. 140.

obstruct the pursuit of meritorious claims."[65] Accordingly, the request to certify a final judgment in favor of these Defendants is denied.

## CONCLUSION

For the reasons fully explained above, the Motion for Summary Judgment and to Sever Final Judgment [Rec. Doc. 133], filed by Defendants Wayne Cutrer ("Cutrer") and Downhole Chemical Solutions, LLC ("DCS") is GRANTED insofar as Cutrer and DCS are entitled to summary judgment and DENIED insofar as Cutrer and DCS are not entitled to a final judgment under Rule 54(b). Plaintiffs' claims against Cutrer and DCS are hereby DISMISSED WITH PREJUDICE.

Signed at Lafayette, Louisiana on this 17th day of September, 2018.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[65] *Tetra Techs., Inc. v. Cont'l Ins. Co.*, 755 F.3d 222, 231 (5th Cir. 2014) (citing *Sherri A.D. v. Kirby*, 975 F.2d 193, 201 (5th Cir. 1992) (citation omitted) and *Ali v. Quarterman*, 607 F.3d 1046, 1048 (5th Cir. 2010)).