**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

RICHARD SAPIENZA          CASE NO. 6:16-CV-01701

VERSUS          MAGISTRATE JUDGE HANNA

TRAHAN ET AL          BY CONSENT OF THE PARTIES

## MEMORANDUM RULING

Currently pending are two Motions for Summary Judgment and to Sever Final Judgment, filed by Defendants David O. Trahan, Chem Advances, LLC, and Cypress Technologies, LLC [Rec. Doc. 173]; and Defendants Ben D. Davis and Tarrytown Ventures, LP [Rec. Doc. 176] (collectively, "Defendants"). Plaintiffs Richard Sapienza, individually and/or derivatively as member and manager on behalf of Advanced Applied Research, LLC (collectively, "Plaintiffs"), failed to file any opposition to the motions. Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, each of the motions [Rec. Docs. 173, 176] is GRANTED in part and DENIED in part.

## PROCEDURAL BACKGROUND

This lawsuit was brought by Plaintiffs Richard Sapienza ("Sapienza"), individually and/or derivatively as member and manager on behalf of Advanced Applied Research, LLC ("AAR"), and involves allegations of, *inter alia*, misappropriation and misuse of trade secrets against the following remaining

1

defendants: David O. Trahan ("Trahan"); Ben D. Davis ("Davis"); Chem Advances, LLC ("CA"); AAR; Cypress Technologies, LLC ("Cypress"); and Tarrytown Ventures, LP ("Tarrytown").[1] Plaintiffs name Trahan and Davis as defendants in their individual capacities; as Members and Managers of AAR; and as Members and Managers of CA via their "alter egos," Cypress and Tarrytown, respectively.[2]

At issue in the instant motions are the following counts: Count One, violations of the Defend Trade Secrets Act ("DTSA") and the Louisiana Uniform Trade Secrets Act ("LUTSA"); Count Three, violations of the Louisiana Unfair Trade Practices Act ("LUTPA"); Count Four, breach of fiduciary duties; Count Five, breach of contractual obligations in bad faith; Count Six, fraud; Count Seven, intentional and negligent misrepresentation; Count Eight, detrimental reliance; Count Ten, criminal fraud, malfeasance and breach of personal duties; Count Twelve, alter ego and single business enterprise liability; Count Thirteen, conspiracy; and Count Fourteen, unjust enrichment. Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), the parties filed a joint stipulation of voluntary dismissal with prejudice, as to five other counts.[3] Further, Defendants have agreed to dissolution of AAR, such that Count Fifteen,

---

[1] Rec. Docs. 1 (complaint); 32 (54-page first amended and restated complaint). Plaintiffs' claims against Defendants Wayne Cutrer ("Cutrer") and Downhole Chemical Solutions, LLC ("DCS") were previously dismissed. *See* Rec. Docs. 191, 192.

[2] Rec. Doc. 32, p. 6, ¶¶ 7 and 8.

[3] Those counts include: Count Two, violations of Computer Fraud and Abuse Act, 18 U.S.C. § 1030; Count Nine, conversion; Count Eleven, tortious interference with a contract; Count Sixteen, declaratory judgment; and Count Seventeen, injunctive relief under DTSA, LUTSA, and/or Fed. R. Civ. P. 65. *See* Rec. Docs. 230, 231 (voluntary dismissals).

which seeks judicial dissolution of AAR is rendered moot.[4] This ruling will therefore focus on the allegations against Trahan, CA and Cypress, as well as Davis and Tarrytown, arising out of the remaining eleven counts.

The undersigned previously held a four-day hearing on Plaintiffs' requests for injunctive relief, after which proposed findings of fact and recommendations were issued and subsequently adopted by the then-presiding district judge.[5] Thereafter, the parties consented to proceed before the undersigned magistrate judge, and the case, along with all pending motions, was referred.[6] As noted above, Plaintiffs' claims against DCS and Cutrer were dismissed in September 2018, via motion for summary judgment brought by those defendants.[7]

FACTUAL BACKGROUND[8]

**A.**     **FORMATION OF AAR AND CA**

In October 2015, Sapienza was working as a consultant for EnerSciences Holdings, LLC ("EnerSciences"), which was a company partially owned by Davis and Trahan. When EnerSciences shut down, Trahan, Davis, and Sapienza decided to

---

[4] Rec. Docs. 187, p. 30, ¶ 84; and 176-1, p. 24, ¶ 76.
[5] Rec. Docs. 125, 125-1, 125-2, 125-3 (transcript); 123 (proposed findings); 131 (adoption thereof).
[6] *See* Rec. Docs. 153, 155, 156, and 158.
[7] Rec. Docs. 191, 192; *see also* footnote 1, *supra*.
[8] Unless otherwise indicated, the facts are drawn from Defendants' statement of uncontested facts and the transcripts from the four-day preliminary injunction ("PI") hearing. *See* Rec. Docs. 173-2; 176-2; 125, 125-1, 125-2, 125-3. To the extent the Court cites findings made after that hearing, it has determined same to have been established by the evidence presented therein and uncontroverted by Plaintiffs in response to the instant motions. *See* Rec. Doc. 123.

create AAR, in an effort to keep EnerSciences' research team together and replicate its business model. The research team began their work on behalf of AAR in October 2015.[9] AAR, which was officially formed on October 29, 2015, was created to conduct research and development of chemical technologies and processes for both internal and third-party use, as applicable in oil and gas and other markets. It was expected that the chemical technologies and processes would generate two forms of revenue: (1) research, development, testing, and service functions for its chemical technologies and processes; and (2) licenses and sales of its chemical technologies and processes as intellectual property, specifically including the trade secrets at issue herein.[10] Like EnerSciences, AAR was never intended to manufacture or market chemicals itself but rather would rely on a separate entity to do so.[11]

AAR does not have an operating agreement; however, its members are Trahan, Davis, and Sapienza, each of whom made a capital contribution to AAR and was intended to oversee a different aspect of AAR's business.[12] Trahan was intended

---

[9] In October 2015, EnerSciences shut down and its research team continued to research and develop certain technologies and processes. Two members of that team testified during the PI hearing that they were aware that they would work for AAR once it was formed; however, they were under the impression AAR would not be formed until January 2016 and that they would continue to be paid by Rapid Specialty Products until then. *See* footnote 10, *infra*; *see also* Rec. Doc. 125-2, pp. 200-01. Indeed, although AAR was officially formed on October 29, 2015, it did not officially have employees until January 2016. *See* Rec. Doc. 123, pp. 2-3; and Rec. Docs. 173-2 and 176-2, p. 3, ¶ 11 and n.11.

[10] *See* Rec. Doc. 32, p. 11, ¶ 21.

[11] *See* Rec. Doc. 32, p. 11, ¶ 21 (In their amended complaint, Plaintiffs state that "AAR would not . . . manufacture, sell, or distribute products.").

[12] During the PI hearing, testimony established that AAR's intended members were Tarrytown, with Davis as its sole member; Cypress, with Trahan as its sole member; and Visibly Green, LLC,

to oversee the business aspects, including marketing and sales; Davis was intended to secure additional sources of funding while also helping with marketing and sales; and Sapienza was intended to oversee the science and technology aspects, including the researching, inventing, developing, and testing of chemical technologies and processes. As stated in Plaintiffs' amended complaint: "The course of dealing and documents amongst Trahan, Davis, and Sapienza evidence their shared management. For instance, AAR issued an Employee Handbook effective January 2016, which contained a 'Welcome' letter from Sapienza, Trahan, and Davis, identifying them as 'Managing Member[s].'"[13]

As EnerSciences had done, the initial plan was for AAR to use Rapid Specialty Products ("Rapid Specialty"), an entity owned by Trahan and Davis, to manufacture and market AAR's chemical technologies and processes.[14] On November 17, 2015, Trahan illustrated this intent in a memo to all AAR employees, which stated that Rapid Specialty would "serve as a conduit to the market in order to supply products and solutions into the field. AAR will share in the gross profit on these sales, generating additional revenue to our AAR team."[15] Sapienza not only

---

with Sapienza as its sole member. Rec. Doc. 123, p. 3. However, upon noticing that the Articles of Organization failed to identify AAR's members, Trahan filed a notice of change, identifying AAR's members as Trahan, Davis and Sapienza. *Id*. at pp. 3-4.

[13] Rec. Doc. 32, p. 10, ¶ 18.

[14] During the PI hearing, testimony established that Rapid Specialty was a Texas LLC, whose sole member and manager was Novastar Holdings, LLC, a Louisiana LLC whose members were Trahan and Davis. Rec. Doc. 123, p. 3.

[15] Rec. Doc. 123, p. 5; and Rec. Doc. 120-2, p. 2.

agreed that a separate entity would sell AAR's products, but he also knew that Rapid Specialty was intended to fill that position and that he did not have an ownership interest in Rapid Specialty. However, as it turned out, Rapid Specialty was never actually used to sell AAR's products. Due to issues surrounding name similarities between Rapid Specialty and another entity, Trahan and Davis intended to form a new entity to replace Rapid Specialty and avoid the name confusion.

On December 9, 2015, CA was formed, as a Louisiana limited liability company, whose members are Tarrytown, with Davis as its sole member, and Cypress, with Trahan as its sole member. Trahan and Davis both followed corporate formalities with respect to each entity with which each is involved; each entity has its own filing documentation, its own separate ownership, and its own distinct records.[16] Cypress and Tarrytown both followed all formalities with respect to their relations with CA and AAR; each had separate bank accounts and did not commingle funds.[17]

Neither Sapienza nor his entity, Visibly Green, LLC, are or ever were members of CA. Sapienza was aware of CA's existence and its purpose. Trahan explained to Sapienza and AAR's staff that CA would replace Rapid Specialty as the separate entity primarily responsible for marketing AAR's products and services.

---

[16] *See* Rec. Doc. 173-7 (Cypress); Rec. Doc. 176-7 (Tarrytown); Rec. Docs. 173-8 and 173-9 (AAR); Rec. Doc. 173-10 (CA); *see also* Rec Docs. 173-11, 173-12, and 173-13.
[17] Rec. Docs. 173-2, p. 4, ¶ 19; 176-2, p. 4, ¶ 18.

