# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

**RICHARD SAPIENZA**                     **CASE NO. 6:16-CV-01701**

**VERSUS**                                  **MAGISTRATE JUDGE HANNA**

**TRAHAN ET AL**                   **BY CONSENT OF THE PARTIES**

### <u>MEMORANDUM RULING</u>

Currently pending are two motions, styled as Motions for Summary Judgment on the Pleadings, pursuant to Federal Rules of Civil Procedure 56 and 8(b)(6), one of which was filed by Defendants David Trahan ("Trahan"), Ben Davis ("Davis"), Chem Advances, LLC ("CA"), Cypress Technologies, LLC ("Cypress"), and Tarrytown Ventures, LP ("Tarrytown") (collectively, the "CA Defendants") [Rec. Doc. 180]; and one of which was filed by Defendants Wayne Cutrer ("Cutrer") and Downhole Chemical Solutions, LLC ("DCS")[1] (collectively, the "DCS Defendants") [Rec. Doc. 178]. The motions pertain to the CA and DCS Defendants' counterclaims, which were filed against Plaintiffs Richard Sapienza ("Sapienza") and Visibly Green, LLC ("Visibly Green") (collectively, "Plaintiffs"), on January 11, 2018 [Rec. Docs. 140, 142]. Plaintiffs failed to file an answer to any of the

---

[1] As recognized in a prior ruling, DCS is an oil and gas fluids company, partially owned by Cutrer, and is also a wholly-owned subsidiary of Dynamic Chemical Solutions, Inc., which has multiple shareholders and a seven-person board of directors. Thus, Cutrer does not solely own or control DCS or its parent company, and DCS is not affiliated by common ownership, control or purpose with any of the CA Defendants. *See* Rec. Docs. 191, p. 6; 125-1, pp. 100-01; and 178-2, p. 4, ¶ 4.

counterclaims within twenty-one days, pursuant to Federal Rule of Civil Procedure 12(a)(1)(B), or at any time thereafter, and have likewise failed to file any opposition to the instant motions. Considering the record, the evidence, and the law, and for the reasons fully explained below, the motions [Rec. Docs. 178, 180] are denied.

## BACKGROUND

On January 11, 2018, both the CA and DCS Defendants filed answers to Plaintiffs' amended complaint, in which they also asserted the counterclaims at issue in the instant motions.[2] For purposes of this ruling, the Court adopts the factual and procedural background set forth in the prior rulings on the motions for preliminary injunction ("PI") and summary judgment and focuses herein on the factual and procedural background relevant to the CA and DCS Defendants' counterclaims.[3]

In October 2015, Sapienza was working as a consultant for EnerSciences Holdings, LLC ("EnerSciences"), a research and development company, which operated out of 1424 S. Hugh Wallace Road, in Lafayette, Louisiana. Trahan, Davis, and Cutrer were also part of EnerSciences, or one or more of its subsidiaries, until

---

[2] Rec. Docs. 140 (DCS Defendants' answer and counterclaims); and 142 (CA Defendants' answer and counterclaims).

[3] Rec. Docs. 123 and 131 (ruling on motion for PI); 191 and 192 (ruling and judgment on motion for summary judgment filed by DCS Defendants); and 233 and 234 (ruling and judgment on motion for summary judgment filed by CA Defendants). The facts herein are drawn largely from the CA and DCS Defendants' counterclaims and statements of material facts in support of the instant motions. *See* Rec. Docs. 140 and 142 (counterclaims); and 178-2 and 180-2 (statements of uncontested facts). Where appropriate, these facts are deemed admitted, given that Plaintiffs failed to respond or defend against the facts and allegations in either filing, as required by Federal Rule of Civil Procedure 8(b)(6) and Local Rule 56.2.

EnerSciences ended commercial operations on October 23, 2015.[4] On October 29, 2015, Trahan, Davis, and Sapienza officially formed Advanced Applied Research, LLC ("AAR"), in an effort to keep EnerSciences' research team together and replicate its business model, which had included reliance on a separate entity to sell its products.

The record reflects that AAR's intended members were Tarrytown, with Davis as its sole member; Cypress, with Trahan as its sole member; and Visibly Green, with Sapienza as its sole member.[5] However, upon noticing that the Articles of Organization failed to identify AAR's members, Trahan filed a notice of change, identifying AAR's members as Trahan, Davis and Sapienza.[6] Although AAR does not have an operating agreement, Trahan, Davis, and Sapienza each made a capital contribution to AAR and each was intended to oversee a different aspect of AAR's business. Trahan was intended to oversee the business aspects, including marketing and sales; Davis was intended to secure additional sources of funding while also helping with marketing and sales; and Sapienza was intended to oversee the science and technology aspects, including the researching, inventing, developing, and testing

---

[4] Rec. Doc. 125, pp. 8-10 (Trahan and Davis were partial owners of EnerSciences, while Cutrer was previously President of ChemRock Technologies, LLC, a subsidiary of EnerSciences.); *see also* Rec. Doc. 133-10, p. 3, ¶ 11, n.14; and Rec. Doc. 133-5, p. 7.

[5] Rec. Doc. 233, pp. 4-5, n.12 (citing Rec. Doc. 123, p. 3); *see also* Rec. Doc. 233, p. 41 ("[T]he *intended* members of AAR were the various entities (Tarrytown, Cypress and Visibly Green), but the actual members have been recorded in various documents and filings as Trahan, Davis and Sapienza.").

[6] *Id.* (citing Rec. Doc. 123, at pp. 3-4).

of chemical technologies and processes. It is undisputed that, at all relevant times since AAR's formation on October 29, 2015, Trahan, Davis and Sapienza have managed AAR, regardless of whether they were doing so in their individual capacities as member-managers of AAR or as representatives of the various entities as members of AAR.

Trahan, Davis and Sapienza agreed that AAR would focus solely on testing, research and development of chemical technologies and processes for both internal and third-party use, as applicable in oil and gas and other markets. Thus, like EnerSciences, AAR was never intended to manufacture or market chemicals itself but rather would rely on a separate entity to do so. Rapid Specialty Products ("Rapid Specialty"), which was indirectly owned by Trahan and Davis, was intended to fulfill this role.[7] On November 17, 2015, Trahan illustrated this intent in a memo to all AAR employees, which stated that Rapid Specialty would "serve as a conduit to the market in order to supply products and solutions into the field. AAR will share in the gross profit on these sales, generating additional revenue to our AAR team."[8] Sapienza not only agreed that a separate entity would sell AAR's products, but he also knew that Rapid Specialty was intended to fill that position and that he did not

---

[7] As previously noted, testimony during the PI hearing established that Rapid Specialty was a Texas LLC, whose sole member was Novastar Holdings, LLC, a Louisiana LLC whose members were Trahan and Davis. *See* Rec. Docs. 123, p. 3; 191, p. 6, n.13; and 233, p. 5, n.14.
[8] Rec. Doc. 233, p. 5 (citing Rec. Doc. 123, p. 5; and Rec. Doc. 120-2, p. 2).

have an ownership interest in Rapid Specialty. As noted above, as well as in prior rulings, Rapid Specialty was indirectly owned by Trahan and Davis; Sapienza never had any ownership interest in Rapid Specialty. As it turned out, Rapid Specialty was never actually used to sell AAR's products. Due to issues surrounding name similarities between Rapid Specialty and another entity, Trahan and Davis formed a new entity to replace Rapid Specialty and avoid the name confusion. The new entity would assume already-existing business from Rapid Specialty, as well as Rapid Specialty's intended business relationship with AAR.

Although the parties discussed using the name Advanced Specialty Products, that entity was never actually formed. Instead, on December 9, 2015, CA was formed, as a Louisiana limited liability company, whose members are Tarrytown, with Davis as its sole member, and Cypress, with Trahan as its sole member. Trahan and Davis both followed corporate formalities with respect to each entity with which each is involved; each entity has its own filing documentation, its own separate ownership, and its own distinct records.[9] Cypress and Tarrytown both followed all formalities with respect to their relations with CA and AAR; each had separate bank accounts and did not commingle funds.[10]

---

[9] Rec. Doc. 233, p. 6 (citing Rec. Doc. 173-7 (Cypress); Rec. Doc. 176-7 (Tarrytown); Rec. Docs. 173-8 and 173-9 (AAR); Rec. Doc. 173-10 (CA); Rec Docs. 173-11, 173-12, and 173-13).
[10] Rec. Doc. 233, p. 6 (citing Rec. Docs. 173-2, p. 4, ¶ 19; 176-2, p. 4, ¶ 18).