During the PI hearing, a member of AAR's research team testified that she was always aware that AAR and CA were two separate companies, and she further testified that she attended a meeting, with Sapienza present, where it was explained that AAR would be a research and development company and CA would sell and manufacture AAR's products.[18] In addition, Sapienza received multiple emails and other documents evidencing the existence of AAR and CA as two separate and distinct entities.[19]

## B.   UNIVAR OPPORTUNITY

Once AAR was formed, a potential business opportunity arose with Univar, which is an international distributor of chemical related products and services, with which Rapid Specialty had previously had a distribution agreement. In an attempt to secure an agreement with Univar, AAR prepared a product list containing the names and general descriptions of AAR's products. Through CA, Trahan began discussing a deal for AAR to develop and test products for Univar. The record reflects communications between Trahan and Univar, discussing a proposed distribution agreement between AAR/CA and Univar.[20] However, Univar never reached an agreement with AAR, deciding instead to only to do business with CA, as a

---

[18] Rec. Docs. 123, p. 6; and 125-2, p. 195.

[19] *See* Rec. Docs. 173-14 through 173-20; and Rec. Doc. 186-1 (sealed). During the PI hearing, Sapienza testified that he was unaware that AAR and CA were two separate entities. There, the Court found Sapienza's testimony incredible; however, the Court is precluded from continuing in that finding at the summary judgment stage.

[20] *See* Rec. Docs. 120-7, pp. 22, 23; and 120-2, p. 8, ¶ 7.

continuation of the manufacturing and sales arrangement Univar previously had with Rapid Specialty.[21] CA already had access to the product lines that Univar had bought from Rapid Specialty in the past, given that Rapid Specialty was the predecessor to CA. Univar never purchased any AAR-developed chemical technology or process from AAR or CA.

## C.    RELATIONSHIP WITH DCS

In December 2015, through CA, Trahan also reached out to DCS, an oil and gas fluids company partially owned by Cutrer. Trahan knew Cutrer from previous interactions through EnerSciences, including Cutrer's October 2015 research request regarding a low temperature gel breaker. On January 4, 2016, in an e-mail exchange between Trahan and Cutrer, it was agreed that Sapienza and two additional AAR researchers, would continue their previous research from EnerSciences, to develop a low temperature breaker for DCS. As a result, Trahan and Cutrer entered into a work-for-hire agreement between DCS, AAR, and CA, pursuant to which AAR began developing a low temperature breaker for use in certain DCS products. Sapienza was aware that Trahan entered into a business arrangement with DCS and that DCS was paying AAR for its services.

---

[21] Defendants allege that the negotiations halted after an unprofessional display of emotion by Sapienza during a meeting between AAR/CA and Univar. Rec. Doc. 173-2, p. 6, ¶ 27 and n.27.

Consistent with DCS's typical business practices, Trahan and Cutrer did not execute a written contract; rather, they orally agreed that AAR would perform the breaker testing and development work for DCS at a set hourly rate, to be periodically invoiced to DCS. In order for AAR to determine which products would work for DCS's intended purposes, DCS provided AAR with certain parameters for the breaker development. AAR ultimately developed a formulation with three additives that works with a diluted peroxide to break down polymers at a slow enough speed to allow the chemicals to function before being broken down. AAR figured out the additives, each of which is publicly available and commonly known as a peroxide additive, and conducted testing with various dilutions of peroxide to determine the optimal formulation for DCS's needs. After obtaining the formulation, DCS ordered the additives from CA and sent the additives to an entity named PeroxyChem to be mixed with peroxide.

On January 27, 2016, an AAR employee and member of its research team, Suchandra Hazra, completed a Choline Chloride Enhancer Evaluation for AAR. Two days later, on January 29, 2016, CA made modifications to the report and renamed the product Clay Control 532 ("CC 532"), to market and sell it as a product. Sapienza knew that CA was marketing CC 532 and a concentrated version called

CC 532C.[22] On March 15, 2016, Raymond Bienvenu, a CA employee, emailed Trahan and Sapienza regarding the "Chem Advances 532C" and attached the product's safety data sheet and customer label. Neither of the two attachments discloses specific details, technical aspects, or otherwise proprietary information regarding CC 532C. In the safety data sheet, under the section titled "Composition Information on Ingredients," the actual composition/specific chemical identity is not disclosed; the information is only identified as "Proprietary."[23]

DCS purchased and, to the Court's knowledge, continues to purchase CC 532 from CA and blends it with choline chloride, a widely known and commonly used clay control product. As recognized in a prior ruling, DCS hired and paid AAR by the hour to test various blends to find a commercially viable blend of CC 532 and choline chloride. DCS provided AAR with desired specifications, and AAR billed DCS for hours spent working on the project. As requested by DCS, AAR provided DCS with a formulation blend of CC 532 and choline chloride. DCS's end product is sold under the trade name Clayblok 35.[24] DCS manufactures Clayblok 35 by shipping the chemicals to a facility, where they are blended based on the specific

---

[22] Again, although Sapienza knew this to be true, he also testified during the PI hearing that he did not understand that CA and AAR were two separate entities. *See, e.g.,* Rec. Doc. 125-1, p. 45 (Sapienza testified: "[T]wo entities could mean two entities within the same organization.").
[23] Rec. Doc. 186-7, p. 5 (sealed).
[24] Until this lawsuit, DCS was not aware of the source of the cationic starch (in the cationic starch-choline chloride formulation), and DCS is still unaware of the specific chemical composition thereof. *See* Rec. Doc. 191, p. 8, n.14.

formulation DCS paid AAR to develop, and then markets and sells that blend to its oil and gas customers.[25] The chemical formula for CC 532 was never disclosed to DCS or Cutrer; neither DCS nor Cutrer know the chemical formula to create CC 532; and no proprietary information regarding CC 532 is disclosed in DCS's safety data sheet for Clay Blok 35.

Under the direction of Trahan, CA provided AAR with administrative services, including payroll, accounting, invoicing, human resources, and general bookkeeping. Trahan appointed his son, Richard "Butch" Trahan, a CA employee, to oversee AAR's payroll and other administrative aspects such as accounting and bookkeeping.

AAR began sending invoices to DCS in June 2016, for work AAR performed related to the development of the low temperature breaker and clay control, as well as other services. After reviewing time entries in Projecturf, a web-based program used to track AAR's work and protect its proprietary information, AAR would generate invoices using QuickBooks. The customer was then invoiced through a web-based program called Smartsheet. Once an invoice was posted to Smartsheet, Butch Trahan would notify DCS's accounting manager that the invoice was available, and DCS would then wire the money to CA's account or directly to

---

[25] As previously recognized, DCS also hired AAR for testing and development of a specific flow aid blend and a friction reducer sourced by AAR and/or CA, and DCS paid AAR for all time so expended. *See* Rec. Doc. 191, p. 8.

AAR.[26] In total, AAR has invoiced DCS $771,562.69, and DCS has paid, in full, each invoice it has received from AAR. Likewise, CA invoiced DCS for all chemicals, and DCS paid for those chemicals.

## D.  BALCHEM OPPORTUNITY

CA also pursued a business opportunity with Balchem, specifically regarding AAR's Choline Chloride Enhancer.[27] CA wanted to reach an agreement with Balchem, because it is one of the largest manufacturers and suppliers of choline chloride, and AAR's Choline Chloride Enhancer would allow them to supplement and sell their product at a lower cost. On April 1, 2016, Balchem signed a non-disclosure and non-solicitation agreement with AAR. On August 17, 2016, CA and AAR held a presentation for Balchem in Lafayette regarding AAR's Choline Chloride Enhancer. The presentation was put together by Trahan and Sapienza and contained references to both CA and AAR. During the presentation, Balchem requested the identity of the key raw material supplier for the CC 532 concentrate. On August 22, 2016, Trahan disclosed the supplier to Balchem under the terms of

---

[26] DCS's accounting manager, Bryan Leonards, testified by affidavit that AAR, CA, and DCS all had access to Smartsheet. When new AAR and CA invoices were posted to Smartsheet, Butch Trahan notified Mr. Leonards, at which time Mr. Leonards would wire the amount due from DCS "directly to CA's account." However, "[i]n at least one instance, the money was sent by check or wire directly to AAR." Rec. Doc. 133-8, pp. 1-2, ¶¶ 3-4.

[27] Plaintiffs allege that this opportunity, "for AAR to market and sell the Choline Chloride Trade Secrets to Balchem, one of the largest manufacturers and suppliers of choline chloride[,]" arose out of Sapienza's "contacts and experience." It is this Balchem opportunity which Plaintiffs contend was "the tipping point that caused Trahan and Davis finally to disclose the true ownership of CA and freeze out Sapienza[.]" Rec. Doc. 32, p. 25, ¶¶ 50 and 51.

the previously executed non-disclosure agreement. However, Balchem never reached an agreement with CA or AAR regarding the Choline Chloride Enhancer.

## E.   EFFORTS TO PROTECT PROPRIETARY INFORMATION

CA prepared product data sheets for Breaker LT 105 Concentrate, CC 532C and Advanced ClayControl, to advertise and sell those AAR products to potential customers. The data sheets contained a general product description that is commonly used to advertise products to potential customers; however, they did not disclose any product formulations or specific details about the technical aspects of the products.

AAR protected their proprietary information through different methods. AAR authorized only its members, managers, and employees to access their research and relied on two different web-based programs called Projecturf, discussed above, and Egnyte. All access to Projecturf and Egnyte required the use of a password and was limited to only AAR's members, managers, and employees. AAR also made all employees acknowledge that they received an Associate Guide to Policy Handbook. As quoted in the amended complaint, the Associate Guide to Policy Handbook, in the Confidential Information section, provides in pertinent part:

> [AAR] policy requires that all Associates protect the integrity of the company's proprietary and confidential information as well as the proprietary and confidential information of others. It is the responsibility of all [AAR] Associates to safeguard sensitive company information. The nature of our business and the economic well-being of our company is dependent upon protecting and maintaining proprietary company information. Continued employment with the company is contingent upon compliance with this policy. Each

company supervisor/manager bears the Responsibility for the orientation and training of his or her Associates to ensure enforcement of company confidentiality. Any and all company information, including trade secrets or confidential information relating to products, processes, know-how, customers, designs, drawings, formulas, test data, marketing data, accounting, pricing or salary information, business plans and strategies, negotiations and contracts must remain company private and confidential . . .

Company trade secrets or confidential information should never be transmitted or forwarded to outside individuals or companies not authorized to receive that information, and should not even be sent or forwarded to Associates inside the company who do not have a need to know the information . . .