Neither Sapienza nor Visibly Green are or ever were members of CA. Sapienza was aware of CA's existence and its purpose. Trahan explained to Sapienza and AAR's staff that CA would replace Rapid Specialty as the separate entity primarily responsible for marketing AAR's products and services. During the PI hearing, a member of AAR's research team, Suchandra Hazra, testified that she was always aware that AAR and CA were two separate companies, and she further testified that she attended a meeting, with Sapienza present, where it was explained that AAR would be a research and development company and CA would sell and manufacture AAR's products.[11] In addition, Sapienza received multiple emails and other documents evidencing the existence of AAR and CA as two separate and distinct entities.[12]

Both AAR and CA operated out of 1424 S. Hugh Wallace Road, in Lafayette, Louisiana, the same physical location that formerly served as EnerSciences' address.[13] This property is owned by 1424 Partners, LLC, which is jointly owned by Trahan and Davis. 1424 Partners, LLC leased the property to CA for $6,000 per month, and CA then subleased a portion of the space to AAR for the stated price of $5,000 per month; however, CA never billed AAR, nor did AAR ever pay, for any

---

[11] Rec. Doc. 233, p. 7 (citing Rec. Docs. 123, p. 6; and 125-2, p. 195).
[12] Rec. Doc. 233, p. 7 (citing Rec. Docs. 173-14 through 173-20; and Rec. Doc. 186-1 (sealed)). During the PI hearing, Sapienza testified that he was unaware that AAR and CA were two separate entities. There, the Court found Sapienza's testimony incredible; however, the Court is precluded from continuing in that finding at the summary judgment stage.
[13] Rec. Doc. 180-2, p. 5, ¶ 11 (citing Rec. Doc. 125-1, p. 137).

portion of AAR's rent.[14] Likewise, AAR and CA shared administrative services, which were mostly performed through CA employee Butch Trahan; however, CA never billed AAR for these services.

When EnerSciences shut down in October 2015, its research team continued working, on behalf of AAR, even though AAR did not officially begin operations or have paid employees until January 2016. At the end of 2015, AAR made formal offers of employment to the majority of EnerSciences' former research staff, while CA made formal offers of employment to EnerSciences' former sales staff. These employees officially began working for and being paid by AAR and CA, respectively, on the first business day of 2016. Prior thereto, from the time EnerSciences shut down on October 23, 2015 through December 30, 2015, these employees were paid contract wages by Rapid Specialty. Those wages, for intended employees of both CA and AAR, totaled approximately $120,000.[15] Rapid Specialty never sought or received reimbursement, from AAR or any other entity.[16]

During early November 2015, Trahan directed the research team to begin working on development of a new product, incorporating cationic starch, that could

---

[14] Rec. Doc. 180-2, p. 5, ¶ 11; *see also* Rec. Doc. 120-4, p. 10.
[15] Rec. Doc. 180-2, pp. 4-5, ¶ 10 (citing Rec. Doc. 142, p. 17, ¶ 12; Rec. Doc. 125-2, pp. 65-66, 128; and Rec. Doc. 180-6, pp. 4-5).
[16] *Id.*

be used as a clay control.[17] This work began while the employees were being paid contract wages through Rapid Specialty, and the work was then continued once they were employed by AAR and CA after January 2016. CA paid for AAR's lab time and testing of various products which CA found to offer as clay control products.[18] Specifically, CA employee Raymond Bienvenu identified and sourced the product which CA ultimately sold as a clay control.[19] AAR employee Suchandra Hazra did the majority of the testing on this product to confirm that the third party product would work as a clay control, and AAR was paid by CA for the time spent conducting the tests.[20] CA purchased the third party-manufactured cationic starch, "L360"—the formulation of which the third party manufacturer, Grain Processing Company, protects as proprietary—freely on the market, and in turn, marketed it as a clay control to third parties.[21] All work related to discovery and testing of the clay

---

[17] Rec. Doc. 180-2, p. 5, ¶ 12. During the PI hearing, Trahan testified that his knowledge and understanding that cationic starch could be used as a clay control "dates back way before the formation of AAR[;] [i]t goes back for years." Rec. Doc. 125-2, p. 60.

[18] Rec. Doc. 180-2, pp. 5-6, ¶ 12 (citing Rec. Doc. 125-2, pp. 87-89).

[19] Rec. Doc. 180-2, pp. 5-6, ¶ 12, n.32 (citing Rec. Doc. 142, p. 17, ¶ 14, n.4). During the PI hearing, Trahan testified that this product was called L360 and came from Grain Processing Company. Rec. Doc. 125-2, p. 88.

[20] Rec. Doc. 180-2, p. 6, ¶ 12 (citing Rec. Doc. 125-2, pp. 88-89; and Rec. Doc. 142, p. 17, ¶ 14). Hazra conducted this testing at the end of 2015 and into 2016. All testing performed during 2015 was paid for by Rapid Specialty, as Hazra was then being paid contract wages by Rapid Specialty; all testing performed during 2016 was paid for by CA, as Hazra was then officially employed by and working on behalf of AAR. *See* Rec. Doc. 125-2, pp. 88-89.

[21] Rec. Doc. 180-2, p. 6, ¶ 12 (citing Rec. Doc. 142, pp. 17-18, ¶ 14); *see also* Rec. Doc. 125-2, pp. 56-58. It is undisputed that AAR owns no rights in or to the third party product, L360, and has no right to control the market of L360, as a product sold by a third party. Defendants deem L360 to be a commercially available product; even though the underlying technology and specifications thereof are proprietary to Grain Processing Company, the product itself is commercially available.

control product ultimately sold by CA was paid for by Rapid Specialty (during 2015) or CA (beginning in 2016).

Prior to EnerSciences shutting down, Sapienza had been assisting its research lab in developing a low temperature gel breaker for Cutrer, on behalf of EnerSciences' subsidiary ChemRock Technologies, LLC.[22] A couple of months later, Trahan reached out to DCS, in light of Cutrer's previous interactions with EnerSciences, including this research request.[23] Cutrer indicated immediate interest, on behalf of DCS, in the development of a specifically formulated low temperature breaker.[24] As a result, Trahan and Cutrer entered into a work-for-hire agreement between DCS, AAR, and CA, pursuant to which AAR successfully developed a low temperature breaker that is currently used in certain DCS products.[25] As explained below, all service work done by AAR for DCS was performed on a fee per hour basis, pursuant to a work-for-hire agreement, such that DCS never agreed to pay an

---

Defendants contend that they properly bought L360, rebranded it as "CC 535," and then sold it. Plaintiffs, on the other hand, argue that the value of their clay control products is derived from their own proprietary, choline chloride trade secret, rather than some commercially available product, such as L360. *See* Rec. Doc. 125-2, pp. 57-60; Rec. Doc. 32, pp. 12-14, ¶ 24(a) and 25. However, it is unclear whether Plaintiffs intended CC 535 to be included in the clay control products involving the alleged choline chloride trade secret, as the term "cationic starch" does not appear anywhere in the description thereof. Rec. Doc. 32, pp. 12-13, ¶ 24(a). Regardless, Defendants' facts, which find support in the record, are deemed admitted, given that Plaintiffs have neither responded nor defended against them, as required by Rule 8(b)(6) and Local Rule 56.2

[22] Rec. Doc. 191, pp. 4-5. Chem Rock was also a subsidiary of EnerSciences. Rec. Doc. 125, p. 9.

[23] Rec. Doc. 191, p. 6; *see also* Rec. Docs. 180-2, p. 6, ¶ 13; 178-2, p. 1, ¶ 1 (citing Rec. Docs. 140, p. 19, ¶ 9 and 142, p. 18, ¶ 15, respectively); 178-4, p. 2; and 180-8, pp. 6-7.

[24] Rec. Doc. 125-2, p. 99 (During the PI hearing, Trahan testified that Cutrer was interested in replacing "a peroxide product he was buying from a supplier with his own product.").