Associates who improperly use or disclose trade secrets or confidential business information may be subject to disciplinary action, up to and including termination and legal action.[28]

AAR also implemented a policy to protect their confidential information from former employees. Two former members of AAR's research team testified during the PI hearing that their hard drives were removed from their computers and their access to Projecturf and Egnyte was terminated when their AAR employment ended.

## ANALYSIS

### A.   THE SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. A fact is material if proof of

---

[28] *See* Rec. Doc. 32, pp. 15-16, ¶ 28.

its existence or nonexistence might affect the outcome of the lawsuit under the applicable governing law.[29] A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[30]

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.[31] The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of genuine issues of material fact.[32] If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact.[33] All facts and inferences are construed in the light most favorable to the nonmoving party.[34]

The court cannot make credibility determinations or weigh the evidence, and the nonmovant cannot meet his burden with unsubstantiated assertions, conclusory allegations, or a scintilla of evidence.[35] Under Rule 56(c)(3), "[t]he court need

---

[29] *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex*., 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc*., 232 F.3d 473, 477 (5th Cir. 2000).
[30] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citing *Anderson*, 477 U.S. at 252); *Hamilton,* 232 F.3d at 477.
[31] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).
[32] *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007) (citing *Celotex Corp.*, 477 U.S. at 323).
[33] *Washburn*, 504 F.3d at 508.
[34] *Brumfield*, 551 F.3d at 326 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).
[35] *Boudreaux v. Swift Transp. Co., Inc*., 402 F.3d 536, 540 (5th Cir. 2005).

consider only the cited materials, but it may consider other materials in the record."[36] Here, the parties were put on notice of the Court's intent, for purposes of the dispositive motions in this case, to consider the evidence presented during the PI hearing held on October 2–5, 2017.[37]

Importantly, motions for summary judgment "cannot be granted simply because there is no opposition."[38] When no response is filed, however, the Court may accept as undisputed the facts set forth in support of the motions and grant summary judgment when a prima facie showing for entitlement to judgment is made.[39] "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."[40]

---

[36] Fed. R. Civ. P. 56(c)(3).

[37] *See* Fed. R. Civ. P. 65(a)(2) (Even when the Court does not consolidate the injunction hearing with trial on the merits, "evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial."); *see also Brown v. Livingston*, 524 F. App'x 111, 115 (5th Cir. 2013) (consideration of, *inter alia*, evidence presented at preliminary injunction hearing resulted in conversion of motion to dismiss into a summary judgment motion); *JSLG, Inc. v. City of Waco*, No. 11-131, 2011 WL 13180227, at *1 (W.D. Tex. Sept. 26, 2011), *aff'd*, 504 F. App'x 312 (5th Cir. 2012) (considering evidence presented at a preliminary injunction hearing in granting a motion for summary judgment).

[38] *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 n.3 (5th Cir. 1995); *see also Calais v. Theriot*, 589 F. App'x 310, 311 (5th Cir. 2015) (per curiam).

[39] *See Eversley v. MBank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988).

[40] *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec.*, 475 U.S. at 586-87 (footnote and internal citation marks omitted)).

**B.** **PLAINTIFFS ARE NOT ENTITLED TO ADDITIONAL DISCOVERY UNDER RULE 56(D) OR MODIFICATION OF THE SCHEDULING ORDER UNDER RULE 16(B)(4)**

Oppositions to the instant motions were originally due on September 27, 2018.[41] That deadline passed without any submission from Plaintiffs. At the request of defense counsel, a telephone status conference was held on October 9, 2018, at which time Plaintiffs' counsel, Ms. Lafontaine, advised that she would be immediately enrolling pro hac vice co-counsel, David Cabrales, who was also on the call.[42] In light of then-pending, unopposed motions for summary judgment, which included the instant motions, Mr. Cabrales suggested that further discovery may be necessary. In consideration of Plaintiffs' arguments and anticipated request for further discovery, the Court advised that any such request must be made pursuant to Federal Rule of Civil Procedure 56(d) and "as soon as possible," and further extended the deadline by which to oppose the dispositive motions until November 23, 2018, with oral argument continued to December 11, 2018.[43]

---

[41] Rec. Doc. 182. All defendants, including Cutrer and DCS, have also moved for summary judgment on their counterclaims [Rec. Docs. 178, 180], and those motions were likewise included in the notice of motion setting, in which briefing deadlines and oral argument were set for the instant motions. Rec. Doc. 182. However, the counterclaims are not addressed herein.

[42] Rec. Doc. 198. Five days after the conference, Ms. Lafontaine formally moved for Mr. Cabrales to enroll pro hac vice; however, the motion was deemed deficient for lack of original signature of counsel applying for pro hac vice status. *See* Rec. Docs. 201, 202. Despite Plaintiffs' counsel's failure to respond to the deficiency, the Court granted Mr. Cabrales' request on October 31, 2018. *See* Rec. Doc. 207.

[43] *Id.*

Thereafter, on November 20, 2018, Plaintiffs moved for a one-week extension of time within which to oppose the dispositive motions.[44] The Court granted Plaintiffs' request, extending the deadline to November 30, 2018; however, noting "the specious nature of the plaintiff[s'] motion," the Court warned that no further extension would be granted.[45] Nonetheless, Plaintiffs missed the extended deadline and, on December 3, 2018, submitted a "Combined Response" to all pending dispositive motions, which was actually a dual motion, urging the Court for a continuance and new scheduling order under Rule 16(b)(4) and/or additional discovery under Rule 56(d), in order to oppose the summary judgment motions.[46] In support thereof, Plaintiffs claimed that previous discovery was limited to "preliminary injunction issues," namely the alleged "misappropriation of trade secrets;" that no party had served formal discovery responses despite having served formal discovery requests; and that only a limited number of depositions had been taken.[47] As to the latter, Plaintiffs admit that Sapienza was previously deposed "both in connection with the preliminary injunction[] and on the merits;" however, Plaintiffs claim that the depositions of Trahan, CA, Cutrer and DCS were limited to "preliminary injunction issues."[48]

---

[44] Rec. Doc. 208.
[45] Rec. Doc. 209.
[46] Rec. Doc. 210.
[47] Rec. Doc. 210-1, pp. 15-17.
[48] *Id*. at pp. 16-17. The Court finds this argument unpersuasive, given that Plaintiffs were required to show "a substantial likelihood of success on the merits," to prevail on the motion for preliminary

Defendants filed one joint reply, objecting to any further extension of time to respond to the dispositive motions, particularly given Plaintiffs' history of extension requests and missed deadlines, detailed in a spreadsheet attached to the reply, and Plaintiffs' failure to support their requests for additional time and discovery with specific reasons therefor.[49] In addition, contrary to Plaintiffs' assertions, Defendants asserted that they had responded to all discovery requests propounded by Plaintiffs and had also produced over 12,000 pages of bates numbered documents consisting of "much more than just 'trade secret' discovery."[50] Defendants further argued that the parties had engaged in numerous conferences and communications, in an effort to ascertain what discovery was needed, and even set aside various dates for Plaintiffs to depose defense witnesses, only to have Plaintiffs fail to notice any additional depositions, request any timely discovery extensions or move to compel additional responses to discovery.[51]

On December 11, 2018, the parties appeared, as scheduled, for oral argument on the pending dispositive motions. At the conclusion of the hearing, and in light of the parties' dispute surrounding the extent of discovery undertaken in this case, the

---

injunction. *Planned Parenthood Ass'n of Hidalgo Cty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012). The substantive depth of the PI hearing, as indicated through the lengthy transcript, belies Plaintiffs' assertions that the hearing and related discovery were "limited" to the extent claimed in this particular case. Furthermore, the parties engaged in post-hearing discovery between August and October 2018. *See, e.g.,* Rec. Docs. 217, pp. 3-6; and 224-227.

[49] Rec. Doc. 213.

[50] Rec. Doc. 213, p. 3-4.

[51] *Id.*

Court ordered each side to "submit copies of all interrogatories and document requests propounded to that party and the written responses thereto, in addition to any agreed-upon responses or production, to the extent the parties reached such agreements without requiring written discovery requests."[52] The parties complied, and the Court has reviewed their submissions, in order to ascertain whether the parties have had an adequate opportunity to engage in discovery.[53]

Where, as here, a party seeks "a continuance of a motion for summary judgment in order to obtain further discovery, [that] party must indicate to the court by some statement, preferably in writing (but not necessarily in the form of an affidavit), *why he needs additional discovery and how the additional discovery will create a genuine issue of material fact*."[54] "The nonmoving party 'may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts.'"[55] Instead, that party must "set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence

---

[52] Rec. Doc. 215.

[53] *See* Rec. Docs. 217–227.

[54] *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993) (emphasis added) (citations omitted); *see also* Fed. R. Civ. P. 56(d)(2) ("If a nonmovant shows by affidavit or declaration that, *for specified reasons*, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery[.]") (emphasis added).

[55] *Id*. (quoting *SEC v. Spence & Green Chemical Co.*, 612 F.2d 896, 901 (5th Cir. 1980)).

the outcome of the pending summary judgment motion."[56] "If it appears that further discovery will not produce evidence creating a genuine issue of material fact, the district court may, in the exercise of its discretion, grant summary judgment."[57]

In considering the instant Rule 56(d) request, it is important to note that this is not the first such request by Plaintiffs in this case. On December 14, 2017, now-dismissed defendants Cutrer and DCS filed a motion for summary judgment.[58] Plaintiffs sought and were granted an extension of time within which to respond thereto.[59] One day after their extended deadline passed, Plaintiffs submitted a memorandum, in which they represented that certain facts had been unavailable to them and therefore, pursuant to Rule 56(d), requested that the Court defer consideration of the motion and allow time to take additional discovery.[60] On the basis of Plaintiffs' request, the Court upset the original hearing on the motion and granted Plaintiffs an additional thirty days to supplement their opposition.[61] Plaintiffs then made another untimely request to extend the opposition deadline, which the Court again granted.[62] Despite the extensions, and having been put on

---

[56] *American Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013) (quoting *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010) and *C.B. Trucking, Inc. v. Waste Mgmt. Inc.*, 137 F.3d 41, 44 (1st Cir. 1998)).
[57] *Krim,* 989 F.2d at 1442 (citing *Netto v. Amtrak*, 863 F.2d 1210, 1216 (5th Cir. 1989); *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991)).
[58] Rec. Doc. 133.
[59] Rec. Docs. 137, 138.
[60] Rec. Doc. 139, pp. 2, 7-12.
[61] Rec. Doc. 162.
[62] Rec. Doc. 167 (motion); Rec. Doc. 168 (order).

notice that the Court would consider evidence presented during the PI hearing, Plaintiffs failed to supplement their opposition and likewise failed to controvert Defendants' statement of uncontested facts.[63] The Court granted the motion and dismissed all claims against Cutrer and DCS.