[25] Rec. Doc. 191, p. 7.

ongoing or continuing royalty to AAR or CA. Rather, DCS offered to pay CA and AAR for goods and services; CA and AAR provided the specified goods and services; and DCS paid for all goods and services for which it received invoices from CA and/or AAR.[26]

Consistent with DCS's routine business practices, Trahan and Cutrer did not execute a written contract; rather, they orally agreed, on behalf of their respective companies, that AAR would perform the breaker testing and development work for DCS at a set hourly rate, to be periodically invoiced to DCS.[27] DCS paid AAR for all the work on an hourly basis. In order for AAR to determine which products would work for DCS's intended purposes, DCS provided AAR with certain parameters for the breaker development. AAR ultimately developed a formulation with three additives, to work with a diluted peroxide to break down polymers at a slow enough speed to allow the chemicals to function prior to breakdown.[28] AAR figured out the additives, each of which is publicly available and commonly known as a peroxide additive, and conducted testing with various dilutions of peroxide to determine the optimal formulation for DCS's needs. After obtaining the formulation, DCS ordered the additives from CA and sent the additives to an entity named PeroxyChem to be

---

[26] Rec. Doc. 191, p. 9; *see also* Rec. Docs. 140, pp. 20-21, ¶¶ 13-18; and 178-2, pp. 5-6, ¶¶ 6-7.
[27] *Id.*; *see also* Rec. Docs. 140, p. 19, ¶ 9; and 142, p. 18, ¶ 15.
[28] *Id.*

mixed with peroxide.[29] CA named the blend "LT Breaker 105," for purposes of sales to DCS, but never sold or marketed the blend to any other customers besides DCS.[30]

On January 27, 2016, AAR employee Suchandra Hazra completed a Choline Chloride Enhancer Evaluation for AAR.[31] Two days later, on January 29, 2016, CA made modifications to the report and renamed the product Clay Control 532 ("CC 532"), in order to market and sell it as a product.[32] Upon being informed of the product CA marketed, DCS determined that it would be easier to market CC 532 if blended with choline chloride, a widely known and commonly used clay control product.[33] DCS hired and paid AAR by the hour to test various blends, in order to find a commercially viable blend of CC 532 and choline chloride.[34] DCS provided AAR with its desired specifications, and AAR billed DCS for hours spent working on the project. As requested by DCS, AAR ultimately provided DCS with a formulation blend of CC 532 and choline chloride, which resulted in an end product, using the cationic starch-choline chloride formulation, which DCS sells under the trade name Clayblok 35.[35] DCS manufactures Clayblok 35 by shipping the

---

[29] *Id.*
[30] Rec. Docs. 180-2, pp. 7-8, ¶ 13; and 178-2, pp. 2-3, ¶ 1; *see also* Rec. Doc. 125-2, pp. 101-03 (Trahan testified that LT Breaker 105 was only ever sold to DCS and PeroxyChem; however, all sales to PeroxyChem were made at DCS' direction and for DCS' ultimate use and distribution.).
[31] Rec. Doc. 191, p. 7.
[32] Rec. Doc. 191, p. 8.
[33] Rec. Docs. 178-2, p. 3, ¶ 2; 180-2, p. 8, ¶ 14 (citing Rec. Docs. 140, p. 19, ¶ 10; 142, p. 19, ¶ 16; and 125-1, pp. 96-98).
[34] Rec. Doc. 191, p. 8; *see also* Rec. Docs. 178-2, p. 3, ¶ 2; and 180-2, p. 8, ¶ 14.
[35] *Id.*

chemicals to a facility, where they are blended based on the specific formulation DCS paid AAR to develop for DCS, and then markets and sells that blend to its oil and gas customers.[36] Until this lawsuit, DCS was not aware of the source of the cationic starch, and DCS is still unaware of the specific chemical composition of the starch.[37]

DCS also hired AAR for testing and development of a specific flow aid blend and a friction reducer sourced by DCS, AAR and/or CA. DCS paid AAR for all time expended in testing the successes of the flow aid blend and friction reducer products and in determining what specific quantities or dilutions were needed to meet DCS's specifications.[38]

Throughout the above-described working relationships between DCS and AAR/CA, DCS never received any information that anyone at CA or AAR, including Sapienza, identified as a trade secret or designated as information which DCS should keep secret.[39] The record reflects that, at all relevant times during which

---

[36] *Id.*

[37] Rec. Doc. 191, p. 8, n.14; *see also* Rec. Docs. 140, p. 20, ¶ 10; 178-2, pp. 3-4, ¶ 2; and 180-2, p. 8, ¶ 14.

[38] Rec. Doc. 191, p. 8, n.14; *see also* Rec. Docs. 140, p. 20, ¶ 11; 142, p. 19, ¶ 17; 178-2, p. 4, ¶ 3; and 180-2, p. 9, ¶ 15.

[39] Rec. Docs. 178-2, p. 6, ¶ 8; and 140, p. 23, ¶¶ 25-29. During his deposition, Sapienza was asked whether "[t]o [his] knowledge, [] there [is] any document that shows [DCS] receiving a written form of the actual formula[,]" to which he responded "[n]o, not of my knowledge." Rec. Doc. 178-8, p. 2. He was likewise asked whether "[CA] or Trahan or Davis ever g[a]ve the formulation for the breaker 105 concentrate to [DCS,]" to which he responded "I don't know. I'm not privy to who – if they made a sale to them." *Id.* at p. 3.

DCS was able to access the AAR/CA online server, Sapienza had knowledge of DCS's access and received the same information as DCS.[40] There is no evidence that Sapienza ever objected to this relationship or arrangement until Sapienza named DCS as a defendant herein.[41] Even after this lawsuit was filed, DCS continued to pay AAR for testing and development of specific dilutions and formulations until on or about August 1, 2017.[42] At the time DCS decided to stop doing business with AAR, DCS was AAR's only customer, providing AAR with enough business to maintain its employees and cover overhead.[43] The loss of DCS's business ultimately put AAR out of business.[44]

In addition to the research and development work it performed for DCS, AAR also did other testing work for CA.[45] One project involved testing a new application for an oilfield waste chemical to help clean hydrogen sulfide from natural gas before processing;[46] another project involved efforts to develop an engineering process for on site development of carbon disulfide, which is dangerous to use, store, and transport.[47] CA paid AAR for all the time related to those testing and development

---

[40] Rec. Docs. 178-2, p. 6, ¶ 8; and 140, p. 23, ¶ 26.
[41] Rec. Docs. 178-2, p. 6, ¶ 8; and 140, p. 18, ¶ 8.
[42] Rec. Doc. 178-2, p. 6, ¶ 9 (citing Rec. 133-9 (DCS's Billing Report, attached to affidavit of Bryan Leonards, DCS's accounting manager)).
[43] Rec. Doc. 178-2, p. 6, ¶ 9 (citing Rec. Doc. 125-2, pp. 168-69 and 195-96).
[44] *Id.*
[45] Rec. Doc. 180-2, pp. 9-10, ¶¶ 16-17.
[46] Rec. Doc. 180-2, p. 9, ¶ 16 (citing Rec. Doc. 142, p. 19, ¶ 18).
[47] *Id.* at pp. 9-10, ¶ 17 (citing Rec. Doc. 142, p. 20, ¶ 19).

efforts.[48] In the end, AAR was never able to develop a product or system with commercial value through either of these projects.[49]

While Sapienza was working on behalf of AAR, the CA Defendants allege that he took efforts to pursue selling a "knock-off" version of a product with which Sapienza was familiar through his time with a company called METSS.[50] During the PI hearing, Sapienza testified that "[t]he product was developed by METSS" and was "a fluid made for the Navy[,]" called "2190," to which Sapienza has or had "a nonexclusive license," allowing him "[t]o use the 2190 and all of the technology[,]" if he first "check[ed] with METSS to make sure that they understood [he] was going to use it."[51] It is undisputed that, while at AAR, Sapienza caused Raymond Bienvenu, a CA employee, to attempt to use the 2190 formula to source relevant raw materials.[52] Yet, Trahan and Davis contend that METSS never gave Sapienza the right to use 2190 and no executed agreement has ever purported to give him such a right.[53] Ultimately, neither AAR nor CA actually used the 2190 formula.[54]

---

[48] *Id.*

[49] *Id.* (citing Rec. Docs. 142, p. 19, ¶ 18, and p. 20, ¶ 19); *see also* Rec. Doc. 180-6, pp. 16-18 (During Trahan's deposition, regarding the oilfield waste chemical, he testified that AAR "tested the chemical triazine combined with a chemical glyoxal, and it did not improve, and there was no commercial value. We discontinued the project. [CA] paid for all the time at AAR to do this.")); and Rec. Doc. 180-11, pp. 4-5 (During Sapienza's deposition, regarding the carbon disulfide project, he testified that "this project was not completely finished when I left.").