Against that backdrop, the Court further notes that the above-referenced Rule 56(d) request for additional discovery was filed on January 6, 2018, and relied upon nearly identical reasons *and*, aside from references to an updated residence and the recent addition of co-counsel, identical affidavits from Sapienza, declaring in part that "[h]e believes the written and oral discovery will reveal facts enabling the Plaintiffs to oppose Defendants' Motions . . . and to support further the Plaintiffs' claims against the Defendants."[64] In other words, although this case has been pending since December 9, 2016, and the parties participated in a four-day PI hearing from which there exists an available 741-page transcript, Plaintiffs have failed to use their time or resources to either engage in meaningful discovery or to support any request for additional discovery with *specific reasons* why more discovery is needed and *how* such discovery might create a genuine issue of material fact. This is true despite having ample time and ability to do so, particularly given that the Court has

---

[63] *See* Rec. Doc. 191, pp. 3-4.
[64] *Compare* Rec. Docs. 139 and 139-1 *with* Rec. Docs. 210-1 and 210-3.

granted all, or substantially all, of Plaintiffs' requests for extensions, whether such requests were made timely or untimely.

Nonetheless, as acknowledged above, following the parties' arguments on December 11, 2018, the Court allowed the parties to submit copies of all interrogatories and document requests propounded or agreed-upon, and the responses thereto, so that the Court could review same and decide whether Plaintiffs should be allowed any additional discovery.[65] Having thoroughly reviewed and considered the parties' submissions, the Court remains satisfied that Plaintiffs have had ample opportunity within which to conduct any necessary discovery and have failed to do so or to provide specific reasons why additional time is necessary to do so. Moreover, despite having engaged in significant discovery, which included depositions of both Trahan and CA, and having a 741-page transcript available from the PI hearing, Plaintiffs have failed to make *any* effort to oppose the pending dispositive motions.[66] Accordingly, both the request for additional discovery under Rule 56(d) and the request to modify the scheduling order under Rule 16(b)(4) are

---

[65] *See* Rec. Docs. 217-227.
[66] Rec. Docs. 210-1, p. 16; and 172-2, p. 2, ¶ 2.

denied.[67] As such, all material facts set forth by Defendants will be deemed admitted, for purposes of the instant motions.[68]

## C. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL REMAINING COUNTS

As mentioned, only the following eleven counts remain. Each count will be analyzed in turn.

### Count One: Violations of the DTSA and the LUTSA

Plaintiffs allege that AAR owns the following five trade secrets, collectively referred to as the "[AAR] Trade Secrets:"[69] (1) Choline Chloride Trade Secrets; (2) Hydrogen Peroxide Trade Secrets; (3) Carbon Disulfide Trade Secrets; (4) Flow Aid Blend Trade Secret; and (5) Hydrogen Sulfide Trade Secrets.[70] In forming AAR, Plaintiffs claim that Sapienza, Trahan and Davis agreed that AAR's trade secrets would be protected, such that each of the three members and managers of AAR owed

---

[67] Rule 16(b)(4) provides that "[a] schedule may be modified *only for good cause* and with the judge's consent." Fed. R. Civ. P. 16(b)(4). For the same reasons Plaintiffs have failed to justify their request for additional discovery under Rule 56(d), they have likewise failed to show good cause for modifying the scheduling order on this record and at this stage in the proceedings.

[68] Rec. Docs. 173-2 and 176-2 (Defendants' statements of uncontested facts). Pursuant to Local Rule 56.2, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." Because Plaintiffs failed to file "a separate, short and concise statement of the material facts as to which there exists a genuine issue to be tried," all material facts set forth by Defendants will be deemed admitted, in accordance with Local Rule 56.2.

[69] Although Plaintiffs originally claimed that "Sapienza and AAR" own the trade secrets, it is undisputed that Plaintiffs are claiming that the trade secrets at issue belong to AAR rather than Sapienza himself. *Compare*, *e.g.,* Rec. Doc. 32, pp. 36-37, ¶ 85, *with* Rec. Doc. 125-3, p. 45, line 11 (Sapienza testified during the PI hearing: "They are AAR trade secrets.").

[70] Rec. Doc. 32, pp. 36-37, ¶ 85.

duties to maintain the secrecy and limit the use of AAR's trade secrets.[71] In Count One, Plaintiffs allege that "[all] Defendants willfully, maliciously, and in bad faith, misappropriated [and continue to misappropriate] the [AAR] Trade Secrets by (a) acquiring them by improper means; [and] (b) disclosing and using them without express or implied consent."[72]

In the background section of the amended complaint, Plaintiffs allege, in part:

[O]nly forty (40) days after the formation of AAR, Trahan and Davis surreptitiously caused a separate, competing entity - CA - to be formed on December 9, 2015, to misappropriate and misuse the [AAR] Trade Secrets for their sole, personal, financial benefit; to compete with AAR; to divert opportunities from AAR to CA; and to tortiously interfere with AAR's contracts. Trahan and Davis caused CA to acquire the [AAR] Trade Secrets via improper means of theft, misrepresentation, inducement of the breach of duty to maintain secrecy, electronic means, and other unlawful means[.] Trahan and Davis also caused CA to disclose and use the [AAR] Trade Secrets, without express or implied consent[.][73]

Although it is undisputed that AAR was never intended to market or sell its own products, Plaintiffs allege that all parties initially contemplated "that a separate entity or division *of AAR* would fill that role.[74] Instead, Plaintiffs allege that Trahan and Davis, through their respective "alter egos" Cypress and Tarrytown, breached their fiduciary duties and "decided to utilize CA for their own interests," without

---

[71] Rec. Doc. 32, p. 9, ¶ 16.
[72] Rec. Doc. 32, p. 37, ¶ 86; and p. 19, ¶ 35.
[73] Rec. Doc. 32, p. 17, ¶ 30.
[74] Rec. Doc. 32, p. 17, ¶ 31.

disclosing the formation of CA "to Sapienza (or properly to AAR)[.]"[75] Plaintiffs

further contend that, when they became aware of the existence of CA in Spring of

2016, Trahan and Davis misrepresented that CA was a "sales and marketing" part or

division of AAR, and it was not until August 2016 that Trahan and Davis disclosed

to Sapienza and AAR that CA was a separate entity owned by them, personally and

separately.[76] At that point, Plaintiffs allege that Trahan and Davis began to "force

and freeze out Sapienza," which "coincided with Trahan and Davis attempting to

divert [the Balchem opportunity] from AAR to CA."[77]

Plaintiffs further claim that Trahan and Davis facilitated the alleged

misappropriation and misuse:

> by simultaneously being intimately involved in the day-to-day
> operations of CA; by improperly accessing and using AAR's two, web-
> based, computer programs (Projecturf and Egnyte) beyond their
> capacity and authority for AAR, on behalf of themselves individually,
> CA, and others; and by taking advantage of their authority and
> responsibilities as Members and Managers of AAR to create and allow
> certain internal control weaknesses to further their purposes including,
> but not limited to, a lack of segregation of duties, physical safeguards,
> independent checks, proper authorizations, proper documents,
> overriding existing controls, and an inadequate accounting system.[78]

---

[75] Rec. Doc. 32, p. 17, ¶ 31; and p. 18, ¶¶ 32 and 34. Again, the Court notes that, during the PI hearing, a member of AAR's research team testified that she was always aware that AAR and CA were two separate companies and that she attended a meeting, with Sapienza present, where it was explained that AAR would be a research and development company and CA would sell and manufacture AAR's products. The record also reflects that Sapienza received multiple emails and other documents evidencing the existence of AAR and CA as two separate and distinct entities.

[76] Rec. Doc. 32, p. 18, ¶ 34.

[77] *Id*. at pp. 18-19, ¶ 34.

[78] Rec. Doc. 32, p. 19, ¶ 35.

Specifically, Plaintiffs allege that Trahan and Davis caused CA to misappropriate and misuse the AAR Trade Secrets, by, *inter alia*, creating a "confidential memo" for CC 532 sales targets; engaging with Univar, Cutrer and DCS, without first obtaining a non-disclosure agreement; issuing a product information brochure for "Breaker LT 105" (hydrogen peroxide trade secret), using Projecturf and an AAR employee; and issuing product data sheets, through CA, which allegedly revealed "part of the formula, methodology, application, and the like pf the [AAR] Trade Secrets."[79] As explained below, even assuming the existence of two trade secrets, Plaintiffs' claims under the DTSA and the LUTSA fail, because there is no evidence that any of the Defendants misappropriated any trade secret.

To succeed under the DTSA, a plaintiff must establish (1) the existence of a trade secret; (2) misappropriation of the trade secret by another; and (3) the trade secret's relation to a good or service used or intended for use in interstate or foreign commerce.[80] Similarly, to succeed under the LUTSA, "a complainant must prove (a) the existence of a trade secret, (b) a misappropriation of the trade secret by another, and (c) the actual loss caused by the misappropriation."[81]

---

[79] Rec. Doc. 32, pp. 19-20, ¶ 36; p. 20, ¶ 37; p. 21, ¶¶ 39 and 40; and p. 22, ¶ 41.

[80] 18 U.S.C. § 1836(b)(1); *see also Source Prod. & Equip. Co. v. Schehr*, No. 16-17528, 2017 WL 3721543, at *2 (E.D. La. Aug. 29, 2017).

[81] *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 403 (5th Cir. 2000) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 648 (5th Cir. 1997) (citations omitted)); *see also Johnson Controls, Inc. v. Guidry*, 724 F. Supp. 2d 612, 628–29 (W.D. La. 2010) ("In order to show that the trade secrets have been misappropriated, [Plaintiffs] would have to prove that (1) a trade secret existed, and (2) that they were misappropriated by the [Defendants].").