[50] Rec. Doc. 180-2, pp. 10-11, ¶ 19.

[51] Rec. Doc. 125-1, pp. 34-35, 37.

[52] Rec. Doc. 125-1, pp. 33-40 (Sapienza's testimony during the PI hearing); Rec. Doc. 122-4.

[53] Rec. Doc. 180-2, pp. 10-11, ¶ 19 (citing Rec. Docs. 142, p. 20, ¶ 21; and 125-2, pp.

[54] Rec. Doc. 125-2, p. 121.

The CA Defendants also allege that Sapienza caused at least two of AAR's potential business deals, one with Univar and the other with Balchem, to fall apart.[55] The facts surrounding each of these potential business opportunities were discussed in a prior ruling.[56] Regarding Univar, the record reflects that Trahan was negotiating a potential distribution agreement between AAR/CA and Univar; however, the CA Defendants allege that negotiations halted after an unprofessional display of emotion by Sapienza during a meeting between AAR/CA and Univar.[57] Regarding Balchem, Plaintiffs' amended complaint alleges that the opportunity "for AAR to market and sell the Choline Chloride Trade Secrets to Balchem, one of the largest manufacturers and suppliers of choline chloride[,]" arose out of Sapienza's "contacts and experience" and began around mid-March 2016.[58] Ultimately, Trahan and Sapienza gave a presentation to Balchem, in Lafayette in August 2016, in which both CA and AAR were referenced.[59] It is this Balchem opportunity which Plaintiffs contend was "the tipping point that caused Trahan and Davis finally to disclose the true ownership of CA and freeze out Sapienza[.]"[60] However, the CA Defendants allege that, like the Univar scenario, Sapienza became verbally aggressive towards a Balchem

---

[55] Rec. Doc. 180-2, p. 11, ¶ 20 (citing Rec. Doc. 142, p. 20, ¶ 22).
[56] *See* Rec. Doc. 233, pp. 7-8 (Univar opportunity) and pp. 12-13 (Balchem opportunity).
[57] Rec. Doc. 180-2, p. 11, ¶ 20 (citing Rec. Doc. 125-2, pp. 109-112); *see also* Rec. Doc. 233, p. 8, n.21.
[58] Rec. Doc. 233, p. 12, n.27 (citing Rec. Doc. 32, p. 25, ¶¶ 50, 51).
[59] Rec. Doc. 233, p. 12.
[60] *Id.*

representative and, thereafter, communicated to Balchem that Trahan had a conflict of interest, such that Balchem should go through Sapienza to pursue a business relationship with AAR.[61] The CA Defendants claim that, thereafter, Balchem stopped discussing a potential deal with AAR and CA.[62]

Prior to leaving AAR's premises, Sapienza used AAR staff, including Dr. Srinivasan Ambatipati and Yash Doshi, to work on a gas to liquids opportunity being pursued in Malaysia.[63] It is undisputed that Sapienza was pursuing this opportunity on behalf of Sapienza's own company, Visibly Green.[64] The CA Defendants claim that AAR personnel spent at least 300 hours on the project, while Sapienza testified that "AAR had done no work, really . . . [maybe] put eight hours on it."[65] In any event, neither Sapienza nor Visibly Green paid AAR for AAR's work, personnel or resources expended on that project.[66] It is further undisputed that, when Sapienza left AAR, he asked Dr. Ambatipati to remove from AAR's servers, through Egnyte and Projecturf, all files related to this project.[67] Sapienza testified that Trahan and

---

[61] Rec. Doc. 180-2, p. 11, ¶ 20 (citing Rec. Docs. 142, p. 21, ¶ 22; and 125-2, pp. 112-15); *see also* Rec. Doc. 180-13.

[62] *Id.*

[63] Rec. Doc. 180-2, pp. 11-12, ¶ 20 (citing Rec. Doc. 142, p. 20, ¶ 20); *see also* Rec. Doc. 125-2, pp. 117-19.

[64] Rec. Doc. 125-2, p. 117 (During the PI hearing, in response to a question asking "what company Dr. Sapienza was using to pursue the [Malaysia] project[,]" Trahan testified that "[i]t was [his] understanding it was Visibly Green."); Rec. Doc. 180-11, pp. 9-10 (Sapienza's testimony regarding the Malaysia project).

[65] Rec. Doc. 180-2, p. 12, ¶ 20 (at least 300 hours); Rec. Doc. 180-11, p. 10 (8 hours)

[66] Rec. Doc. 180-2, p. 12, ¶ 20; Rec. Doc. 125-2, pp. 117-18.

[67] Rec. Doc. 180-2, p. 12, ¶ 20; Rec. Doc. 125-2, pp. 119-20; Rec. Doc. 122-1, p. 53 (E-mail, dated August 5, 2016, sent from Sapienza to Dr. Ambatipati, stating: "Please remove all methanol and

Davis acquiesced in that request and told Sapienza that he "could go off and form [his] own entity that had to do with . . . the methanol project."[68]

Ultimately, the relationships between the parties soured to the point that Sapienza decided to physically leave AAR, on or about September 2016.[69] It is undisputed that Sapienza was never locked out of AAR's premises nor did Trahan or Davis ever demand Sapienza's resignation.[70] Rather, Sapienza testified that Trahan and Davis had caused him to become "extremely upset," which in turn led him to remove "all of [his] personal belongings from the building . . . in the middle of the night."[71] He did not thereafter return to AAR's premises.

## LAW & ANALYSIS

### A.    THE SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the

---

CO2 files from Egnyte and Projecturf." Admitted, Defendants' Exhibit 23, during the PI hearing); *see also* Rec. Doc. 180-11, p. 9 (When asked whether he disputed sending the email to Dr. Ambatipati, Sapienza testified "[n]o, no, I don't at all," but stated that Trahan and Davis acquiesced in that request.).

[68] Rec. Doc. 180-11, pp. 9-10; *see also* Rec. Doc. 125-1, p. 61.
[69] Rec. Doc. 125-1, p. 62.
[70] Rec. Doc. 180-2, p. 12, ¶ 22; Rec. Doc. 125-2, p. 122; Rec. Doc. 125-1, pp. 60-61.
[71] Rec. Doc. 125-1, pp. 60-61.

applicable governing law.[72] A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[73]

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.[74] The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of genuine issues of material fact.[75] If the moving party carries its initial burden, then "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."[76] "[F]actual controversies [are resolved] in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[77] The court does "not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[78]

---

[72] *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex*., 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc*., 232 F.3d 473, 477 (5th Cir. 2000).

[73] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citing *Anderson*, 477 U.S. at 252); *Hamilton,* 232 F.3d at 477.

[74] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

[75] *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007) (citing *Celotex Corp.*, 477 U.S. at 323).

[76] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex Corp.*, 477 U.S. at 325).

[77] *Little*, 37 F.3d at 1075.

[78] *Little*, 37 F.3d at 1075 (citing *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888 (1990) (resolving actual disputes of material facts in favor of nonmoving party "is a world apart from 'assuming' that general averments embrace the 'specific facts' needed to sustain the complaint.... It will not do to 'presume' the missing facts because without them the affidavits would not establish the injury that they generally allege") (emphasis removed)).

The court cannot make credibility determinations or weigh the evidence, and the nonmovant cannot meet his burden with unsubstantiated assertions, conclusory allegations, or a scintilla of evidence.[79] Under Rule 56(c)(3), "[t]he court need consider only the cited materials, but it may consider other materials in the record."[80] Here, the parties were put on notice of the Court's intent, for purposes of the dispositive motions in this case, to consider the evidence presented during the PI hearing held on October 2–5, 2017.[81]

Importantly, motions for summary judgment "cannot be granted simply because there is no opposition."[82] When no response is filed, however, the court may accept as undisputed the facts set forth in support of the motions and grant summary judgment when a prima facie showing for entitlement to judgment is made.[83] "Where

---

[79] *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005); *see also Little*, 37 F.3d at 1075 (citations omitted).

[80] Fed. R. Civ. P. 56(c)(3).

[81] *See* Fed. R. Civ. P. 65(a)(2) (Even when the Court does not consolidate the injunction hearing with trial on the merits, "evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial."); *see also Brown v. Livingston*, 524 F. App'x 111, 115 (5th Cir. 2013) (consideration of, *inter alia*, evidence presented at preliminary injunction hearing resulted in conversion of motion to dismiss into a summary judgment motion); *JSLG, Inc. v. City of Waco*, No. 11-131, 2011 WL 13180227, at *1 (W.D. Tex. Sept. 26, 2011), *aff'd*, 504 F. App'x 312 (5th Cir. 2012) (considering evidence presented at a preliminary injunction hearing in granting a motion for summary judgment).