Under the DTSA, a trade secret is defined, in pertinent part, as:

all forms and types of . . . business, scientific, technical . . . information, including . . . formulas, . . . methods, techniques, processes, procedures, . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if–

A. The owner thereof has taken reasonable measures to keep such information secret; and

B. The information derives independent economic value, actual or potential, from not being known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.[82]

The definition of a trade secret under the LUTSA is very similar to the definition under the DTSA.[83]

For purposes of this ruling, the Court assumes that the chemical technologies and processes developed by AAR related to Choline Chloride and Hydrogen Peroxide, numbers one and two listed above, are classified as trade secrets.[84] These technologies contain scientific formulas that AAR used reasonable measures to protect. AAR secured the proprietary information regarding the research and development of these technologies on computer programs with limited access; had

---

[82] 18 U.S.C. § 1839(3).

[83] *Compare* 18 U.S.C. § 1839(3) and La. R.S. 51:1431(4).

[84] The Court previously made this finding, on the evidence presented during the PI hearing, and Plaintiffs have failed to submit any further evidence of the existence of any other trade secrets in support of this motion. Rec. Doc. 123, p. 17; *see Johnson Controls*, 724 F. Supp. 2d at 629 ("Determining whether information qualifies as trade secrets is a question of fact."); *see also* Rec. Doc. 32, pp. 12-13, ¶ 24(a) (description of Choline Chloride Trade Secrets); and p. 13, ¶ 24(b) (description of Hydrogen Peroxide Trade Secrets).

all AAR employees execute confidentiality agreements; and required non-disclosure agreements before disclosing certain aspects of the technologies to potential customers. Furthermore, the Choline Chloride and Hydrogen Peroxide technologies remain valuable to potential companies, because they are not generally known and not readily ascertainable. The evidence in the record indicates that several companies, such as DCS, Balchem, and Univar, were interested in these technologies because of their attributes and the companies' inability to obtain them from other sources. Therefore, the Court continues in its earlier finding that the Choline Chloride and Hydrogen Peroxide technologies are classified as trade secrets under DTSA and LUTSA.[85]

As to the second required element of Plaintiffs' case, the DTSA defines the term "misappropriation" to mean:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
>> (i)     used improper means to acquire knowledge of the trade secret;
>>
>> (ii)    at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

---

[85] *See* Rec. Doc. 123, pp. 17-18.

   (I)  derived from or through a person who had used improper means to acquire the trade secret;

   (II)  acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

   (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

  (iii) before a material change of the position of the person, knew or had reason to know that—

   (I)  the trade secret was a trade secret; and

   (II)  knowledge of the trade secret had been acquired by accident or mistake[.][86]

The DTSA also defines the term "improper means[,]" which "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means," but explicitly "does not include . . . any other lawful means of acquisition[.]"[87] The LUTSA's definitions of "misappropriation" and "improper means" are almost identical to those under the DTSA.[88]

  Here, it is undisputed that Trahan's role in, and on behalf of, AAR was to oversee the business side, including developing new or improved concepts,

---

[86] 18 U.S.C. § 1839(5); *see also Source Prod.*, 2017 WL 3721543, at *3.
[87] 18 U.S.C. § 1839(6)(A) and (B).
[88] La. Rev. Stat. § 51:1431(2) (defining misappropriation) and (1) (defining improper means).

marketing and sales.[89] Contrary to Plaintiffs' assertions, the record indicates that any business, scientific or technical information Trahan received from AAR was received in his capacity as member/manager and through the functioning of his agreed-to role in AAR's management, and therefore by "other lawful means."[90] The same holds true for CA.[91] It is likewise undisputed that Davis' intended role in AAR was to secure additional sources of funding while also helping Trahan with marketing and sales. The record reflects that Davis was not involved in the day to day operations or technical aspects of AAR's business; rather, his only proactive activities with respect to AAR related to funding.[92] In that vein, Davis invested in AAR and CA, through his entity Tarrytown, and also personally participated in efforts to obtain funding and capital sources for AAR.

As recognized, AAR is organized as an LLC, and both Trahan and Davis, as members and managers, are entitled to rely on AAR's agreed-upon business model,

---

[89] Rec. Doc. 187, p. 8; and Rec. Doc. 32, p. 10, ¶ 17.

[90] 18 U.S.C. § 1839(6)(B); *see also* Rec. Doc. 123, p. 20 (The Court continues in its earlier findings: "AAR's three members have access to AAR's trade secrets and acquire their trade secrets through lawful means. There is no evidence that Trahan . . . used theft, bribery, misrepresentation or an inducement of a breach of duty to maintain secrecy to acquire AAR's trade secrets.").

[91] Rec. Doc. 123, p. 21 ("[CA] did not obtain AAR's trade secrets through theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy. To the contrary, [CA] lawfully obtained AAR's trade secrets and received consent from AAR to manufacture and sell products containing their trade secrets to third parties as part of their agreement. Based on the agreement, there is no evidence that [CA] disclosed AAR's trade secrets without AAR's consent.").

[92] At the PI hearing, Sapienza testified that "Mr. Davis hasn't been to the office in probably two years, if I had to guess." Rec. Doc. 125-1, p. 62. And, during his deposition, Sapienza admitted that "[i]n fact, [Cutrer] had [visited AAR] more times than Ben Davis has ever been there." Rec. Doc. 176-4, p. 4, ll. 2-4.

including their respective roles within that model.[93] Similarly, because AAR is a member-managed LLC, each member is a mandatary of the LLC for all matters in the ordinary course of its business.[94] Trahan, whether in his personal capacity or through Cypress, had the authority to reach out to third parties to sell AAR's chemical technologies and processes; therefore, this action cannot constitute a misappropriation of a trade secret.[95] The same would hold true for Davis, to the extent he may have received any technical or proprietary information, although Plaintiffs have failed to come forward with any evidence that Davis acquired any such information.[96] Thus, as previously found, there is no evidence that Trahan or Davis acquired AAR's trade secrets through improper means or that Trahan or Davis

---

[93] Rec. Doc. 187, p, 10, ¶ 19 (citing La. R.S. § 12:1314(A)(2), which states, in part that an LLC's member-manager "[i]n discharging his duties, shall be fully protected in relying in good faith upon the records of the [LLC] and upon such information, opinions, reports, or statements presented to the [LLC], the members, managers, or any committee thereof by any of the [LLC's] members, managers, employees, or by any committee of the members or managers, or by any legal counsel, . . . or independent or certified public accountant . . . or by any other person as to matters the member, if management is reserved to the members, or manager, . . . reasonably believes are within such other person's professional or expert competence and which person is selected with reasonable care by the members, managers, any committee thereof, or any agent having the authority to make such selection.").

[94] Rec. Doc. 123, p. 20 (citing La. R.S. § 12:1317).

[95] *Id.*

[96] Sapienza testified that Davis' job was "to try to find outside people that might be interested in some of our technologies. . . . In other words, take intellectual property we developed in AAR and then to commercialize them so other people would buy those intellectual pieces of property because they would be good to individual companies." Rec. Doc. 176-4, p. 2, ll. 11-13, 19-23. Thus, to the extent Davis acquired or disclosed any such information, he had authority to do so within his agreed-upon role.

disclosed AAR's trade secrets without consent, given that all actions taken by Defendants fell within their agreed-upon roles in AAR's business model.

To the extent Plaintiffs rely solely on the formation of a separate company in which Sapienza did not have an ownership interest to constitute "improper means," the Court previously found that "the statute does not contemplate a breach of a fiduciary duty as suggested in the context of this case," to be "improper means."[97] It is undisputed that AAR was never intended to market or sell its own chemical technologies and processes and that CA was tasked with that role, although Sapienza maintains that he did not understand that CA and AAR were two separate entities.[98] Trahan's and CA's combined roles would therefore necessarily include access to the AAR products which they were intended to manufacture, market and sell. The record is replete with documents and emails received by Sapienza, indicating that he was aware of, and did not challenge, Trahan's actions, in working through CA to market and sell AAR's chemical technologies and processes.[99] And, as to Davis and/or Tarrytown, there is no evidence that either used any AAR information in, or on behalf of, any other businesses or otherwise. Plaintiffs have failed to come forward with any evidence that any Defendant improperly acquired any of AAR's business,

---

[97] Rec. Doc. 123, p. 20.

[98] "While Trahan made the decision that [CA] would be that entity, his actions were consistent with the members' intent. It is undisputed that AAR's members and employees knew that [CA] was being used to manufacture and sell products that contained AAR's trade secrets." Rec. Doc. 123, p. 20.

[99] *See* Rec. Doc. 187, p. 10 n.13 (collecting record citations).

scientific or technical information, formulas, processes, etc., or that any Defendant used any such information for purposes other than for marketing and sales of AAR's chemical technologies and processes.

As to CA's engagements with specific customers or potential customers, on behalf of AAR, there is no evidence that any proprietary information was ever disclosed to any customer or potential customer without Defendants first obtaining a non-disclosure agreement. For instance, although the Balchem engagement did not ultimately lead to any agreement, the record reflects that Balchem signed an April 2016 non-disclosure agreement with AAR prior to Trahan and/or CA making any disclosures in August 2016. Further, Sapienza was involved in both creating and delivering the presentation to Balchem, in which both AAR and CA are referenced and involved. Similarly, as to the relationship with Cutrer and DCS, the record reflects that neither Cutrer nor DCS know or have ever known the chemical formula for CC 532, and no proprietary information regarding CC 532 is disclosed in DCS's safety data sheet for Clay Blok 35. And, as previously found in a prior ruling dismissing Plaintiffs' claims against those defendants, DCS has paid all AAR and CA invoices it has received.[100] Therefore, there is no evidence that DCS has misused

---

[100] *See* Rec. Doc. 191; *see also* Rec. Docs. 173-37 and 173-38 (According to the affidavit of a Certified Valuation Analyst, as supported by the expert report of same, both of which are attached to the instant motion: AAR was "fully paid for all of the work it performed and billed for [DCS] – an amount totaling $771,552.69. CA did not keep any of the money from [DCS] to pay AAR invoices that it was not entitled to keep.").

any proprietary information or acquired any such information by improper means. And, finally, there is no evidence that Davis or Tarrytown was involved in communicating with Univar, Balchem, DCS, Cutrer, or any other relevant third party.