[82] *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 n.3 (5th Cir. 1995); *see also Calais v. Theriot*, 589 F. App'x 310, 311 (5th Cir. 2015) (per curiam).

[83] *See Eversley v. MBank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988); *see also Little*, 37 F.3d at 1075-76 ("[T]he nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in *any* case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'") (emphasis in original) (quoting *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993)).

the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."[84]

## B. THE STANDARDS FOR DEEMING FACTS ADMITTED

As mentioned above, each of the instant motions is styled as a Motion for Summary Judgment on the Pleadings, pursuant not only to Rule 56, but also to Rule 8(b)(6). Rule 8(b)(1) provides the following general rule for defenses, admissions and denials: "In responding to a pleading, a party *must*: (A) state in short and plain terms its defenses to each claim asserted against it; and (B) admit or deny the allegations asserted against it by an opposing party."[85] Rule 8(b)(6) pertains to the effect of a party's failure to deny and provides, in pertinent part, that "[a]n allegation--other than one relating to the amount of damages--is admitted if a responsive pleading is required and the allegation is not denied."[86]

Further, under Rule 8(c)(1), "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense[.]"[87] The Fifth Circuit has therefore recognized that "[g]enerally, affirmative defenses must be presented in the

---

[84] *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (footnote and internal citation marks omitted)).
[85] Fed. R. Civ. P. 8(b)(1)(A), (B) (emphasis added).
[86] Fed. R. Civ. P. 8(b)(6); *see Hall v. Aetna Cas. and Sur. Co.,* 617 F.2d 1108 (5th Cir. 1980) ("the effect of [insurer's] failure to deny coverage under its policy was to admit this coverage") (citing *Sinclair Refining Co. v. Howell*, 222 F.2d 637, 639 (5th Cir. 1955)).
[87] Fed. R. Civ. P. 8(c).

answer."[88] "Even so, if the defense is later presented 'in a manner that does not result in unfair surprise[,] . . . technical failure to comply precisely with Rule 8(c) is not fatal.'"[89] "The defense may be considered if it was raised 'at a pragmatically sufficient time, and [the opposing party] was not prejudiced in its ability to respond.'"[90]

Here, Plaintiffs failed to file an answer to any of the counterclaims within twenty-one days, pursuant to Rule 12(a)(1)(B), or at any time thereafter, and have likewise failed to file any opposition to the instant motions despite this Court having granted substantially all of the numerous extensions Plaintiffs have requested over the course of this litigation.[91] The details of those requests, extensions, and repeated failures by Plaintiffs to meet their deadlines, despite extensions thereof, are contained in this Court's prior rulings on the CA and DCS Defendants' motions for summary judgment.[92] Further, despite significant discussions and filings regarding various deadlines and requests for extensions thereof, Plaintiffs have never properly

---

[88] *Bradberry v. Jefferson Cty., Tex.*, 732 F.3d 540, 553 (5th Cir. 2013) (citing Fed. R. Civ. P. 8(c)(1)).

[89] *Bradberry*, 732 F.3d at 553 (quoting *Allied Chem. Corp. v. Mackay*, 695 F.2d 854, 855–56 (5th Cir. 1983)).

[90] *Bradberry*, 732 F.3d at 553 (quoting *Allied Chem.,* 695 F.2d at 856).

[91] *See Hall*, 617 F.2d at 1110-11 (finding no abuse of discretion where defendant "had ample opportunity to amend its answer throughout the pendency of the case, and the district court was liberal in granting it leave to do so[,]" until recognizing "final amendment would clearly prejudice the opposing party and simply came too late").

[92] *See* Rec. Doc. 233, pp. 17-24 (ruling on CA Defendants' motion for summary judgment); and Rec. Doc. 191, pp. 3-4 (ruling on DCS Defendants' motion for summary judgment).

acknowledged their failure to respond or otherwise defend against Defendants' counterclaims, nor have Plaintiffs ever requested an extension of time, whether timely or untimely, within which to do so.

As far as the Court is aware, the only instance of Plaintiffs acknowledging their failure to respond or otherwise defend against any counterclaims may be found on page 20 of Plaintiffs' "Combined Response" to all then-pending dispositive motions.[93] The Combined Response, which was filed on December 3, 2018, was actually a dual motion, urging the Court for a continuance and new scheduling order under Rule 16(b)(4) and/or additional discovery under Rule 56(d), in order to oppose the summary judgment motions. Therein, on page 20, Plaintiffs state: "Although couched as a Motion for Summary Judgment on the Pleadings, the DCS Defendants' Motion effectively seeks a default judgment due to Sapienza's failure to file an Answer to their counterclaims. Accordingly, Sapienza now seeks to remedy this failure by moving to file his Answer soon after this Combined Response."[94] Simultaneous with the filing of the Combined Response, Plaintiffs filed a proposed order, capturing the various relief requested therein; however, the proposed order failed to capture any request for leave to file an answer.[95] Moreover, Plaintiffs did not, at any time before or after that filing, properly move to file an out of time answer.

---

[93] *See* Rec. Doc. 210-1, p. 20.
[94] *Id.*
[95] *See* Rec. Doc. 210-2.

Thus, although Rule 6(b)(1)(B) *might* have provided a vehicle through which Plaintiffs could have sought such an extension, their complete failure to pursue same, particularly in light of Plaintiffs' record of dilatory conduct in this case, leaves the Court with little choice but to act on the record now before it.[96] Accordingly, for purposes of the instant motions, all material facts (*not* arguments) set forth by the DCS and CA Defendants, insofar as they are not controverted by the record, will be deemed admitted.[97]

## C.  ANALYSIS OF COUNTERCLAIMS

In light of Plaintiffs' failure to respond or defend against any of the counterclaims presented, the CA and DCS Defendants generally contend that "the allegations" are "automatically deemed admitted[;]" Plaintiffs have waived any affirmative defenses and therefore cannot defend against the claims; and, on that basis, Defendants move for summary judgment.[98] Indeed, as noted above, Plaintiffs' failure to respond or defend does allow the Court to accept as undisputed the facts set forth in support of the instant motions and grant summary judgment if a prima

---

[96] *See* Fed. R. Civ. P 6(b)(1)(B) ("When an act may or must be done within a specified time, the court *may, for good cause*, extend the time . . . *on motion* made after the time has expired *if the party failed to act because of excusable neglect*.") (emphasis added).

[97] Rec. Docs. 178-2 and 180-2 (DCS and CA Defendants' statements of uncontested facts, respectively). As noted, in footnote 3, *supra,* where appropriate, these facts are deemed admitted, given that Plaintiffs failed to respond or defend against the facts and allegations in either filing, as required by Federal Rule of Civil Procedure 8(b)(6) and Local Rule 56.2.

[98] Rec. Docs. 178-1, p. 9, ¶¶ 14, 15; and 180-1, p. 15, ¶¶ 28, 29.

facie showing is made.[99] However, given the nature of this case, the unique circumstances surrounding the parties' interrelationships, and the existence of a 741-page PI hearing transcript, "the record taken as a whole" does not support summary judgment in Defendants' favor on these counterclaims.[100] Even if the Court were to grant summary judgment on all counterclaims, both the CA and DCS Defendants concede that there would remain a triable issue regarding the amount of any damages.[101] With these principles in mind, each counterclaim will be analyzed in turn.

### *Breach of Fiduciary Duty*

In the CA Defendants' first counterclaim, Trahan and Davis, individually and on behalf of Cypress and Tarrytown, allege that Sapienza, individually and on behalf of Visibly Green, breached his fiduciary duties to the Defendants.[102] Under Louisiana law, "[t]he members and managers owe fiduciary duties to the LLC and to the other members and managers."[103] In prior rulings, the Court has held that Trahan and Davis owed Sapienza and AAR fiduciary duties, and for the same

---

[99] *Eversley*, 843 F.2d at 174; *Little*, 37 F.3d at 1075-76.

[100] *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (footnote and internal citation marks omitted)).

[101] *See* Rec. Docs. 178-1, p. 9, ¶ 15, n.40; and 180-1, p. 15, ¶ 29, n.85.

[102] Rec. Docs. 142, p. 22, ¶ 27; and 180-1, p. 16, ¶ 32.