Accordingly, despite the assumed existence of trade secrets, Plaintiffs' claims under Count One fail, because there is no evidence that any of these Defendants misappropriated any trade secret. Specifically, there is no evidence that any Defendant acquired any trade secret by improper means or used or disclosed any trade secret without consent. Although Plaintiffs allege that Trahan and Davis formed CA for the purpose of misappropriating trade secrets,[101] Plaintiffs have failed to come forward with any evidence to support that allegation or to dispute the Court's previous finding to the contrary. As noted, at the summary judgment stage, the nonmovants cannot meet their burden with unsubstantiated assertions or conclusory allegations.[102] Defendants have established that they each acted properly, within their agreed-upon roles and for the benefit of AAR, and there is no evidence which might support a finding of use or disclosure of any trade secret by improper means. Based on the uncontroverted evidence, including the testimony presented

---

[101] *See* Rec. Doc. 32, pp. 17-25, ¶¶ 30-49.
[102] *Boudreaux*, 402 F.3d at 540.

during the PI hearing, Defendants are entitled to summary judgment as to Count One.

### *Supplemental Jurisdiction as to the Remaining Counts*

Having determined that Plaintiffs' claims under the DTSA shall be dismissed, there are no remaining federal claims, such that the Court must decide whether to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over the remaining state law claims. "The question under section 1367(a) is whether the supplemental claims are so related to the original claims that they form part of the same case or controversy, or in other words, that they 'derive from a common nucleus of operative fact.'"[103] Here, given the nature of Plaintiffs' amended complaint, which is drafted in such a way as to interweave all predicate facts into the fabric of each and every legal claim, as well as the fact that all state law claims either directly or indirectly relate to the allegations underlying the DTSA claims, the Court finds that both the federal and state claims clearly form part of the same case or controversy. Therefore, the claims are sufficiently related for purposes of 28 U.S.C. § 1367(a).

Even where supplemental jurisdiction exists, section 1367(c) provides that a district court "may decline" to exercise such jurisdiction if --

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

---

[103] *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008) (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966)).

(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.[104]

Section 1367(c) vests district courts with discretion in deciding whether to retain jurisdiction over state law claims once all federal law claims have been dismissed. In addition to the above statutory factors, courts should consider "judicial economy, convenience, fairness, and comity."[105] "These interests are to be considered on a case-by-case basis, and no single factor is dispositive."[106]

Here, the remaining claims do not raise novel or complex issues of Louisiana law, as addressed in the first factor, and although the *number* of state law claims predominates over the one federal count at issue in this motion, federal claims constituted the heart of this case. All remaining claims derive from the allegations in support of Plaintiffs' contentions that Defendants misappropriated trade secrets by acquiring them via improper means and/or disclosing and using them without consent; therefore, the Court finds that the second factor weighs in favor of retaining jurisdiction. The third factor clearly weighs in favor of declining jurisdiction; however, in consideration of the fourth factor, neither the Court nor the parties have identified any other compelling reasons to decline jurisdiction. To the contrary, the

---

[104] 28 U.S.C. § 1367(c).
[105] *Mendoza*, 532 F.3d at 346.
[106] *Id.*

fact that this case has been pending since 2016 and has proceeded through a substantively dense PI hearing, as well as dispositive motion practice, which has already resulted in dismissal of Plaintiffs' claims – both federal and state – against two defendants, the Court finds compelling reasons to retain jurisdiction over the remaining claims herein. The Court notes that its decision to exercise supplemental jurisdiction comports with Fifth Circuit case law, as well.[107]

### Count Three: Violations of the LUTPA

Count Three alleges violations of the Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. § 51:1401, *et seq.*, against Trahan, Davis and CA. Under the LUTPA, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful."[108] "LUTPA confers a private right of action on '[a]ny person who suffers any ascertainable loss of money or movable property . . . as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405."[109]

"To recover under LUTPA, a plaintiff must 'prove some element of fraud,

---

[107] *See Mendoza*, 532 F.3d at 346 (citing *Smith v. Amedisys Inc.*, 298 F.3d 434, 447 (5th Cir. 2002) (affirming the decision to retain supplemental jurisdiction, despite the dismissal of all federal claims, given that the remaining issues were not complex, were well-known to the court, and were ripe for summary disposition) and *Batiste v. Island Records, Inc.*, 179 F.3d 217, 227 (5th Cir. 1999) (noting that the absence of difficult state law questions can weigh heavily in favor of retaining jurisdiction)).
[108] La. R.S. § 51:1405(A).
[109] *Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp.*, 292 F.3d 471, 480 (5th Cir. 2002) (quoting La. R.S. § 51:1409(A)).

misrepresentation, deception or other unethical conduct.'"[110] "A trade practice is unfair under the statute only when it offends established public policy and is immoral, unethical, oppressive or unscrupulous."[111] "What constitutes an unfair trade practice is determined by the courts on a case-by-case basis."[112]

In alleging violations of LUTPA, Plaintiffs merely track the language of the statute and required elements, cited above, to argue that Trahan, Davis and CA are liable for actual damages suffered by Sapienza and AAR.[113] Defendants argue that neither Trahan, Davis, nor CA engaged in any unfair trade practices under Louisiana law, and Plaintiffs have not and cannot show that Defendants engaged in any conduct which offends established public policy and is immoral, unethical, oppressive or unscrupulous.[114] Specifically, Defendants argue that Trahan/Cypress and Davis/Tarrytown invested in AAR and CA; Trahan's actions, through CA, corresponded with his agreed-to role on behalf of AAR; Davis' involvement was limited to his funding efforts and the receipt of periodic correspondence about the business; CA actively marketed and sold AAR's chemical technologies and

---

[110] *Id*. at 480 (quoting *Omnitech Intern., Inc. v. Clorox Co.*, 11 F.3d 1316, 1332 (5th Cir. 1994)).

[111] *Id*. (*Computer Mgmt.,* 220 F.3d at 404).

[112] *Id*. (citing *Omnitech Intern.,* 11 F.3d at 1332).

[113] Rec. Doc. 32, p. 40, ¶¶ 100, 101. Plaintiffs further argue that they are entitled to treble damages. However, LUTPA allows treble damages "[i]f the court finds the unfair or deceptive method, act, or practice was knowingly used, *after being put on notice by the attorney general* . . . ." La. R.S. § 51:1409(A) (emphasis added); *see also Andretti Sports Mktg. Louisiana, LLC v. Nola Motorsports Host Comm., Inc*., 147 F. Supp. 3d 537, 572–73 (E.D. La. 2015). In this case, there is no such allegation; therefore, the Court pretermits any discussion thereof.

[114] Rec. Doc. 187, pp. 15-16, ¶¶ 29-30; and Rec. Doc. 176-1, pp. 12-13, ¶¶ 26-30.

processes; and Trahan and CA sought business opportunities with various entities, including those referenced in this case. Defendants correctly point out that Plaintiffs have failed to establish that any of these activities constituted unfair trade practices and further argue that both Trahan's and Davis' activities involved the lawful exercise of their business judgment and constituted appropriate free enterprise.[115] Furthermore, there is no evidence that any Defendant defrauded Sapienza; made any misrepresentations or deceptions; or engaged in any other unethical conduct. In the absence of any such evidence, Plaintiffs' LUTPA claims fail.

### *Count Four: Breach of Fiduciary Duties*

Count Four alleges that Trahan and Davis breached their fiduciary duties of good faith, diligence, care, judgment, skill, loyalty, and not to engage in self-dealing.[116] Plaintiffs specifically allege that Trahan (and Davis) "repeatedly and extensively" violated their fiduciary duties, in "grossly-negligent manners," including:

> (a) failing to contribute their promised and represented capital contributions and/or diverting and converting those funds to other entities, ventures, businesses, opportunities, etcetera; (b) creating a separate, competing entity - CA - within forty (40) days of the formation of AAR; (c) fraudulently failing to disclose the existence of CA to AAR or Sapienza; (d) intentionally and fraudulently misrepresenting to AAR and Sapienza the ownership, business, and nature of CA when its existence became known; (e) misappropriating, misusing, and failing to protect the [AAR] Trade Secrets for the benefit

---

[115] Rec. Doc. 187, pp. 15-16, ¶ 30; and Rec. Doc. 176-1, p. 12, ¶ 27.
[116] Rec. Doc. 32, pp. 40-41, ¶¶ 103-106.

of themselves and CA, to the exclusion of and damage to Sapienza and AAR; (f) by usurping business opportunities from AAR including, but not limited to, those with Balchem, Univar, Clean Waste, as well as others . . .; (g) by causing CA to enter into an Exclusivity Agreement with the only raw material supplier in the United States of a key component of the Choline Chloride Trade Secrets; (h) by violating the Conflict of Interest and other provisions of the Employee Handbook of AAR effective January 2016; (i) by attempting to freeze out Sapienza; (j) by forcing out Sapienza from the premises of AAR; and by (k) other acts and omissions to be proven at . . . trial.[117]

Under Louisiana law, "[t]he members and managers owe fiduciary duties to the LLC and to the other members and managers."[118] At the outset, Defendants cite the Court's prior ruling to argue that neither Trahan nor Davis owe Sapienza or AAR a fiduciary duty, as they are not members or managers of AAR.[119] However, what was recognized in that ruling, and is repeated herein, is that the *intended* members of AAR were the various entities (Tarrytown, Cypress and Visibly Green), but the actual members have been recorded in various documents and filings as Trahan, Davis and Sapienza. Therefore, the Court assumes, for purposes of this ruling, that Trahan and Davis did owe a fiduciary duty to Sapienza and AAR.

Even assuming a duty was owed, Defendants argue that neither Trahan nor Davis took any action constituting fraud or breach of trust, or any action otherwise outside of their authority, which would result in a breach of any fiduciary duty owed.

---

[117] Rec. Doc. 32, p. 41, ¶ 104.
[118] *Rudney v. Int'l Offshore Servs., L.L.C.*, No. 07-3908, 2007 WL 2900230, at *2 (E.D. La. Oct. 1, 2007) (citing La. R.S. § 12:1314(A)(1) and *Gill v. Gill*, 39,406 (La. App. 2 Cir. 3/9/05); 895 So.2d 807, 814 n. 3).
[119] *See* Rec. Doc. 187, p. 16, ¶ 35 and Rec. Doc. 176-1, p. 13, ¶ 32 (citing Rec. Doc. 123, pp. 3-4).