[103] *Rudney v. Int'l Offshore Servs., L.L.C.*, No. 07-3908, 2007 WL 2900230, at *2 (E.D. La. Oct. 1, 2007) (citing La. R.S. § 12:1314(A)(1) and *Gill v. Gill*, 39,406 (La. App. 2 Cir. 3/9/05); 895 So.2d 807, 814 n. 3).

reasons, now finds that Sapienza owed Trahan, Davis, and AAR a fiduciary duty as well.[104]

In Louisiana, "[t]he elements of a cause of action for a breach of fiduciary duty, or a knowing participation in such, are: (1) a breach by a fiduciary of an obligation to another; (2) a knowing collusion or participation in the breach by the fiduciary; and (3) damages suffered by another as a result of the breach."[105] "Further, the cause of action requires proof of fraud, breach of trust or action outside the limits of the fiduciary's authority; the burden of proof is on the [claimant]."[106] In this case, the CA Defendants allege that Sapienza breached his fiduciary duties by

> utilizing AAR's resources and property for personal gain; usurping business opportunities; misrepresenting a business opportunity; misrepresenting rights to use technology owned by Sapienza's former employer and exposing AAR to potential liability therefor; improperly sharing financial information with non-member employees and third parties; causing the loss of legitimate business opportunities because of Sapienza's unprofessional behavior; single-handedly instituting a lawsuit against DCS, AAR's only customer, and its CEO Cutrer, thereby causing DCS to discontinue business with AAR and putting AAR out of business; and, to the extent Sapienza proves anything as an AAR trade secret with value, causing AAR to lose the value of the information of such alleged trade secrets.[107]

The Court finds that there is no evidence of fraud in this case; however, whether there was a breach of trust or action outside the limits of Sapienza's

---

[104] *See* Rec. Docs. 123, pp. 3-4; and 233, p. 41.
[105] *Brockman v. Salt Lake Farm P'ship*, 33,938 (La. App. 2 Cir. 10/4/00); 768 So. 2d 836, 844 (citing *Oliver v. Central Bank*, 26,932 (La. App. 2 Cir. 5/10/95); 658 So.2d 1316).
[106] *Id.*
[107] Rec. Docs. 142, pp. 22-23, ¶¶ 27-36; Rec. Doc. 180-1, pp. 16-17, ¶¶ 32-34.

authority requires further analysis. As recognized above, at the time AAR was formed, the parties agreed that Trahan, Davis and Sapienza would each be responsible for different aspects of the business. Trahan was intended to oversee the business aspects, including marketing and sales; Davis was intended to secure additional sources of funding while also helping with marketing and sales; and Sapienza was intended to oversee the science and technology aspects, including the researching, inventing, developing, and testing of chemical technologies and processes. Further, certain entities were owned by some but not all of the individuals involved, namely, as relevant here, CA was owned only by Trahan and Davis, and Visibly Green was owned only by Sapienza. Further still, because CA essentially stepped into the shoes of Rapid Specialty, an entity also owned by Trahan and Davis but not Sapienza, there were also elements of continuing business relationships, which carried over from Rapid Specialty to CA and were not necessarily attributable to nor did they even involve AAR. Obviously, the extent to which these boundaries were defined and/or enforced goes to the heart of the subject-matter of this litigation and has served to complicate analysis of the parties' claims in this case.

First, the CA Defendants claim that Sapienza usurped and/or misrepresented a business opportunity, by pursuing a gas to liquids opportunity in Malaysia, on behalf of Visibly Green, and thus for personal gain, while also using AAR resources and property. As recognized above, it is undisputed that: AAR staff spent at least

some time on this project; Sapienza was pursuing this opportunity on behalf of Visibly Green; AAR was never compensated for the use of any time, resources or personnel; and Sapienza asked Dr. Ambatipati to remove from AAR's servers all files related to the project. Yet, considering the parties' complex interrelationships, as well as the shared physical work space and general acceptance of overlapping business interests, it is unclear whether Sapienza's actions went beyond the limits of his authority. Despite Plaintiffs' failure to respond or otherwise defend against this allegation, the record reflects a genuine dispute of material fact as to whether Sapienza knowingly colluded or participated in a breach of his duties of trust and loyalty to the CA Defendants in the context of the relevant relationships. Further, the CA Defendants claim that AAR personnel spent at least 300 hours on the project, allegedly believing it to be for AAR's benefit, while Sapienza testified that "AAR had done no work, really . . . [maybe] put eight hours on it[,]" and that Trahan and Davis acquiesced in Sapienza's request of Dr. Ambatipati to remove the project files in order to pursue this project on his own.[108] Such factual controversies must be resolved in favor of the nonmovant.

Second, the CA Defendants claim that Sapienza misrepresented rights to use technology owned by Sapienza's former employer, METSS, thereby exposing AAR

---

[108] Rec. Doc. 180-2, p. 12, ¶ 20 (at least 300 hours); Rec. Doc. 180-11, p. 10 (8 hours); *see also* Rec. Docs. 125-2, pp. 119-20; 122-1, p. 53 and 180-11, p. 9.

to potential liability for improper use or disclosure of that companies' information. At a minimum, the record certainly reflects some confusion regarding what rights, if any, Sapienza had to proprietary information involving his time with METSS. This confusion is exacerbated by Sapienza's own testimony, during the PI hearing. Regardless of the parties' relative positions, the Court declines the invitation to conduct a "trial within a trial," surrounding the question of Sapienza's intellectual property rights as it relates to a party not represented in this case. Further, given that the Defendants assert only that any misrepresentation exposed AAR to "potential liability," any assessment of damages would be speculative at best.[109]

Third, the CA Defendants claim that Sapienza improperly shared financial information with non-member employees and third parties, and that this, and other allegedly unprofessional behavior toward representatives of Balchem and Univar, caused AAR to lose legitimate business opportunities. There is some support in the record for the Defendants' versions of these events; however, the record also reflects that Sapienza has a different view of each of these scenarios. As such, the Court declines to speculate as to whether any unprofessional behavior on the part of Sapienza caused the loss of these business opportunities and/or whether the challenged communications, presumably those between Sapienza, Raymond Bienvenu and Vanessa Madrid, were outside the bounds of Sapienza's authority or

---

[109] Rec. Doc. 142, pp. 23-24, ¶ 32.

otherwise improper relative to the routine information sharing practices within CA and AAR.

Fourth, the CA Defendants allege that Sapienza breached his fiduciary duties by instituting a lawsuit against Cutrer and DCS, AAR's only customer, thereby causing DCS to discontinue business with AAR which ultimately put AAR out of business. The Defendants concede that, even after this lawsuit was filed, DCS continued to do business with AAR, paying it to conduct testing and development of specific dilutions and formulations, until on or about August 1, 2017. The record also reflects that the professional relationship between Cutrer and Trahan dates back long before the events which led to this lawsuit, beginning in at least 2012, when Cutrer assumed the role of President of EnerSciences' subsidiary ChemRock.[110] Considering the record taken as a whole, the Court finds that the CA Defendants have failed to establish whether any action by Sapienza, including the filing of this lawsuit, caused the discontinuance of the business relationship between AAR and DCS.

Here, the burden of proof is on the CA Defendants. Given the totality of circumstances, including the parties' interrelationships and loose boundaries drawn in the course of regular business practices, the Court finds that genuine disputes of material fact prevent summary judgment on the CA Defendants' claim for breach of

---

[110] Rec. Doc. 133-5, p. 7.

fiduciary duties. As to each underlying allegation, the record, including the transcript from the PI hearing and the depositions attached to the dispositive motions, create questions of fact surrounding whether, or the extent to which, Sapienza knowingly colluded or participated in any breach. Further, there is no evidence of fraud, and the CA Defendants have not established breach of trust or action outside the limits of Sapienza's agreed-to authority. Accordingly, the motion is denied as to this claim.

### Declaratory Judgment on Right to Own or Use Work-for-Hire Development & Judicial Dissolution

For reasons explained below, this section will address both the counterclaims for declaratory judgment, asserted by both CA and the DCS Defendants, and for judicial dissolution, asserted only by the CA Defendants.