In Louisiana, "[t]he elements of a cause of action for a breach of fiduciary duty, or a knowing participation in such, are: (1) a breach by a fiduciary of an obligation to another; (2) a knowing collusion or participation in the breach by the fiduciary; and (3) damages suffered by another as a result of the breach."[120] "Further, the cause of action requires proof of fraud, breach of trust or action outside the limits of the fiduciary's authority; the burden of proof is on the plaintiff."[121] As discussed herein, there is no evidence that Trahan or Davis breached any fiduciary duty owed, and the record taken as a whole, including the testimony during the PI hearing, contradicts each of Plaintiffs' assertions to the contrary. Given that Plaintiffs have not come forward with any evidence of fraud, breach of trust, or actions taken by Trahan or Davis outside their agreed-upon roles, which for Trahan, included the authority to oversee AAR's business decisions, marketing and sales, and for Davis, included the authority to assist in marketing and sales, while trying to obtain capital sources and funding. Accordingly, Trahan and Davis are entitled to summary judgment on Count Four.

### Count Five: Breach of Contractual Obligations in Bad Faith

In Count Five, Plaintiffs allege that all three AAR members "obligated themselves to form and operate AAR in a certain manner and for certain purposes,

---

[120] *Brockman v. Salt Lake Farm P'ship*, 33,938 (La. App. 2 Cir. 10/4/00); 768 So. 2d 836, 844 (citing *Oliver v. Central Bank*, 26,932 (La. App. 2 Cir. 5/10/95); 658 So.2d 1316).
[121] *Id.*

in compliance with Louisiana law[,]" yet Trahan and Davis breached those obligations in bad faith. Plaintiffs incorporate all foregoing paragraphs of the amended complaint but do not specifically allege any instances of bad faith. It is undisputed that Trahan, Davis and Sapienza all agreed (1) to create AAR to conduct research and development of chemical technologies and processes, *and* (2) on their respective roles, which included Trahan overseeing business, marketing and sales, and Davis to be principally involved in capital acquisition. There is no evidence that Trahan's or Davis' actions failed to honor that agreement or that any other agreement was ever reached between Trahan, Davis and Sapienza. Accordingly, Trahan and Davis are entitled to summary judgment as to Count Five.

### Count Six: Fraud

Count Six alleges that "Trahan and Davis repeatedly and extensively misrepresented and suppressed the truth about many matters both to Sapienza and AAR, with the obvious and admitted intentions to obtain an unjust advantage for themselves and CA, and to cause a loss or inconvenience to Plaintiffs."[122] In the background section of the amended complaint, Plaintiffs allege the following:

> From January through late August 2016, Trahan and Davis misrepresented to Sapienza, AAR, and its employees that AAR and CA were 'one company using two names for different divisions,' and suppressed the truth regarding CA's actual ownership and operations. Early on, Trahan and Davis contributed to the confusion by changing some employees' email addresses from @realadvances.com to

---

[122] Rec. Doc. 32, p. 43, ¶ 112.

@chemadvances.com, with the explanation that CA is 'part of the [AAR] business.' Trahan also contributed to the confusion by including the companies' names in the signature block of his emails, as illustrated by emails from him on May 27, 2016 and August 23, 2016.

From approximately February 2016 until August 2016, Sapienza repeatedly asked Trahan and Davis about the relationship between AAR and CA. Trahan and Davis consistently, repeatedly, and expressly suppressed and misrepresented the truth by responding that they were the same company, with CA being a part of AAR.

On or about August 2, 2016, communications regarding one of the Hydrogen Peroxide Trade Secrets caused Sapienza again to question Trahan and Davis about its relationship with AAR. Approximately three days later, on or about August 5, 2016, Trahan, with Davis' acquiescence, admitted for the first time that CA and AAR are two, separate entities, with CA being owned by Trahan and Davis only. For the first time, that same day, Trahan sent a MEMO on AAR letterhead to its employees asking each to sign and return a Non[-]Disclosure Agreement. This discovery also compelled Sapienza to attempt to protect the [AAR] Trade Secrets by limiting their access on Egnyte and Projecturf.

Sapienza and Trahan, copying Davis, subsequently exchanged emails on August 6 and 7, 2016. In his initial writing to Trahan on August 6, 2016, Sapienza confirmed their conversation the day before, in which he learned for the first time (1) that he had 'no ownership or rights from [CA]'; (2) that Trahan espoused '[CA] should buy out AAR'; and (3) that Trahan asked Sapienza to 'spin off' a separate entity with only 'methanol and more'; amongst other matters. Otherwise, Sapienza also questioned 'AAR . . . doing work for the benefit of [CA] but . . . not directly [being] reimbursed' and requested a 'clear accounting.'

Trahan responded, at length, later that day, in an email inexplicably designated as an 'FRE 408 Communication' (because, to Sapienza's knowledge, no attorney thus far had been involved in resolving any dispute). Therein, Trahan failed to address the fundamental issue of his (and Davis') separate creation and ownership of CA, its competition with AAR, or their misappropriation and misuse of the [AAR] Trade Secrets. Trahan did make a 'tentative proposal to purchase [Sapienza's]

interest in AAR,' and attempted to rationalize this obvious freeze-out by saying 'it would take a newco because I wish to keep it separate from CA/AAR in order to avoid any further confusion on efforts and costs.' No doubt Trahan (and Davis) would.

The next day, Sapienza rejected Trahan's proposal; inquired of the separate creation and ownership of CA by Trahan and Davis; and pointed out CA's drain of AAR'[s] resources in the form of employee time, business opportunities, and misappropriation and misuse of trade secrets via their unprotected disclosure and otherwise. As of that time, CA's accounts receivables included [DCS], PeroxyChem, and Univar.

On September 8, 2016, Trahan and Davis locked out Sapienza from the main research and development tools for AAR (Egnyte and Projecturf), thereby forcing him out. Until September 2016, the website of CA described it as an 'affiliated' company of AAR. As of that time, AAR had not received any payment from CA.[123]

Plaintiff has failed to provide the requisite evidentiary support for any of these allegations against Trahan or Davis.

Under Louisiana law, "[f]raud is a misrepresentation or suppression of the truth made with the intention to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other."[124] "The elements of fraud include: 1) a misstatement or omission; 2) of material fact; 3) made with the intent to defraud; 4) on which the plaintiff relied; and 5) which proximately caused the plaintiff's injury."[125] "In alleging fraud or mistake, a party must state with particularity the

---

[123] Rec. Doc. 32, pp. 23-25, ¶¶ 43-49.
[124] La. Civ. Code art. 1953. The article further states that "[f]raud may also result from silence or inaction." *Id.*
[125] *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (citing *Cyrak v. Lemon*, 919 F.2d 320 (5th Cir. 1990)).

circumstances constituting fraud or mistake."[126] In the Fifth Circuit, pleading fraud with particularity requires "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby."[127]

As to the first paragraph of Plaintiffs' allegations above, a member of AAR's research team testified that she was always aware that AAR and CA were two separate companies, and she further testified that she attended a meeting, with Sapienza present, where it was explained that AAR would be a research and development company and CA would sell and manufacture AAR's products. In addition, Sapienza received multiple emails and other documents evidencing the existence of AAR and CA as two separate and distinct entities.[128] As just one example, a memo dated February 7, 2016, sent from Trahan to Davis and Sapienza, and printed on CA letterhead, included a statement clearly and expressly delineating, side-by-side in one sentence, that the co-founders of AAR included Trahan, Davis and Sapienza, while the co-founders of CA included only Trahan and Davis.[129] While, at the summary judgment stage, the Court must accept as true Sapienza's claim that he did not know CA and AAR were two separate entities, that alone will

---

[126] Fed. R. Civ. P. 9(b).
[127] *Williams*, 112 F.3d at 177 (citations omitted).
[128] *See* Rec. Docs. 173-14–173-20; and Rec. Doc. 186-1 (sealed).
[129] Rec. Doc. 173-20; Rec. Doc. 122-1, p. 37.

not suffice to establish that any Defendant committed fraud. The Court finds no evidence that any action of Trahan, Davis or CA compelled Sapienza to believe that AAR and CA were one and the same, or that CA was "a division of" AAR.[130]

Similarly, as to the second and third paragraphs, there is no evidence supporting Plaintiffs' claims that Sapienza repeatedly inquired about the relationship between the two companies and/or that he was repeatedly and expressly misled into believing that they were one and the same. Furthermore, there is no evidence which tends to show that Sapienza first learned that CA was a separate entity in August 2016. Again, all evidence contradicts those claims.

Plaintiffs' allegations in the next paragraphs, suggesting that AAR resources were being improperly used for CA's benefit and against AAR's interests, also lack support. The record reflects that CA, through Trahan, was working on behalf of AAR, for its benefit, in accordance with the purposes for which the respective companies were created. For instance, regarding CA/AAR's business dealings with DCS, Defendants have established, and the Court has previously found, that DCS has paid, in full, each invoice it has received from AAR. Likewise, the report of Defendants' Certified Valuation Analyst, attached to Trahan, Cypress and CA's motion, shows that "CA did not keep any of the money from [DCS] to pay AAR

---

[130] Plaintiffs rely solely on conclusory allegations with no evidentiary support. But, again, the nonmovants cannot meet their burden with unsubstantiated assertions or conclusory allegations. *Boudreaux*, 402 F.3d at 540.

invoices that it was not entitled to keep."[131] The remainder of Plaintiffs' allegations in support of Count Six have been previously addressed and do not merit further discussion. Defendants are entitled to summary judgment as to Count Six.