Both CA and the DCS Defendants seek a declaratory judgment on the right to own or use work-for-hire testing and development.[111] CA's claim pertains to the following: testing of cationic starches sourced by CA to determine a commercially viable product to use as a clay control; development, although unsuccessful, of a carbon disulfide generator; and development, although unsuccessful, of a hydrogen sulfide scavenger. CA claims that none of these projects were contributed by Sapienza or Visibly Green. The DCS Defendants' claim pertains to the development of the following: a low temperature breaker additive formulation; a friction reducer;

---

[111] Rec. Docs. 142, pp. 24-26, ¶¶ 37-49; and 180-1, pp. 17-18, ¶¶ 35-39 (CA); *see also* Rec. Docs. 140, pp. 20-22, ¶¶ 12-22; and 178-1, pp. 10-11, ¶¶ 18-22 (DCS Defendants).

a formulation for a flow aid; and a specifically formulated clay control using a CA additive, choline chloride, and water. Both CA and the DCS Defendants argue that they have each paid AAR for all formulations, testing and development provided by AAR, and therefore, further seek a declaratory judgment that they owe no additional liability, royalty, or other amount to Sapienza and/or Visibly Green for any of these items or projects. Alternatively, both CA and the DCS Defendants seek a declaration that they "own[] all right, title and interest in and to any specific formulations developed for [them] by AAR under any agreement between [CA and/or DCS] and AAR."[112]

Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."[113] The Act "confers no jurisdiction but is a procedural device designed to provide a new remedy to the federal court arsenal."[114] "The district court, however, is not required to provide declaratory judgment relief, and it is a matter for the district court's sound discretion whether to decide a declaratory judgment

---

[112] Rec. Docs. 142, p. 26, ¶ 49; and 180-1, p. 18, ¶ 39 (CA); *see also* Rec. Docs. 140, p. 22, ¶ 22; and 178-1, p. 11, ¶ 22 (DCS Defendants).
[113] 28 U.S.C. § 2201.
[114] *Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 601 (5th Cir. 1983) (*Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239-240 (1937)).

action."[115] "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[116] The Fifth Circuit has succinctly stated that the Act "gives the court a choice, not a command."[117]

It is because of the Act's introductory phrase, *in a case of actual controversy*, that the Court has combined consideration of these counterclaims with the CA Defendants' request for judicial dissolution. Originally, Plaintiffs likewise sought judicial dissolution of AAR; however, the parties have since agreed, as confirmed in open court on December 11, 2018, that AAR should be dissolved orderly and pursuant to Louisiana law without need for judicial dissolution.[118] Accordingly, any claims for judicial dissolution are now moot, as previously recognized in the Court's ruling on Defendants' motions for summary judgment.[119]

Given that the question of dissolution is no longer ripe for the Court's consideration, the Court likewise finds that CA's request for declaratory judgment

---

[115] *Id.* (citing *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491 (1942); and *Hollis v. Itawamba County Loans*, 657 F.2d 746, 750 (5th Cir. 1981)).

[116] *Maryland Cas. Co. v. Pac. Coal & Oil Co*., 312 U.S. 270, 273 (1941); *see also, id.* ("The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy.").

[117] *Puritan Fashions,* 706 F.2d at 601 (quoting *Dresser Industries, Inc. v. Ins. Co. of North America*, 358 F. Supp. 327, 330 (N.D. Tex.), *aff'd*, 475 F.2d 1402 (5th Cir. 1973)).

[118] *See* Rec. Doc. 233, pp. 2-3, n.4 (citing Rec. Docs. 187, p. 30, ¶ 84; and 176-1, p. 24, ¶ 76).

[119] *Id.*

does not present an actual controversy at this time. Under Louisiana law, statutorily dissolving a limited liability company "merely begin[s] the winding up process that will later result in [] termination" thereof.[120] Louisiana's statute providing for dissolution based on member consent refer to a limited liability company being "dissolved and its affairs . . . wound up[,]" which the Court interprets to mean that, once the question of judicial dissolution is no longer before the Court, any lingering question of "winding up" affairs is likewise not properly before the Court.[121] In other words, to the extent that Plaintiffs properly placed legal issues before the Court, the Court has ruled thereon via prior rulings on Defendants' motions for summary judgment and those questions have been decided; to the extent there were, or may have been, lingering questions relevant to the winding up of AAR's affairs prior to dissolution, Plaintiffs and the CA Defendants removed those questions from the Court's jurisdiction by mooting their claim for judicial dissolution. In any event, were the Court to find that this claim did present an actual controversy, it would nonetheless find that genuine disputes of material fact exist which would preclude the Court from granting the declaratory judgment sought on behalf of CA.

---

[120] *Gambel v. Tullis*, 2017 WL 3336629, at *6 (E.D. La. 2017) (quoting Glenn G. Morris and Wendell H. Holmes, *Business Organizations, in* 8 *La. Civ. L. Treatise* § 44.25) (citing La. Rev. Stat. §§ 12:1334-1335)).
[121] *See* La. Rev. Stat. § 12:1334.

As to the DCS Defendants' claims, the Court likewise finds that there is no actual, substantial controversy necessitating a declaratory judgment as to the rights of DCS to use the products and/or services which it requested and for which all invoices have been paid. In a prior ruling, the Court adjudicated all claims brought by Plaintiffs against Cutrer and DCS, granting summary judgment in favor of the DCS Defendants as to all of Plaintiffs' claims.[122] Included therein was a finding that Plaintiffs had failed to dispute the DCS Defendants' evidence of a legitimate work-for-hire agreement, pursuant to which AAR and CA were paid for the work performed on behalf of Cutrer and DCS. Having so ruled, the Court declines to repeat *or broaden* its prior ruling, to the extent the instant counterclaim overlaps therewith or falls thereunder, and the Court dismisses the declaratory action, to the extent the DCS Defendants' seek a judgment pertaining to rights not already covered by the Court's prior ruling. Accordingly, the counterclaims of both the CA and DCS Defendants, pursuant to which declaratory judgment is sought, will be dismissed without prejudice for lack of an actual controversy.

### *Unjust Enrichment*

Next, the CA Defendants claim that Plaintiffs are liable to them under a theory of unjust enrichment, in an amount equal to the value attributable to AAR employee time and resources used by Plaintiffs for improper purposes surrounding pursuit of

---

[122] Rec. Doc. 191.

the gas to liquids opportunity in Malaysia, with the amount to be proven at trial.[123] To recover under a theory of unjust enrichment, the CA Defendants must show enrichment on the part of Plaintiffs; impoverishment on the part of the CA Defendants; a causal relationship between the enrichment received by Plaintiffs and the CA Defendants' impoverishment; and a lack of other remedy at law.[124] For the same reasons that the Court found genuine disputes of material facts surrounding the Malaysia opportunity as it pertained to Sapienza's alleged breach of fiduciary duty, the CA Defendants have likewise failed to meet their burden of establishing unjust enrichment.

### Attorney's Fees Under DTSA and LUTSA

Finally, both the CA and DCS Defendants claim that they are entitled to recover attorney's fees reasonably incurred in defending against Plaintiffs' claims, pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(3), and the Louisiana Uniform Trade Secrets Act ("LUTSA"), La. Rev. Stat. § 51:1434, because Plaintiffs' trade secret claims were brought in bad faith.[125] Under the DTSA, a court *may*, "if a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, . . . award reasonable attorney's fees to the

---

[123] Rec. Docs. 142, pp. 26-27, ¶¶ 50-53; 180-1, p. 18, ¶ 40.
[124] *Carriere v. Bank of Louisiana*, 95-3058 (La. 12/13/96); 702 So. 2d 648, 658, *on reh'g* (Nov. 3, 1997).
[125] Rec. Docs. 142, pp. 27-29, ¶¶ 55-63; and 180-1, p. 19, ¶ 42 (CA Defendants); *see also* Rec. Docs. 140, pp. 22-24, ¶¶ 23-31; and 178-1, p. 12, ¶ 23 (DCS Defendants).

prevailing party."[126] For purposes of this analysis, the attorney's fees provision under LUTSA is identical to that under the DTSA.[127] A plain reading of either statute indicates that the decision is a discretionary one.

"In the United States, parties are ordinarily required to bear their own attorney's fees—the prevailing party is not entitled to collect from the loser."[128] "Under this 'American Rule,' we follow 'a general practice of not awarding fees to a prevailing party absent explicit statutory authority.'"[129] The DTSA explicitly authorizes the award of attorney's fees to the prevailing party but only if there is also a finding of bad faith on the part of the plaintiff in bringing the misappropriation claim or claims.[130]

The CA Defendants claim that, prior to filing this lawsuit, Plaintiffs knew that Sapienza did not create, invent, or develop any of the claimed trade secrets, yet Sapienza falsely asserted that he had done so and had personal and individual rights to such information. Prior to filing this lawsuit, the CA Defendants further allege that Sapienza was aware that CA received information from AAR, pursuant to

---

[126] 18 U.S.C. § 1836(b)(3)(D).