### Count Seven: Intentional and Negligent Misrepresentation

In Count Seven, Plaintiffs allege "that Defendants expressly, repeatedly, and extensively made intentional and negligent misrepresentations to Sapienza and AAR."[132] Although Count Seven is drafted generally against "All Defendants," only Trahan and Davis are specifically named as having made "express, repeated, and extensive intentional and negligent misrepresentations[,] . . . [which] caused injury and loss to Sapienza and AAR."[133]

"The elements of a claim for *intentional* misrepresentation in Louisiana are: (1) a misrepresentation of a material fact; (2) made with intent to deceive; and (3) causing justifiable reliance with resultant injury."[134] "To make out a *negligent* misrepresentation claim in Louisiana: (1) there must be a legal duty on the part of the defendant to supply correct information; (2) there must be a breach of that duty, which can occur by omission as well as by affirmative misrepresentation; and (3) the breach must have caused damages to the plaintiff based on the plaintiff's

---

[131] Rec. Docs. 173-37 (declaration) and 173-38 (expert report).
[132] Rec. Doc. 32, p. 43, ¶ 113.
[133] *Id*. at p. 44, ¶ 114.
[134] *Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, 527 F.3d 412, 418 (5th Cir. 2008).

reasonable reliance on the misrepresentation."[135] Just as Plaintiffs have failed to establish fraud, they have not met their burden of establishing any misrepresentation or breach upon which Plaintiffs relied to their detriment or injury. Defendants are entitled to summary judgment as to Count Seven.[136]

### *Count Eight: Detrimental Reliance*

Count Eight alleges that Sapienza and AAR reasonably relied upon promises and representations from Trahan, Davis, and CA, which were made knowing they would induce Sapienza and AAR to rely upon them, to their detriment."[137] Louisiana Civil Code article 1967 provides, in part, that "[a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying."[138] "Detrimental reliance requires (1) a representation by conduct or word, (2) justifiable reliance on the representation, and (3) a change in position to the plaintiff's detriment as a result of the reliance."[139] Detrimental reliance "usually

---

[135] *Id.*

[136] To the extent Cypress, CA and Tarrytown are named in Count Seven, Plaintiffs have failed to allege, much less establish, any misrepresentation or breach, such that all Defendants are entitled to summary judgment on Count Seven.

[137] Rec. Doc. 32, p. 44, ¶ 116.

[138] La. Civ. Code art. 1967.

[139] *Drs. Bethea, Moustoukas and Weaver LLC v. St. Paul Guardian Ins. Co.*, 376 F.3d 399, 403 (5th Cir. 2004).

functions when no written contract or an unenforceable contract exists between the parties."[140]

Aside from Plaintiffs' unsubstantiated assertions, there is no basis upon which the Court could find that Defendants made any promise to Sapienza or AAR knowing that Plaintiffs would rely upon any such promise to their detriment. To the contrary, as discussed above, the record reflects that Trahan and Davis, individually and through Cypress, Tarrytown and CA, acted within the parameters of their agreed-to roles, in the best interests and on behalf of AAR. Plaintiffs have failed to come forward with evidence to the contrary, such that Defendants are entitled to summary judgment on Count Eight.

*Counts Ten & Twelve: Fraud, Malfeasance, Criminal Wrongdoing and Breach of Personal Duty; and Alter Ego and Single Business Enterprise*

Counts Ten and Twelve of the amended complaint have been combined for purposes of this ruling. In Count Ten, Plaintiffs allege that Trahan and Davis, as members and managers of AAR, incurred personal liability for the debts of AAR by committing fraud, malfeasance, criminal wrongdoings, and owing personal duties towards Plaintiffs, the breach of which specifically caused damages.[141] Plaintiffs further speculate, without any evidentiary support, that "much financial gain,

---

[140] *Id.*

[141] Rec. Doc. 32, p. 45, ¶ 122.

probably millions of dollars, were diverted and converted to Trahan and Davis, who appear to be much [more] liquid than AAR."[142] In Count Twelve, Plaintiffs allege that Cypress and Tarrytown are the closely-held and controlled entities of Trahan and Davis, respectively, and are used as their alter egos to control CA, and further allege that CA is the alter ego of Trahan and Davis, and/or that CA, Cypress, and Tarrytown constitute a single-business enterprise.[143]

By Plaintiffs' own concession, Louisiana courts have traditionally focused on the following five elements in applying the alter ego doctrine: "(1) commingling of corporate and shareholder funds; (2) failure to follow statutory formalities for incorporation and the transaction of corporate affairs; (3) undercapitalization of the corporation; (4) failure to provide separate bank accounts and bookkeeping records; and (5) failure to hold regular shareholder or director meetings."[144] Yet, Plaintiffs fail to allege, much less establish, any of these factors. The record reflects that Trahan followed all corporate formalities and that each entity maintained separate bank accounts and bookkeeping records.[145] Furthermore, there is no evidence that

---

[142] *Id*. at pp. 45-46, ¶ 122.

[143] Rec. Doc. 32, p. 4, ¶ 4; p. 5, ¶¶ 5 and 6; and p. 47, ¶ 129.

[144] *United States v. Clinical Leasing Serv., Inc.*, 982 F.2d 900, 902 (5th Cir. 1992) (collecting Louisiana cases); *see also* Rec. Doc. 32, p. 47, ¶ 128 (Plaintiffs' citation to Louisiana case law on alter ego liability).

[145] As recognized above, Trahan and Davis both followed corporate formalities with respect to each of their entities; each has its own filing documentation, its own separate ownership, and its own distinct records. *See* Rec. Doc. 173-7 (Cypress); Rec. Doc. 176-7 (Tarrytown); Rec. Docs. 173-8 and 173-9 (AAR); Rec. Doc. 173-10 (CA); *see also* Rec Docs. 173-11, 173-12, and 173-13.

any Defendant – Trahan, Cypress, Davis, Tarrytown, or CA – commingled funds; were ever undercapitalized; or failed to hold regular meetings. Therefore, Defendants are entitled to summary judgment on Count Twelve.

As to Count Ten, "Louisiana courts are reluctant to hold a shareholder, officer, or director of a corporation personally liable for corporate obligations, in the absence of fraud, malfeasance, or criminal wrongdoing."[146] As discussed throughout this ruling, the record is void of any evidence of fraud, malfeasance or criminal wrongdoing. And, as pointed out by Defendants, there is no record that Trahan or Davis wrongfully "diverted and converted" *any* money from Sapienza and AAR, much less the "probably millions of dollars," about which Plaintiffs speculate in Count Ten. Accordingly, Defendants are likewise entitled to summary judgment as to Count Ten.

### Count Thirteen: Conspiracy

Count Thirteen of the amended complaint alleges that the "Defendants conspired with one another to commit the underlying intentional torts alleged [in the amended complaint], and acted in furtherance of that conspiracy[,]" and are therefore liable *in solido*, pursuant to Louisiana Civil Code article 2324.[147] For the

---

[146] *Riggins v. Dixie Shoring Co.*, 590 So. 2d 1164, 1168 (La. 1991) (citations omitted).

[147] Rec. Doc. 32, p. 48, ¶¶ 131-132; *see also* pp. 31-36; and p. 22, ¶ 41 (specifically alleging that Trahan, Davis and CA conspired with DCS and Cutrer to misappropriate and misuse the AAR Trade Secrets). Louisiana Civil Code article 2324(A) provides: "He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act."

reasons outlined herein, as well as in the prior ruling dismissing Plaintiffs' claims against DCS and Cutrer, Plaintiffs have failed to establish that Defendants have committed any underlying intentional torts and therefore have not come forward with any evidence in support of their allegations of conspiracy. Accordingly, Defendants are entitled to summary judgment as to Count Thirteen.

### Count Fourteen: Unjust Enrichment

Count Fourteen of the amended complaint alleges that "Defendants were enriched without cause at Plaintiffs' expense," such that "Defendants are bound to compensate Plaintiffs," pursuant to the DTSA and Louisiana Civil Code article 2298.[148] To recover under a theory of unjust enrichment, the Louisiana Supreme Court has explained that a plaintiff must show the following: "enrichment on the part of the defendant; impoverishment on the part of plaintiff; [causal] relationship between the enrichment received by the defendant and the plaintiff's impoverishment; and a lack of other remedy at law."[149] Again, for the reasons outlined herein, Plaintiffs have failed to establish unjust enrichment, as Defendants

---

[148] Rec. Doc. 32, pp. 48-49, ¶¶ 134-135. Louisiana Civil Code article 2298 provides, in pertinent part: "A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term 'without cause' is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law." Further, in a civil action brought under the DTSA with respect to the misappropriation of a trade secret, a court may award "damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss[.]" 18 U.S.C. § 1836(b)(3)(B)(II).
[149] *Carriere v. Bank of Louisiana*, 95-3058 (La. 12/13/96); 702 So. 2d 648, 658, *on reh'g* (Nov. 3, 1997).

acted in accordance with the agreements reached, for the benefit of AAR, and Plaintiffs have failed to come forward with any evidence which might establish that any Defendant was enriched without cause at the expense of the Plaintiffs. Accordingly, Defendants are entitled to summary judgment as to Count Fourteen.

## C.    DEFENDANTS ARE NOT ENTITLED TO A FINAL JUDGMENT PURSUANT TO RULE 54(B)

In addition to summary judgment, both motions seek to sever final judgment in favor of the respective parties, pursuant to Federal Rule of Civil Procedure 54(b), arguing that there is no just reason to delay same. Pursuant to Rule 54(b), "[w]hen an action presents more than one claim for relief . . . or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."[150] As the Fifth Circuit has explained, "[s]ince the inception of the federal judiciary," the role of a court of appeals "has been to review final decisions of the trial courts, not to tinker with ongoing cases through piecemeal appeals, which waste 'judicial energy,' create unnecessary delays, and obstruct the pursuit of meritorious claims."[151] Given that the practice is disfavored, and in light of the

---

[150] Fed. R. Civ. P. 54(b).

[151] *Tetra Techs., Inc. v. Cont'l Ins. Co.*, 755 F.3d 222, 231 (5th Cir. 2014) (citing *Sherri A.D. v. Kirby*, 975 F.2d 193, 201 (5th Cir. 1992) (citation omitted) and *Ali v. Quarterman*, 607 F.3d 1046, 1048 (5th Cir. 2010)).

Defendants' lack of articulated basis therefor, the request to certify a final judgment in favor of these Defendants is denied.[152]

<h2 style="text-align:center">CONCLUSION</h2>

For the reasons fully explained above, the Motions for Summary Judgment and to Sever Final Judgment, filed by Defendants David O. Trahan, Chem Advances, LLC, and Cypress Technologies, LLC [Rec. Doc. 173] and by Defendants Ben D. Davis and Tarrytown Ventures, LP [Rec. Doc. 176] are GRANTED insofar as these Defendants are entitled to summary judgment and DENIED insofar as these Defendants are not entitled to a final judgment under Rule 54(b). Plaintiffs' claims against David O. Trahan, Chem Advances, LLC, Cypress Technologies, LLC, Ben D. Davis and Tarrytown Ventures, LP are hereby DISMISSED WITH PREJUDICE.

Signed at Lafayette, Louisiana on this 28th day of January, 2019.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[152] The Court further notes that Defendants have asserted counterclaims, including a request for attorney's fees, pursuant to DTSA and LUTSA, as to which they have also moved for summary judgment. *See* Rec. Docs. 142 and 180.