[127] La. Rev. Stat. § 51:1434 ("If a claim of misappropriation is made in bad faith, . . . the court may award reasonable attorney's fees to the prevailing party.").

[128] *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 602 (2001) (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975)).

[129] *Id.* (citing *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994)).

[130] *Dunster Live, LLC v. LoneStar Logos Mgmt. Co., LLC.*, 908 F.3d 948, 952 (5th Cir. 2018). ("To be eligible, the party seeking fees (1) must prevail and (2) it must do so in one of the three listed scenarios that also require a showing of bad faith or malice.").

legitimate business arrangements and CA's agreed-to role as AAR's marketing arm, and Sapienza never identified any of that information as trade secret or confidential information belonging to him. Based on the parties' agreements in forming AAR, including Trahan, Davis and Sapienza's respective roles therein, as well as CA's role as the marketing arm, the CA Defendants allege that Plaintiffs never had a good faith claim for misappropriation of trade secrets, given that all acquisition, use and/or disclosure of any relevant information was proper and in accordance with authorized means.[131]

The DCS Defendants claim that their addition to this lawsuit was done "solely to harass [them] and seek deep pockets[,]" because "[t]here was, and continues to be, no good faith basis to assert any claims against [them] in this case."[132] Prior to filing this lawsuit, the DCS Defendants allege that Plaintiffs were aware that Sapienza did not create, invent, or develop any of the claimed trade secrets; that the DCS Defendants entered into a legitimate business relationship with AAR, through Trahan; that they received information from AAR, pursuant thereto, and yet, Sapienza never identified any of that information as trade secret or confidential information belonging to Plaintiffs. As such, the DCS Defendants claim entitlement to attorney's fees, given that they received all information from AAR pursuant to

---

[131] *See* Rec. Doc. 142, pp. 27-28, ¶¶ 57-62.
[132] Rec. Doc. 140, p. 22, ¶ 23.

valid arm's length transactions, without any restriction or exclusion of rights, and there is no good faith claim that the DCS Defendants misappropriated any trade secrets.

Given the 2016 effective date of the DTSA, the Fifth Circuit was just recently confronted with "the first Defend Trade Secrets Act case [to have] reached [the] court[,]" and it raised a question of entitlement to attorney's fees.[133] Although the precise question at issue in *Dunster Live* is inapplicable here, the case is nonetheless instructive insofar as directing courts to interpret the DTSA in the context of other federal statutes allowing prevailing parties to recover fees. There, the question was whether "a defendant [is] eligible for fees when the plaintiff obtains a dismissal without prejudice."[134] Here, the Court previously dismissed Plaintiffs' claims under the DTSA and the LUTSA, against both the DCS and CA Defendants, on the merits and with prejudice.[135] Prevailing party status requires that a party "received a judgment on the merits, or obtained a court-ordered consent decree."[136] Thus, it is beyond question that the DCS and CA Defendants "prevailed" on Plaintiffs' DTSA and LUTSA claims.[137]

---

[133] *Dunster Live*, *supra*, 908 F.3d at 950.

[134] *Id.*

[135] *See* Rec. Docs. 191, 192, 233, and 234.

[136] *Buckhannon Bd.*, 532 U.S. at 605 (internal citation omitted); *see also Dunster Live*, 908 F.3d at 952-53 (collecting federal cases in which the term "prevailing party" has been consistently interpreted).

[137] *Dunster Live* also instructs that "prevailing party status ordinarily requires being ahead when the final whistle blows in a case, not at halftime." 908 F.3d at 953 (citing *Planned Parenthood of*

Having determined that the DCS and CA Defendants are the prevailing parties for purposes of these claims, the Court must decide whether the Plaintiffs made the claim or claims of misappropriation in bad faith, and if so, whether that finding merits a fee award. Neither the DTSA nor the LUTSA provides a definition of "bad faith" in the context of trade secret misappropriation claims. The Supreme Court has "long recognized a common-law exception to the general 'American rule' against fee-shifting—an exception, 'inherent' in the 'power [of] the courts' that applies for 'willful disobedience of a court order' or 'when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . [.]'"[138] "In this class of cases, the underlying rationale of 'fee shifting' is punitive."[139] "The essential element in triggering the award of fees is therefore the existence of 'bad faith' on the part of the unsuccessful litigant."[140]

"The standards for bad faith are necessarily stringent."[141] "A party should not be penalized for maintaining an aggressive litigation posture."[142] "But advocacy

*Houston & Se. Tex. v. Sanchez*, 480 F.3d 734, 742–43 (5th Cir. 2007)). Although the final whistle has not blown in this case, there are no remaining claims arising under the DTSA or the LUTSA, such that the final whistle has blown for purposes of the Defendants' claims for attorney's fees pursuant to those statutes.

[138] *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 557 (2014) (quoting *Alyeska Pipeline*, 421 U.S. at 258–259 (internal quotation marks omitted)).

[139] *Batson v. Neal Spelce Assocs., Inc.*, 805 F.2d 546, 550 (5th Cir. 1986).

[140] *Id.* (citing *Hall v. Cole*, 412 U.S. 1, 6 (1973)).

[141] *Batson*, 805 F.2d at 550 (citing *Roadway Express Inc. v. Piper*, 447 U.S. 752, 766 (1980) ("Because inherent powers [to levy attorneys' fees for bad faith] are shielded from direct democratic controls, they must be exercised with restraint and discretion."))

[142] *Batson*, 805 F.2d at 550.

simply for the sake of burdening an opponent with unnecessary expenditures of time and effort clearly warrants recompense for the extra outlays attributable thereto."[143]

As relevant here, Plaintiffs originally alleged five separate categories of information which they contended should be classified as trade secrets. Over the course of four days, the parties presented evidence and testimony at a preliminary injunction hearing, resulting in a 741-page transcript. The ruling which followed that hearing decided, *inter alia*, that Plaintiffs had established that the chemical technologies and processes developed by AAR related to Choline Chloride and Hydrogen Peroxide should be classified as trade secrets.[144] The Court maintained that finding throughout its next two rulings on dispositive motions.[145] However, despite the existence of trade secrets, the Court ultimately found that there had been no "misappropriation" thereof, given that Plaintiffs failed to establish "improper means," on the part of any defendant, as those terms are defined in the relevant statutes.[146] While it was and remains clear to the Court that Plaintiffs failed to establish misappropriation, it is equally clear that these parties arrived at this lawsuit amidst a tangled web of overlapping business interests, complicated multi-layered interrelationships, and communication failures. Those elements are reiterated

---

[143] *Id.* (quoting *Lipsig v. National Student Marketing Corp.*, 663 F.2d 178, 181 (D.C. Cir. 1980)).
[144] Rec. Doc. 123, p. 17.
[145] Rec. Docs. 191, p. 16; and 233, p. 29.
[146] Rec. Docs. 191, pp. 16-19; and 233, pp. 29-36.

throughout this ruling. In consideration thereof, after applying the above-cited legal principles, the Court cannot find that Plaintiffs' instituted or maintained their claims under the DTSA or the LUTSA in bad faith. Accordingly, the claims for attorney's fees are denied.

## CONCLUSION

For the reasons fully explained above, the Motions for Summary Judgment on the Pleadings, pursuant to Federal Rules of Civil Procedure 56 and 8(b)(6), filed by David Trahan, Ben Davis, Chem Advances, LLC, Cypress Technologies, LLC, and Tarrytown Ventures, LP [Rec. Doc. 180], and Wayne Cutrer and Downhole Chemical Solutions, LLC [Rec. Doc. 178], are hereby DENIED.

IT IS FURTHER ORDERED that Counterclaim Two, brought by Chem Advances, LLC, and Counterclaim One, brought by Wayne Cutrer and Downhole Chemical Solutions, LLC, both of which seek declaratory judgment, are hereby DISMISSED WITHOUT PREJUDICE for lack of an actual controversy.

IT IS FURTHER ORDERED that Counterclaim Four, for judicial dissolution, brought by David O. Trahan, Cypress Technologies, LLC, Ben D. Davis and Tarrytown Ventures, LP, is hereby DISMISSED WITHOUT PREJUDICE as moot.

Signed at Lafayette, Louisiana on this 18th day of March, 2019.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE